**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS**

ACA INTERNATIONAL,

               Plaintiff,

     v.

MAURA HEALEY, IN HER OFFICIAL
CAPACITY AS MASSACHUSETTS
ATTORNEY GENERAL

               Defendant.

Civil Action No. 20-10767

## <u>COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF</u>

Plaintiff ACA International, the Association of Credit and Collection Professionals, a

Minnesota nonprofit corporation ("ACA"), for its Complaint for Declaratory and Injunctive

Relief against Defendant Maura Healey in her official capacity as Massachusetts Attorney

General, alleges as follows:

## <u>PARTIES</u>

1.　　ACA is a Minnesota nonprofit corporation with offices in Washington, D.C., and

Minneapolis, Minnesota.  Founded in 1939, ACA represents more than 2,300 members,

including third-party collection agencies, law firms, creditors, asset-buying or debt-buying

companies, and vendor affiliates.  ACA provides a wide variety of products, services, and

publications, including educational and compliance-related information; and articulates the value

of the credit-and-collection industry to businesses, policymakers, and consumers.  ACA's

primary purpose is to promote and maintain the highest standards of professionalism in the

credit-and-collection industry.  To that end, ACA represents its members' interests in the

legislative and regulatory processes and addresses regulatory issues that are critical to members'

success.

2.      ACA's membership includes members located in Massachusetts who own and/or collect debt in Massachusetts—including at least one law firm—as well as other attorney members located in Massachusetts.  ACA's membership also includes members located outside of Massachusetts who own and/or collect debt in Massachusetts. (ACA's membership additionally includes members located outside of Massachusetts that own and/or collect debt in other states and in other parts of the world.)  ACA has members both within and outside Massachusetts who have relationships with the state; these include first-party creditors, debt buyers, and collections agencies

3.      Defendant Maura Healey, sued in her official capacity, is the Attorney General of the State of Massachusetts.

## JURISDICTION AND VENUE

4.      This action arises under the United States Constitution, Amendments One, Five, and Fourteen, and the Massachusetts Administrative Procedures Act, M.G.L. c. 30A, § 7.

5.      Federal question jurisdiction lies in this Court pursuant to 28 U.S.C. §§ 1331 and 343(a)(3).

6.      Diversity jurisdiction lies in this Court pursuant to 28 U.S.C. § 1332.  Plaintiff and Defendant are citizens of different states:  Plaintiff is a citizen of Minnesota; Defendant is a citizen of Massachusetts.  And the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.  "Courts have repeatedly held that the value of the matter in controversy is measured not by the monetary judgment which the plaintiff may recover but by the judgment's pecuniary consequences to those involved in the litigation." *Richard C. Young & Co., Ltd. v. Leventhal*, 389 F.3d 1, 3 (1st Cir. 2004).  Thus, "[i]n actions seeking declaratory or injunctive relief, it is well established that the amount in controversy is measured by the value of

the object of the litigation." *Hunt v. Wash. Apple Adver. Com'n*, 432 U.S. 333, 347 (1977).  The

value of the object of this litigation exceeds the sum of $75,000 to ACA individually.  And

independently, it exceeds the sum of $75,000 to ACA's members who are directly impacted by

the Regulation.

7.      Venue lies in this District pursuant to 28 U.S.C. § 1391(b)(1), (2), and (3) because

Defendant resides in this District, performs her official duties in this District, and a substantial

part of the events or omissions giving rise to this action occurred in this District.

## FACTUAL ALLEGATIONS

8.      On March 26, 2020, the Massachusetts Attorney General ("AG") issued 940

CMR 35.00, Unfair and Deceptive Debt Collection Practices During the State of Emergency

Caused by COVID-19 (the "Regulation").

### The Regulation.

9.      The Regulation, 940 CMR 35.00, *et seq.*, attached as Exhibit A, became effective

upon filing on March 26, 2020.  *See* Guidance, attached hereto as Exhibit B, at 1.[1]  It states that it

will remain in effect for 90 days (i.e., until June 24) or until 30 days after Massachusetts lifts its

state of emergency,[2] whichever comes first.  *See* 940 CMR 35.03(1), 35.04(1).[3]

---

[1] The Attorney General's Office issued Guidance in Response to Frequently Asked Questions Concerning 940 CMR 35.00, on April 3, 2020.

[2] The Massachusetts Governor declared the state of emergency on March 10, 2020.  It will remain in effect until the Governor issues a notice lifting it.  Mass. Exec. Order No. 591: *Declaration of a State of Emergency to Respond to COVID-19.*

[3] Section 35.05(2) imposes a different effective period whenever any provision in the new regulation is "determined to be specifically inconsistent with any provision of 940 CMR 7.00." In that case, the provision governs the conflict "during the State of Emergency Period"—i.e., until 30 days after the state of emergency ends.  This period may end later than the period prescribed in §§ 35.03 and 35.04.  This may raise questions over how long any given provision remains in effect.

10.     Regarding its purported compliance with M.G.L. c. 30A,[4] the Regulation states

that that AG issued it on an emergency basis, because "[i]nfections caused by a new

coronavirus—Coronavirus Disease 2019 (COVID-19)—have caused substantial economic and

medical hardship for the residents of the Commonwealth."  It continues:

> To prevent further spread of the disease, Massachusetts residents have largely
> been required to stay at home, and many have lost employment or income as a
> direct or indirect result. Those who have contracted the disease caused by
> COVID-19 can suffer a severe and prolonged illness and must be quarantined for
> a substantial period of time. The prevalence of the virus has placed an enormous
> strain on the Commonwealth's medical professionals and medical facilities.
> Accordingly, the Governor of Massachusetts declared a State of Emergency on
> March 10, 2020, by means of Executive Order No. 591: Declaration of State of
> Emergency to Respond to COVID-19.
>
> Under the present circumstances, certain practices by creditors and debt collectors
> are unfair and deceptive and violate the Massachusetts Consumer Protection Act,
> M.G.L. c. 93A. Pursuant to the Attorney General's authority to issue regulations
> interpreting c. 93A, the Attorney General's Office (AGO) adopts and issues the
> following regulations, 940 CMR 35:00, Unfair and Deceptive Debt Collection
> Practices During the State of Emergency Caused by COVID-19. Because the
> economic and medical crisis faced by Massachusetts residents is acute and
> continues to escalate, the AGO issues these regulations on an emergency basis.
> The AGO finds that the immediate amendment of 940 CMR 35:00 is necessary
> for the preservation of the public health, safety and general welfare, and that
> observance of the requirements of notice and a public hearing set forth in M.G.L.
> c. 30A, sec. 2, would be contrary to the public interest.

11.     For its "Authority," the Regulation states that "940 CMR 35.00 is issued pursuant

to M.G.L. c. 30A, §§ 2 and 3, and M.G.L. c. 93A, sec. 2."

12.     For its "Purpose and Scope," the Regulation states that "[t]he purpose of 940

CMR 35.00 is to provide emergency regulations to protect consumers from unfair and deceptive

debt collection practices during the State of Emergency declared by the Governor of

Massachusetts on March 10, 2020 pursuant to Executive Order No. 591: Declaration of State of

Emergency to Respond to COVID-19."

---

[4] M.G.L., c. 30A is the Massachusetts Administrative Procedures Act.

13.     Section 35.04, entitled "Prohibition on Debt Collection Telephone Calls with

Regard to Debt Collectors Only," provides that:

> For the ninety (90) days following the effective date of this regulation or until the State of Emergency Period expires, whichever occurs first, it shall be an unfair or deceptive act or practice for any debt collector to initiate a communication with any debtor[5] via telephone, either in person or by recorded audio message to the debtor's residence, cellular telephone, or other telephone number provided by the debtor as his or her personal telephone number, provided that a debt collector shall not be deemed to have initiated a communication with a debtor if the communication by the debt collector is in response to a request made by the debtor for said communication.

14.     Section 35.04, which applies only to debt collectors, does not treat all debt

collectors equally.  The term "debt collector" is defined in § 35.02 to mean:

> any person or business whose principal purpose is the collection of a debt,[6] or who regularly collects or attempts to collect, directly or indirectly, a debt owed or due or asserted to be owed or due another. The term debt collector shall also include any person who buys or acquires debt that is in default at the time of purchase or acquisition and who seeks to collect such debt. The term debt collector shall include a creditor who, in the process of collecting his own debt, uses any name other than his own which would indicate that a third person is collecting or attempting to collect the debt. The term debt collector shall also include a person in a business the principal purpose of which is the enforcement of security interests.

15.     But six classes of collectors are specifically excluded from the definition of "debt

collector":

---

[5] The term "[d]ebtor" is defined in § 35.02 to "share the same meaning as defined in 940 CMR 7.03."  That section defines the term to "mean[] a natural person, or his or her guardian, administrator or executor, present or residing in Massachusetts who is allegedly personally liable for a debt."

[6] The term "[d]ebt" is defined in § 35.02 to "share the same meaning as defined in 940 CMR 7.03."  That section defines the term to

> mean[] money or its equivalent which is, or alleged to be, more than 30 days past due and owing, unless a different period is agreed to by the debtor, under a single account as a result of a purchase, lease, or loan of goods, services, or real or personal property, for personal, family or household purposes or as a result of a loan of money which is obtained for personal, family or household purposes whether or not the obligation has been reduced to judgment.

[d]ebt collector shall not include:

(a) an officer or employee of a creditor that is not itself a debt collector, while, in the name of such creditor, collecting debts for such creditor;

(b) a person while acting as a debt collector for another person, both of whom are related by common ownership or affiliated by corporate control, if the person acting as a debt collector does so only for a person to whom it is so related or affiliated and if the principal business of the person is not the collection of a debt;

(c) an officer or employee of the United States or a state of the United States to the extent that collecting or attempting to collect a debt is in the performance of his official duty;

(d) a person while serving or attempting to serve legal process on another person in connection with the judicial enforcement of a debt;

(e) a nonprofit organization which, at the request of a consumer, performs bona fide consumer credit counseling and assists the consumer in the liquidation of debts by receiving payments from the consumer and distributing the amounts to creditors; and

(f) a person collecting or attempting to collect a debt owed or due or asserted to be owed or due another to the extent the activity (i) is incidental to a bona fide fiduciary obligation or a bona fide escrow arrangement; (ii) concerns a debt which was originated by the person; (iii) concerns a debt which was not in default at the time it was obtained by the person; or (iv) concerns a debt obtained by the person as a secured party in a commercial credit transaction.

940 CMR 35.02 (definition of "[d]ebt collector," (a)-(f)).

16.     These exclusions of certain debt collectors in § 35.02 are not contained within the AG's existing debt collection regulations, 940 CMR 7.03.

17.     Section 35.04 also does not treat all communications equally either.  The term "[c]ommunication or [c]ommunicating" is defined in § 35.02 to "share the same meaning as defined in 940 CMR 7.03."  That section defines the term to mean "conveying information directly or indirectly to any person through any medium excluding non-identifying communications."

18.     But just as § 35.04 does not treat all "debt collectors" equally, § 35.04 does not treat all "communications" equally:

> this section shall not apply to communications initiated solely for the purpose of informing a debtor of a rescheduled court appearance date or discussing a mutually convenient date for a rescheduled court appearance

> [and]

> . . . this section shall not apply to (a) any attempt to collect a debt which is, or is alleged to be, owing as a result of a loan secured by a mortgage on real property; or (b) any attempt to collect a debt that is, or is alleged to be, owing by a tenant to an owner, as those terms are defined by 940 CMR 3:01.

940 CMR 35.04(2)-(3).

19.     Section 35.03, entitled "Prohibition on Debt Collection Activity with Regard to All Creditors, Including Debt Collectors," provides that:

> For the ninety (90) days following the effective date of this regulation or until the State of Emergency Period expires, whichever occurs first, it is an unfair or deceptive act or practice for any creditor, including a debt collector, to:

>> (a) initiate, file, or threaten to file any new collection lawsuit;

>> (b) initiate, threaten to initiate, or act upon any legal or equitable remedy for the garnishment, seizure, attachment, or withholding of wages, earnings, property or funds for the payment of a debt to a creditor;

>> (c) initiate, threaten to initiate, or act upon any legal or equitable remedy for the repossession of any vehicle;

>> (d) apply for, cause to be served, enforce, or threaten to apply for, cause to be served or enforce any capias warrant;

>> (e) visit or threaten to visit the household of a debtor at any time;

>> (f) visit or threaten to visit the place of employment of a debtor at any time; and

>> (g) confront or communicate in person with a debtor regarding the collection of a debt in any public place at any time.

940 CMR 35.03(1).

20.     Section 35.03, which applies to both creditors and debt collectors, also does not treat all debt collectors equally.  In defining the term "'[c]reditor' as used herein," it states that it "shall share the same meaning as defined in 940 CMR 7.03" and that "[f]or the avoidance of doubt, the term creditor shall include debt collectors as defined herein."  Section 7.03 defines the term "[c]reditor" to

> mean[] any person and his or her agents, servants, employees, or attorneys engaged in collecting a debt owed or alleged to be owed to him or her by a debtor and shall also include a buyer of delinquent debt who hires a third party or an attorney to collect such debt provided, however, that a person shall not be deemed to be engaged in collecting a debt, for the purpose of 940 CMR 7.00, if his or her activities are solely for the purpose of servicing legal process on another person with the judicial enforcement of a debt.

Section 35.03 uses the same definition of "debt collector" as § 35.04.

21.     Just as § 35.04 does not treat all speakers equally, § 35.03 does not treat all petitioners equally:

> this Section shall not apply to any attempt to collect a debt which is, or is alleged to be, owing as a result of a loan secured by a mortgage on real property, or to any attempt to collect a debt that is, or is alleged to be, owing by a tenant to an owner, as those terms are defined by 940 CMR 3:01.

940 CMR 35.04(2).[7]

22.     Section 35.05, entitled "Relation to Other Law and Regulations," provides that the Regulation "does not exempt any person from complying with existing laws or rules of professional conduct with regard to debt collection practices," and that "[t]his emergency regulation is intended to supplement 940 CMR 7.00 [and] "temporarily replace the provisions of

---

[7] Section 35.03 also provides in Section 35.03(3) that "Paragraph 1(e) of this Section [the prohibition against visiting the household of a debtor] shall not apply to telephone, gas, and electric utility companies regulated by M.G.L. c. 164 and the Department of Public Utilities or the Department of Telecommunications and Cable."

940 CMR 7.00 during the State of Emergency Period" to "the extent that any provision of 940

CMR 35.00 is determined to be specifically inconsistent with any provision of 940 CMR 7.00[.]"

**The Regulation's Effects on ACA, Its Members, and the Public Interest.**

**ACA**

23.     The Regulation has inflicted upon ACA concrete, particularized, actual and

imminent harm in several ways. They include the need to divert from existing duties dozens of

hours of ACA staff time and other company resources to help members understand the

Regulation and to develop internal compliance materials, including an FAQ resource, to educate

members and help members achieve early compliance prior to the release of the Clarifying

Guidance.  As detailed below and in the ACA member declarations submitted herewith, ACA

members are reporting that they are seeing a decline in their revenues due to the Regulation, and

that these declines are endangering their businesses.  By jeopardizing members in this manner,

the Regulation poses an imminent threat to ACA's membership levels and revenues from

membership dues.

24.     ACA members have also been directly harmed by the Regulation, which prohibits

their affirmative efforts to contact consumers via telephone yet effectively requires them to keep

their doors open and staff employed to respond to consumer inquiries and disputes. In just the

two weeks since the Regulation was promulgated, ACA has heard from members with

Massachusetts operations that receipts were down between 20% and 50%, which has forced

some members to lay off employees in order to reduce costs.  If the Regulation is left in effect,

those declined revenues could eventually force these members out of business.

25.     In addition to the ACA declaration, ACA is submitting declarations from three of

its members.  These declarations demonstrate the kinds of harms that the Regulation has already

caused to ACA's members.

26.     The ACA member declarations explain that 940 CMR 35.04's calling prohibitions have required ACA members that have relationships with Massachusetts consumers to largely (if not completely) cease their affirmative efforts to communicate with Massachusetts consumers regarding their financial accounts.  As the members explain, this limitation has caused significant economic harm and, indeed, poses a potential existential threat to some of the affected members' businesses.  Additionally, the very basis of the Regulation—that any and every call initiated by a debt collector in the first instance during the COVID-19 public health emergency constitutes an "unfair or deceptive practice"—not only unfairly exposes debt collectors to the risk of suit for engaging in innocent and even helpful conduct to consumers but also inflicts industrywide reputational harm on ACA and its members.

27.     Section 35.04 also deprives ACA's members of their right to free speech guaranteed by the First Amendment of the United States Constitution by unlawfully banning their truthful, innocent, and even helpful commercial speech.  This too causes immediate, actual, concrete, and particularized harm to ACA's members.

28.     In light of these injuries, each of ACA's members who are directly subject to the Regulation would have standing to sue Defendant in its own right.

29.     The Regulation also injures the public and the interests that the Regulation purportedly protects.  For example, telephone calls are sometimes the preferred method of communication that is convenient to a consumer and are sometimes the exclusive method that is available.  By prohibiting ACA members from initiating calls to consumers, the Regulation largely blocks members from providing them with the best possible resolutions.  Examples of such resolutions include temporary hardship repayment plans that may provide a variety of options for deferring payments or determining longer-term payment plans tailored to individual

consumer situations where income has been interrupted for any reason.  This is especially true for those with COVID-19 or those on the front lines battling this epidemic.

30.     ACA members are well-trained, compassionate professionals who understand well how to communicate with consumers, especially those who are facing financial challenges. They are well-versed in deploying "hardship" programs and resources to assist consumers in making arrangements that best suit their individual financial situation during an emergency. Such programs are tailored to individual consumer needs and can range from temporary payment modifications and deferrals to longer-term repayment plans.  Among other training assistance, ACA offers its members crisis management, financial literacy educational materials, and other information regarding community assistance which may be available to consumers.

31.     ACA members routinely work with consumers and their creditor-clients to exhaust all options before resorting to litigation and to honor crisis-related requests to forbear on existing legal remedies during national or state-specific emergencies.

32.     In other words, ACA and its members play a vital role in helping consumers resolve financial issues so that they can maintain and restore access to affordable credit and services and be in control of their financial future.  When ACA's members cannot readily reach consumers, creditors may be forced to engage in litigation or garnishment proceedings rather than engage in a conversation with a collector which can help them understand their various options to resolve their legally owed debts.

33.     ACA and its members are uniquely qualified—especially in times of crisis—to ensure the general welfare of the public by developing and offering creative hardship solutions for consumers and unique assistance to help clients lessen communication burdens.  Moreover,

as detailed below, ACA members preserve public health and safety by assisting the very healthcare industries servicing the public.

34.     Based on conversation with its members, ACA has learned that many consumers who may either be furloughed or working from home now have more time to deal with their delinquent accounts and in some cases may—for any number of reasons—have more money to allocate toward reduction of legally owed debt. Members have reported that complaints are down and compliments are up since the COVID-19 public health emergency began.  They have also reported that many consumers, when contacted by ACA members, have opted to spend their additional funds paying delinquent bills, as financial planners have been advising lately. See The Washington Post, "The $1,200 stimulus checks are arriving. People are mostly spending them on food" (reporting that "[f]inancial planners have urged people to use the [stimulus] money to buy basic necessities or pay off debt, which should help relieve pressure if someone loses a job.") https://www.washingtonpost.com/business/2020/04/14/1200-relief-checks-have-begun-arriving-bank-accounts-people-are-mostly-spending-it-food/ (accessed Apr. 17, 2020) (emphasis added).

35.     Without question, the payment of just debts on voluntary terms reduces needless litigation.  Collectors and creditors prefer voluntary resolutions because they are usually faster, more predictable, and private. In addition, voluntary resolutions avoid attorney fees and typically maintain the goodwill of the consumer.  Consumers benefit by avoiding litigation.  Indeed, when discussing a debt with a collector, consumers can learn about a variety of options to resolve their past-due accounts, including payment deferral, extended payment plans, or other financial assistance—any of which the consumer may prefer to litigation.  The Regulation stifles these productive communications, thereby increasing the likelihood of a collection lawsuit eventually

being filed against the consumer.  And in the time that passes before the filing of a collection lawsuit, interest continues to accrue increasing the amount of debt owed.

36.     In addition, the Regulation's denial of constitutional rights guaranteed by the First Amendment of the United States Constitution by unlawfully banning ACA's members who are directly subject to the Regulation of the right to petition the courts causes the members and ACA immediate, actual, concrete, and particularized harm.

37.     The claims and relief requested in this lawsuit do not require participation of individual ACA members because the members who are subject to the Regulation will benefit similarly from a favorable decision in this case, as would the consumers that the ACA members wish to help.

38.     A decision in this case favorable to ACA will redress the injury to ACA and its members because, among other things, it will protect against further constitutional infringement and will relieve ACA's members of the costs imposed by the Regulation, permitting them to operate in a manner that respects their relationship with each individual consumer.

39.     Injunctive relief will also help consumers who wish to pay their debts or who would benefit from hardship programs by redressing the harm that the Regulation has caused to them by prohibiting ACA's members from communicating with them in order to work out delinquent obligations and thereby prevent further economic hardships where possible. In the process, it will also eliminate needless litigation over unpaid bills.  Following the enactment of new debt collection regulations in 2015, in New York State, collections lawsuit filings rose 32% in 2018 and 61% in 2017 from pre-2015 levels. Yuka Hayashi, Debt collectors wage comeback, WALL STREET JOURNAL, July 5, 2019 (crediting New Economy Project, a consumer advocacy group).

40.     Many of ACA's members are directly subject to the Regulation because they own debt owed by Massachusetts consumers, collect debt owed by Massachusetts consumers, and/or are attorney members located in Massachusetts.  The Regulation exposes these members— including those who may be unaware of it due to the lack of a notice and comment opportunity— to the potential of liability and sanctions, and it undermines ACA's mission and its members' missions; threatens to label ACA's members as unlawful unfair and deceptive actors; and infringes upon ACA members' constitutional rights, all without sufficient notice before ACA's members are deprived of their good names, reputations, honor, standing, and associations in the community.

**ACA Member Action Collection Agencies, Inc.**

41.     For example, Action Collection Agencies, Inc. d/b/a Action Collection Agency of Boston ("ACAI") is an ACA member.  It was founded in April of 1967 in Boston, providing collection services to Massachusetts hospitals, healthcare providers, and utility companies throughout the state.  It was among the very first collection agencies licensed and has been continuously operated since that time.

42.     Over ACAI's 53-year tenure, it has come to specialize in medical collections, and it provides third-party collection services to a significant number of Massachusetts' healthcare systems, including some of its largest.  Massachusetts healthcare providers make up a significant percentage of its business.  In 2019, of the company's total bad-debt revenue of $2,930,482, $1,989,139 — or over 74% — was represented exclusively by Massachusetts consumers.  These consumers' accounts were not purchased and are not owned by ACAI, but were rather assigned to ACAI by its clients for follow-up on average at 120 days or more past due, with many being delinquent for close to a year.

14

43.     The Regulation has inflicted upon ACAI concrete, particularized, actual, and imminent harm by requiring it to expend internal and external resources, time, and money to comply. For example, the cost of a collection letter is approximately $0.64, as opposed to a telephone call, which on average is less than $0.10.  In addition, it has had to develop a special COVID-19 letter.  Prior to its deployment, it had to have the letter reviewed by an attorney specializing in the Fair Debt Collection Practices Act, and 940 CMR 7.0 and 940 CMR 35.04. The letter then had to be programmed by IT and the letter vendor to be placed into circulation. Moreover, ACAI finds that in addition to being six times as expensive, letters are not nearly as effective as telephonic communication, and that the usual telephone call-to-letter ratio per account over standard account life cycle is roughly 24:1.

44.     In addition to the costs associated with transitioning to lettering instead of outbound calling, ACAI is experiencing the opportunity cost and resulting lost revenue due the reduced effectiveness of letter-only collections.  ACAI finds that letters rarely yield collection results for a large proportion of the accounts in inventory and are largely used to convey the consumers' rights under federal and state law.  For example, the initial letter is comprised largely of the "validation notice," which informs consumers that they have been placed with a collection agency and of their rights to have the debt validated under the FDCPA, as well as, in the case of Massachusetts residents, Notice of Important Rights, which is the right not to be contacted at their place of business.  ACAI finds that, in general, letters do very little to effect payment on an account; that requires telephone communication. Even then, ACAI finds, most collection agencies liquidate a very small percentage of the accounts assigned to them, so eliminating the most effective collection tool in favor of the least effective one exacerbates the problem. ACAI's monthly bad debt revenue through mid-April was down by over 30% as compared to

March, and this shortfall is increasing daily.  ACAI has already have been forced to lay off about 20% of its staff and finds that the Regulation is likely to cause even more reductions.

45.     ACAI further finds that the stellar reputation that it has built, which derives from its blend of professionalism, sensitivity, and strong results, and which commands a great deal of competitive respect and, consequently, market share, is being significantly impacted by the Regulation.  It finds that the Regulation will not only significantly impact its ability to maintain that competitive advantage, but threatens its very existence and the jobs of all its remaining thirty-five employees.

46.     ACAI further finds that in the case of its medical provider clients, it provides information about charity care and other health care programs for which distressed consumers may be eligible.   And since the Governor's Emergency Order, it finds that it has had highly productive and exceptionally positive telephone interactions with consumers in which they have indicated their appreciation for the understanding, compassion, and forbearance that ACAI has extended—but that is not possible except over the telephone.

47.     ACAI further finds that the Regulation will harm the economy.  Numerous studies have shown that the debt-collection industry, which is largely comprised of small businesses (most of which are "Mom and Pop" operations with under 25 employees) benefits other small businesses by returning to them billions of dollars by performing functions those small businesses are simply not equipped to do themselves.  ACAI finds that the calling restrictions within will severely hamper that ability as well.

**ACA Member Peter Roberts & Associates, Inc.**

48.     Peter Roberts & Associates, Inc. ("PRAI") is another ACA member.

49.     PRAI was established in 1997, and specializes in the collection of consumer debt. The company has conducted operations from its main location in Milford, MA throughout its history and currently employs 21 individuals.

50.     The majority of clients that PRAI serves are healthcare providers needing assistance with the collection and management of their delinquent accounts receivable.  PRAI utilizes a customer service approach with patients, working together to establish payment arrangements, identify and untangle third party payer issues and discuss credit related matters. Approximately eighty percent of PRAI consumer contacts are conducted within the Commonwealth of Massachusetts on behalf of its health care clients.  Such balances include patient co-pays, deductibles and co-insurance.  PRAI prides itself on its well-trained collection staff, averaging between 5-10 years' experience with the company.  The preservation of the clients' goodwill and respect for all consumers is paramount throughout company's operation.

51.     The Regulation has inflicted upon PRAI concrete, particularized, actual and imminent harm by requiring PRAI to expend resources, time and money.  Like most professional collection agencies, PRAI relies on the use of the telephone to communicate important information to consumers.  PRAI finds that the use of the telephone provides a streamlined and effective method for the back and forth communication necessary to resolve issues.  It finds that written collection notices, approved under the company's error and omissions insurance program, can be effective but are limited in scope.   It further finds that it is burdensome in terms of both time and expense to attempt to communicate effectively through the use of outgoing collection notices as the primary means of contact.

52.     PRAI's revenue declined over 36% for the month of March 2020 when compared to the same month in the prior year.  As of mid-April, April's revenue is declining for PRAI at a

rate of 50% when compared to the same month in the prior year.  The lack of ability to communicate with Massachusetts consumers via telephone is negatively impacting the company's revenues.  PRAI finds that communication with Massachusetts consumers has become a cumbersome process by way of relying on incoming calls generated from letters sent or incoming email which must be reviewed and distributed to the appropriate associate.  PRAI by nature has been conservative with its means of consumer contact, avoiding the use of email and texts as outgoing means of communication.  PRAI finds that the breakdown in communication caused by the Regulation has frustrated consumers by making communication a more difficult process.

53.     PRAI finds that collection associates regularly receive praise from consumers for their willingness to listen, their integrity and for the empathy they display during their telephone conversations.  It finds that the Regulation's "one size fits all" call banning approach works directly against PRAI's reputation as an agency with professional collection associates that employ high ethical standards as part of their craft.   In fact, PRAI finds that it has received more feedback from frustrated consumers since the Regulation and the communication juggernaut it has created.

54.     PRAI finds that the implementation of the Regulation has created a ripple effect with PRAI's health care clients.  The company's sole largest client, accounting for approximately 13% of 2019 total revenues has ceased placing accounts until further notice. The client informed PRAI that, after learning about the Regulation, the decision was made to suspend further placements until telephone calling could resume.  The stoppage in placements for such a large volume client has placed significant financial strain on the company and its ability to keep collection associates busy with adequate levels of accounts to work.

55.     PRAI finds the implementation of the Regulation and its language to be offensive and damaging—specifically, its language under 35.01 (2): "to protect consumers from unfair and deceptive collection practices during the State of Emergency." PRAI's actions are not deceptive or misleading. PRAI has a 22-year history of demonstrating compliance and integrity in all aspects of its operation. PRAI has received the highest rating assigned on each and every exam conducted by the Massachusetts Division of Banks throughout its history.

56.     PRAI finds that the Regulation has cast a shadow over well run and respected debt collection companies like PRAI by painting a picture that all such companies, through affiliation, are presumed to be unfair and deceptive. And that the Regulation unnecessarily punishes and harms the reputation of professional debt collection companies like PRAI.

**ACA Member All Debt Solutions, Inc.**

57.     All Debt Solutions, Inc. ("ADSI") has been in business here in the Commonwealth of Massachusetts for 4 years; its President has been in the Collection Industry for 28 years and has owned agencies for 20 of those years. He has interacted with Massachusetts Consumers very fairly and congenially for almost 3 decades.

58.     ADSI finds that consumers and its creditor clients both heavily rely on it to keep communication and money exchanging smoothly.

59.     The Regulation has inflicted upon ADSI concrete, particularized, actual and imminent harm by requiring ADSI to expend resources and time, and to make uprooting adjustments to its staff and clientele. ADSI estimates that it will lose 60 to 70% of its revenue as a result of the Regulation. ADSI finds that if it survives, its creditor clients, who are mostly small businesses, will suffer by not receiving the monies they have come to expect through its services.

60.     With regard to 940 CMR 35.04, as a company with hundreds of small business clients, ADSI finds that it is letting them down by not being able to perform their jobs. Professional debt collectors like ADSI are trained regularly to communicate with consumers during economic, health, and other crises.  ADSI finds that preventing communication is not helping consumers, but rather is doing the opposite.

61.     ADSI finds that the Regulation may cripple and annihilate it.  ADSI's employees work 60 to 70% within the Commonwealth of Massachusetts.  Without work in the Commonwealth, ADSI's President finds that he will be forced to eliminate those positions, and that the small business clients that ADSI represents will also incur actual harm due to lack of payments.

62.     In ADSI's experience, consumers expect to hear from it.  Many of its clients are in the medical or dental field, and are amongst the last to be paid. Consumers place these creditors on the bottom of the "to be paid pile".  ADSI finds that without it calling the consumers and working with them to sort out a payment plan, it remains unresolved, open, and becomes a credit risk, and possibly a lawsuit action that should have been avoided by open dialogue.

63.     ADSI finds the Regulation to operate as an essential "gag order", which prevents communication between the consumer and agent of the creditor.  ADSI finds that a consumer is not enlightened by lack of communication.  To ADSI, a pandemic is a nightmare in which we are in it all together.  And that the last thing to halt during a crisis is communication; and all ADSI is trying to do is communicate.  ADSI's compassion, empathy, and assistance are front line during these times, and the Regulation is barring what would be its efforts to extend these vital professionally held attributes, and help consumers and creditors communicate amidst the most tumultuous health and economic time of our lives.

**Massachusetts Courts Remain "Open" – But No one Has to Go in Person.**

64.     There is no requirement that anyone leave their home to go to court for the

litigation of a collections action during the period of the declared COVID-19 emergency.  At the

state level, on April 6, 2020, Massachusetts's highest court, the Supreme Judicial Court ("SJC"),

announced an emergency order to be immediately effective that:

> Until May 4, 2020, all the courts of the Commonwealth will be open to conduct
> business, but courthouses will be closed to general public, except where entry is
> required to address emergency matters that cannot be resolved virtually (i.e. by
> telephone, videoconference, email, or comparable means, or through the
> electronic filing system) because it is not practicable or would be inconsistent
> with the protection of constitutional rights. . . .

A copy of the SJC Order is attached hereto as Exhibit C, available at

https://www.mass.gov/doc/supreme-judicial-court-order-regarding-court-operations-under-the-

exigent-circumstances-created/download (accessed Apr. 20, 2020).

65.     "In accordance with the Supreme Judicial Court Order, effective April 6, 2020,

Trial Court Chief Justice Paula M. Carey has issued Trial Court Emergency Administrative

Order 20-7 to address court operations under the exigent circumstances created by the COVID-

19 pandemic."  Press Release, Trial Court and Trial Court Departments Issue Orders Concerning

Court Operations and Implementation of Supreme Judicial Court Decision, April 6, 2020,

attached hereto as Exhibit D, available at https://www.mass.gov/news/trial-court-and-trial-court-

departments-issue-orders-concerning-court-operations-and (accessed Apr. 20, 2020).  The Press

Release states that "'[t]he emergency administrative order helps to protect the public, our court

employees, and our justice partners from the COVID-19 pandemic by making sure that all

matters that can be heard virtually are heard without an in-person appearance and allows the

public in to Trial Court courthouses only with the express permission of a Regional

Administrative Justice or First Justice,' said Trial Court Chief Justice Paula Carey." *Id*. *See also* SJC Order at ¶ 5.

66.     A copy of Trial Court Emergency Administrative Order 20-7 is attached hereto as Exhibit E, available at https://www.mass.gov/doc/trial-court-emergency-administrative-order-20-7/download (accessed April 20, 2020).  It provides that "Massachusetts trial courts are open for emergency matters, but the courthouses are closed to the public." *Id*. § I.  It further provides that "all Massachusetts trial courts shall conduct all emergency matters as defined in the departmental standing orders virtually (i.e. by telephone, videoconference, email, or comparable means, or through the electronic filing system) without the physical presence of the parties, counsel, or other members of the public." *Id*.  It continues that "no in-person matters shall be conducted in any trial court unless a Regional Administrative Justice (RAJ) or First Justice determines that virtual resolution of the matter is not practicable or would be inconsistent with the protection of constitutional rights" and that "[e]ntry into a courthouse will be permitted only to those persons necessary to resolve such matters." *Id*.

67.     In addition, Boston Municipal Court Standing Order 4-20:  Limiting In-Person Appearances in Boston Municipal Courthouses to Emergency Matters, became effective April 6, 2020 and continues through May 4, 2020.   A copy is attached hereto as Exhibit F, available at https://www.mass.gov/doc/boston-municipal-court-standing-order-4-20-limiting-in-person-appearances-in-boston-municipal/download (accessed April 20, 2020).  And District Court Standing Order 3-20 Court Operations Under the Exigent Circumstances Created by COVID-19 (coronavirus), was issued on March 17, 2020, and will remain in effect until a subsequent order rescinds it.  A copy is attached hereto as Exhibit G, available at

https://www.mass.gov/doc/district-court-standing-order-3-20/download (accessed April 20, 2020).

68.    At the federal level, the United States District Court for the District of Massachusetts has issued a series of orders that are available on the court's website at http://www.mad.uscourts.gov/  Among other orders, the Court has issued a Public Notice, Public Access to Video and Teleconference Hearings, which notes that "[i]n light of the ongoing national emergency with respect to the coronavirus pandemic, the United States District Court for the District of Massachusetts has issued general orders supporting video and teleconferencing for civil and criminal hearings in accordance with the applicable statutes and rules of the Judicial Conference of the United States. . . ."  A copy of the Public Notice regarding Public Access is attached hereto as Exhibit H, available at http://www.mad.uscourts.gov/general/pdf/announce/033120%20Public%20Notice%20Public%20Access%20to%20video%20and%20teleconference%20Hearing-%20Coronavirus.pdf While the public clerk's office of the federal court remains open during regular business hours, its Clerk's offices public counters are closed.  *See* Public Notice, Visitor Restrictions, attached hereto as Exhibit I, available at http://www.mad.uscourts.gov/general/pdf/announce/041420%20Public%20Counter%20closed%20-%20Coronavirus.pdf  This Court may take judicial notice that the various judges of this District Court are routinely granting motions by the parties to appear telephonically, rather than in person, at hearings.

## CLAIMS FOR DECLARATORY AND INJUNCTIVE RELIEF

## COUNT I

## SECTION 35.04 IS INVALID BECAUSE IT VIOLATES THE FIRST AMENDMENT OF THE UNITED STATES CONSTITUTION

69.     Under the First Amendment to the United States Constitution, "Congress shall make no law . . . abridging the freedom of speech . . . ." The First Amendment applies to states through the Fourteenth Amendment.

70.     The First Amendment prohibits the states from restricting speech because of its message, its ideas, its subject matter, or its content. Such content-based restrictions are presumptively unconstitutional, and may be justified only if the government proves that they are narrowly tailored to serve only a compelling state interest.

71.     Section 35.04 is a content-based restriction because it applies to particular speech because of the topic discussed or the idea or message expressed. Section 35.04 on its face, and as applied, draws distinctions based on the message a speaker conveys.

72.     Independently, § 35.04 is content-based because it cannot be justified without reference to the content of the regulated speech, or it was adopted by the AG because of disagreement with the message the speech conveys.

73.     The AG cannot overcome the presumption of unconstitutionality that arises from a content-based restriction to establish that § 35.04 is narrowly tailored to serve compelling state interests. Section 35.04 therefore fails strict scrutiny review.

74.     Section 35.04 also fails an intermediate scrutiny review, which would apply only if the provision were found to be content-neutral (it is not content-neutral). The AG cannot overcome the presumption of unconstitutionality that arises where truthful and non-misleading expression will be ensnared along with fraudulent or deceptive commercial speech, and the AG

cannot demonstrate that § 35.04 serves a substantial state interest and is designed in a reasonable way to accomplish that end.  Section 35.04 fails intermediate scrutiny review for essentially the same reasons that it fails under strict scrutiny.

**COUNT II**

**SECTION 35.03 IS INVALID BECAUSE IT VIOLATES THE FIRST AMENDMENT OF THE UNITED STATES CONSTITUTION**

75.     Paragraphs 1-74 of Count I are incorporated here by reference as paragraphs 1-74 of Count II.

76.     Under the First Amendment to the United States Constitution, in addition to its freedom of speech and other protections, the Amendment provides that "Congress shall make no law . . . abridging . . . the right of the people . . . to petition the Government for a redress of grievances."  The right of access to the courts is but one aspect of the right to petition.  The First Amendment applies to states through the Fourteenth Amendment.

77.     Filing petitions in a court of competent jurisdiction and carrying out court-authorized relief cannot be deemed by the AG to be an unfair or deceptive act or trade practice. Entities who petition the government by seeking redress in court are immune from liability for such activity under the First Amendment.

78.     The AG lacks the authority to deem petitioning activity by creditors and debt collectors to be an unfair and deceptive act or practice subject to liability under Chapter 93A. The First Amendment forbids it.

**COUNT III**

**SECTION 35.03 IS INVALID BECAUSE IT IS BARRED BY THE MASSACHUSETTS ANTI-SLAPP LAW**

79.     Paragraphs 1-76 of Count II are incorporated here by reference as paragraphs 1-76 of Count III.

80.     Section 35.03 is barred by the Massachusetts anti-SLAPP statute, M.G.L. c. 231,

§ 59H, which protects parties from actions designed to chill petitioning activity—i.e., the

presumed result of any violation of § 35.03.

## COUNT IV

**SECTION 35.03 IS INVALID BECAUSE IT IS BARRED BY MASSACHUSETTS'
LITIGATION PRIVILEGE**

81.     Paragraphs 1-80 of Count III are incorporated here by reference as paragraphs 1-

80 of Count IV.

82.     Section 35.03 is barred by the Massachusetts litigation privilege, which affords

absolute immunity to statements by a party, counsel or witness in the institution of, or during the

course of, a judicial proceeding.

## COUNT V

**THE REGULATION IS INVALID BECAUSE IT VIOLATES THE DUE PROCESS
CLAUSE OF THE FOURTEENTH AMENDMENT OF THE UNITED STATES
CONSTITUTION**

83.     Paragraphs 1-82 of Count IV are incorporated here by reference as paragraphs 1-

82 of Count V.

84.     The due-process clause of the Fourteenth Amendment provides that ". . .  No state

shall . . . deprive any person of life, liberty, or property, without due process of law . . . ."

85.     The AG issued the Regulation as an emergency regulation on March 26, 2020.  It

became effective that same day.  *See* Guidance in Response to Frequently Asked Questions

Concerning 940 CMR 35.00, available at ttps://www.consumerfinancialserviceslawmonitor.com/

wp-content/uploads/sites/501/2020/04/Frequently-Asked-Questions-Regarding-the-Emergency-

Debt-Collection-Regulations.pdf.  The AG did not issue a public press release until the day after

the Regulation became effective.  *See* March 27 Press Release, available at

https://www.mass.gov/news/

ags-office-issues-emergency-regulation-to-protect-consumers-from-harmful-debt-collection

(viewed Apr. 17, 2020).

86.     The Regulation exposes ACA members—particularly those unaware of it due to a

lack of notice and comment—to the potential for liability and sanctions, in violation of their

rights under the due process clause.

87.     The Regulation undermines ACA's mission and its members' missions, threatens

to label members as unfair and deceptive actors, infringes upon constitutional rights, and

deprives them of sufficient notice before jeopardizing their good names, reputations, honor,

standing, and associations in the community, in violation of their rights under the due process

clause.

## COUNT VI

**THE REGULATION IS INVALID BECAUSE IT VIOLATES THE EQUAL PROTECTION CLAUSE OF THE UNITED STATES CONSTITUTION AND ART. 10 OF THE CONSTITUTION OF THE COMMONWEALTH OF MASSACHUSETTS**

88.     Paragraphs 1-87 of Count V are incorporated here by reference as paragraphs 1-

87 of Count VI.

89.     The equal protection clause of the Fourteenth Amendment provides that ". . . No

state shall . . . deny to any person within its jurisdiction the equal protection of the laws."

90.     Article 10 of the Massachusetts Constitution provides that "[e]ach individual of

the society has a right to be protected by it in the enjoyment of his life, liberty and property,

according to standing laws."  Although the phrase "equal protection of the laws" does not appear

in Article 10 of the Constitution of the Commonwealth, it raises the same constitutional

principle.

91.     The Regulation classifies certain persons as creditors and debt collectors (and even Massachusetts attorneys) who are seeking to collect certain kinds debts, and bars them from filing new collection lawsuits, enforcing court-ordered remedies, and from initiating certain types communications with consumers.  To varying extents, these prohibitions exempt various other creditor and debt collector persons.  By arbitrarily discriminating against those certain creditor and debt collector persons who are included, the Regulation deprives those included persons of the equal protection of the laws.

92.     The Regulation violates the Fourteenth Amendment's equal protection clause and Article 10 of the Massachusetts Constitution by facially providing for selective application and therefore enforcement, based upon an arbitrary classification.

93.     Independently, the Regulation violates the Fourteenth Amendment's equal protection clause and Article 10 of the Massachusetts Constitution by making an absolute and arbitrary selection of a class, independently of good reasons for making a distinction.

## COUNT VII

**SECTION 34.03 IS INVALID BECAUSE IT VIOLATES STATE LAW SEPARATION OF POWERS**

94.     Paragraphs 1-93 of Count VI are incorporated here by reference as paragraphs 1-93 of Count VII.

95.     Article 30 provides that each of the three governmental departments "shall never exercise" the powers of the others.   M.G.L.A. Const. pt. 1, art. 30.

96.     940 CMR 35.03 exercises a power of the state and federal courts to decide who may and may not file petitions and who may and may not carry out valid judicial orders for relief.

97.     By issuing § 35.03, the AG has impermissibly interfered with judicial functions in violation of Article 30 by purporting to (each subpart which follows is an independent and separate violation):

(A) restrict or abolish a court's inherent powers to permit the filing of new petitions, and to issue orders for relief on existing petitions;

(B) to decide cases by unilaterally restricting petitioners from filing new collections lawsuits in the courts;

(C) barring petitioners from seeking relief that is available to the petitioners at law or in equity as determined by the courts;

(D) unilaterally reversing, modifying or contravening court orders for certain relief;

(E) interfering with court orders being carried out; and by

(F) interfering with the inherent powers of the courts are those whose exercise is essential to the function of the judicial department, to the maintenance of its authority, or to its capacity to decide cases.

98.      Section 35.03 also encroaches on the jurisdictional powers of federal courts. Federal district courts have jurisdiction over consumer debt-collection actions when the amount in controversy exceeds $75,000 and complete diversity of the parties exists.  28 U.S.C. § 1332(a).  States may not alter this jurisdiction—only Congress can do that.

99.     Section 35.03 effectively redefines the jurisdiction of the federal courts by closing the federal courthouse doors to certain disfavored creditors and debt collectors whose consumers reside in Massachusetts.  It also overrides valid orders of the federal courts by barring those

creditors and debt collectors from pursuing judicially-prescribed remedies contained in valid federal-court orders.

100.     Section 34.03 accordingly violates the separation-of-powers clause found in Article 30 of the Declaration of Rights of the Massachusetts Constitution.

## COUNT VIII

**THE REGULATION IS INVALID BECAUSE IT EXCEEDS THE MASSACHUSETTS ATTORNEY GENERAL'S AUTHORITY**

101.     Paragraphs 1-100 of Count VII are incorporated here by reference as paragraphs 1-100 of Count VIII.

102.     As a member of the executive department, the AG lacks the inherent authority to issue regulations beyond what has been delegated.  The AG issued the Regulation under M.G.L. Chapter 93A, § 2, which prohibits unfair or deceptive acts in trade or commerce.  *Id*. § 2(a). Section 2(c) of that chapter allows the AG to make regulations, but it expressly limits that power to ones that are "not inconsistent with the rules, regulations and decisions of the Federal Trade Commission and the Federal Courts interpreting the provisions of 15 U.S.C. 45(a)(1) . . . as from time to time amended."  M.G.L. c. 93A, § 2(c).

103.     The Regulation exceeds the AG's power because it (each subpart which follows is an independent and separate showing of excess):

(A) expands upon the statutory standards to include acts which are not, and have no potential to become, unfair or deceptive;

(B) fails to identify particular business practices as unfair or deceptive, which are unfair or deceptive; or

(C) is arbitrary or capricious.

104.    The conduct prohibited in the Regulation is not unfair or deceptive under Chapter

93A because it does not fall within any recognized or established common law or statutory

concept of unfairness.  It does not fall within at least the penumbra of some common-law,

statutory, or other established concept of unfairness and is not immoral, unethical, oppressive, or

unscrupulous.

105.    The AG accordingly exceeded her authority by issuing the Regulation.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests for relief:

A.    On Count I, a declaratory judgment that 940 CMR 35.04 is invalid

because it violates the First Amendment to the United States Constitution;

B.    On Count II, a declaratory judgment that 940 CMR 35.03 is invalid

because it violates the First Amendment to the United States Constitution;

C.    On Count III, a declaratory judgment that 940 CMR 35.03 is invalid

because is it barred by the Massachusetts Anti-SLAPP law;

D.    On Count IV, a declaratory judgment that 940 CMR 35.03 is invalid

because it is barred by Massachusetts Litigation Privilege.

E.    On Count V, a declaratory judgment that Regulation is invalid because it

violates the Due Process Clause of the Fourteenth Amendment to the United States Constitution;

F.    On Count VI, a declaratory judgment that the Regulation is invalid

because it violates the Equal Protection Clause of the United States Constitution and art. 10 of

the Constitution of the Commonwealth of Massachusetts;

G.    On Count VII, a declaratory judgment that 940 CMR 35.03 is invalid

because it violates separation of powers;

H.      On Count VIII, a declaratory judgment that the Regulation is invalid

because it exceeds the Attorney General's authority;

I.      On all Counts, a permanent injunction enjoining Defendant from enforcing

the Regulation against creditors and debt collectors;

J.      An Order granting Plaintiff its attorney's fees incurred in bringing this

action, to the extent authorized by 42 U.S.C. § 1983, or other law;

K.      An Order granting Plaintiff the costs incurred in bringing this lawsuit; and

L.      Such other and further relief as this Court deems just and proper.


Dated:  April 20, 2020.

> Respectfully submitted,
>
> ACA INTERNATIONAL
>
> By its attorneys,
>
> */s/ David M. Bizar*
> David M. Bizar (BBO# 566795)
> Seyfarth Shaw LLP
> Seaport East, Suite 300
> Two Seaport Lane
> Boston, MA 02210-2028
> Telephone:  (617) 946-4874
> Fax:  (617) 790-5368
> Email:  dbizar@seyfarth.com
>
> Robert J. Carty, Jr. (*pro hac* application forthcoming)
> Seyfarth Shaw LLP
> 700 Milam Street
> Suite 1400
> Houston, TX 77002
> Telephone:  (713) 225-2300
> Fax:  (713) 225-2340
> Email:  rcarty@seyfarth.com