**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| ACA INTERNATIONAL,<br><br>            Plaintiff,<br><br>    v.<br><br>MAURA HEALEY, IN HER OFFICIAL<br>CAPACITY AS MASSACHUSETTS<br>ATTORNEY GENERAL<br><br>            Defendant. | Civil Action No. 1:20-cv-10767-RGS |

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S**
**EMERGENCY MOTION FOR A TEMPORARY**
**RESTRAINING ORDER AND PRELIMINARY INJUNCTION**

David M. Bizar (BBO# 566795)
Seyfarth Shaw LLP
Seaport East, Suite 300
Two Seaport Lane
Boston, MA 02210-2028
Telephone:  (617) 946-4874
Fax:  (617) 790-5368
Email:  dbizar@seyfarth.com

Robert J. Carty, Jr. (*pro hac* application forthcoming)
Seyfarth Shaw LLP
700 Milam Street
Suite 1400
Houston, TX 77002
Telephone:  (713) 225-2300
Fax:  (713) 225-2340
Email:  rcarty@seyfarth.com

## <u>TABLE OF CONTENTS</u>

TABLE OF CONTENTS ..................................................................................................... i

TABLE OF AUTHORITIES ............................................................................................... ii

STATEMENT OF FACTS ................................................................................................. 1

ARGUMENT ..................................................................................................................... 3

      A.       ACA is likely to succeed on its claims that 940 CMR 35.04 is invalid................. 4

      B.       ACA is likely to succeed on its on its claims that 940 CMR 35.03 is invalid....... 14

      C.       ACA is likely to succeed on its claim that the Regulation violates due process. . 17

      D.       ACA is likely to succeed on its claim that the Regulation violates equal
             protection. ....................................................................................................... 18

      E.       ACA and its members will suffer irreparable harm absent injunctive relief. ....... 19

      F.       The harm to ACA and its members outweighs any harm to the AG. ................... 20

      G.       The requested relief will serve the public interest. .............................................. 20

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*American Assoc. of Pol. Cons., Inc. v. FCC*,
 923 F.3d 159 (4th Cir. 2019), *cert. granted*, 140 S. Ct. 812 (2020) .......................................13

*Brockton Power LLC v. City of Brockton*,
 948 F. Supp. 2d 48 (D. Mass. 2013) ......................................................................................16

*Calif. Motor Transp. Co. v. Trucking Unlimited*,
 404 U.S. 508 (1972)................................................................................................................16

*Commonwealth v. Ehiabhi*,
 478 Mass. 154 (2017) .............................................................................................................18

*Commonwealth v. Interstate Consol. St. Ry. Co.*,
 187 Mass. 436 (1905), *aff'd*, 207 U.S. 79 (1907) .................................................................19

*Duracraft Corp. v. Holmes Prods. Corp.*,
 427 Mass. 156 (1988) .............................................................................................................17

*Edenfield v. Fane*,
 507 U.S. 761 (1993)................................................................................................................13

*EF Cultural Travel BV v. Explorica, Inc.*,
 274 F.3d 577 (1st Cir. 2001) ....................................................................................................4

*Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., Inc.*,
 528 U.S. 167 (2000)..................................................................................................................4

*Gerard v. Gerard*,
 83 Mass. App. Ct. 1136 (2013)...............................................................................................18

*Gray v. Comm'r of Revenue*,
 422 Mass. 666 (1996) .............................................................................................................15

*Hoffer v. Comm'r of Correction*,
 397 Mass. 152 (1986) .............................................................................................................15

*Jacobson v. Commonwealth of Mass.*,
 197 11, 29 (1905)......................................................................................................................7

*Kappa Alpha Theta Frat., Inc. v. Harvard Univ.*,
 397 F. Supp. 3d 97 (D. Mass. 2019) ........................................................................................4

*Kline v. Burke Const. Co.*,
  260 U.S. 226 (1922)............................................................................15

*Latin Am. Music Co. v. Cardenas Fernandez & Assoc.*,
  2 Fed. Appx. 40 (1st Cir. 2001) .............................................................4

*Lowell Gas Co. v. Attorney General*,
  385 N.E.2d 240 (Mass. 1979) ...............................................................11

*Maceira v. Pagan*,
  649 F.2d 8 (1st Cir. 1981)..............................................................19, 20

*Mack v. Wells Fargo Bank, N.A.*,
  88 Mass. App. Ct. 664 (2015) ...............................................................17

*Mason v. Hitchcock*,
  108 F.2d 134 (1st Cir. 1939)..................................................................15

*Massachusetts Ass'n of Private Career Sch. v. Healey*,
  159 F. Supp. 3d 173 (D. Mass. 2016) ......................................................6

*McCullen v. Coakley*,
  573 U.S. 464 (2014)........................................................................12, 13

*McDonald v. Smith*,
  472 U.S. 479 (1985)................................................................................16

*NAACP v. Button*,
  371 U.S. 415 (1963)................................................................................16

*Nader v. The Dem. Nat'l Comm.*,
  555 F. Supp. 2d 137 (D.D.C. 2008), *aff'd on other grounds*, 567 F.3d 692
  (D.C. Cir. 2009) ....................................................................................16

*Opinion of the Justices*, 357 Mass. 827 (1970)..............................................18

*Opinion of the Justices to the Senate*, 375 Mass. 795 (1978) .........................14

*Picone v. Shire PLC*,
  No. 16-CV-12396-ADB, 2017 WL 4873506 (D. Mass. Oct. 20, 2017)..................16

*Pioneer Liquor Mart, Inc. v. Alc. Bev. Control Comm'n*,
  350 Mass. 1 (1965) ..................................................................................5

*Purity Supreme, Inc. v. Attorney Gen.*,
  380 Mass. 762 (1980) ...............................................................................6

*Realer v. Judges of Sup. Ct. of the Comm.*,
  265 Mass. 135 (1928) ..............................................................................18

*Reed v. Town of Gilbert, Ariz.*,
  135 S. Ct. 2218 (2015) .................................................................................7, 8

*Rosenberg v. LoanDepot.com*,
  No. 19-10661-NMG, 2020 WL 409634 (D. Mass. Jan. 24, 2020) ...........................8

*Ross-Simons of Warwick, Inc. v. Baccarat, Inc.*,
  102 F.3d 12 (1st Cir. 1996) ..............................................................................4

*Sindicato Puertorriqueño de Trajabadores v. Fortuño*,
  699 F.3d 1 (1st Cir. 2012) ................................................................................4

*Sorrell v. IMS Health Inc.*,
  564 U.S. 552 (2011) .........................................................................................9

*Steinmetz v. Coyle & Caron, Inc.*,
  862 F.3d 128 (1st Cir. 2017) ...........................................................................17

*United Mine Workers of Am. v. Illinois State Bar Ass'n*,
  389 U.S. 217 (1967) ........................................................................................16

*Vapor Technology Ass'n v. Baker*,
  No. SUCV20193102D, 2019 WL 6050041, 36 Mass. L. Rptr. 93 (Mass.
  Super. Oct. 21, 2019), *injunction vacated as moot*, No. SJC-12834, 2019 WL
  8106626 (Mass. Dec. 26, 2019) .........................................................................5

**Statutes**

12 U.S.C. § 5531.................................................................................................9

12 U.S.C. § 5536.................................................................................................9

12 U.S.C. §§ 5561-5565 ....................................................................................11

15 U.S.C. 45(a)(1)...............................................................................................6

15 U.S.C. §§ 1692-1692p ....................................................................................9

15 U.S.C. § 1692(a) ............................................................................................9

15 U.S.C. § 1692e(11) .......................................................................................10

15 U.S.C. § 1692k..............................................................................................11

15 U.S.C. § 1692g..............................................................................................10

28 U.S.C. § 1332(a) ...........................................................................................15

47 U.S.C. § 227..................................................................................................10

47 U.S.C. § 227(b)(3) ........................................................................................11

Dodd-Frank Act ..................................................................................................9

Fair Debt Collection Practices Act ...............................................................9, 10

M.G.L. c. 30A .....................................................................................................5

M.G.L. c. 93, § 18.01(1) .....................................................................................9

M.G.L. c. 93, § 24A .............................................................................................9

M.G.L. c. 93, § 49 ...............................................................................................9

M.G.L. c. 93A, § 2 ...........................................................................5, 6, 10, 17

M.G.L. c. 93A, §§ 4-9 .......................................................................................11

M.G.L. c. 231, § 59H .........................................................................................17

Telephone Consumer Protection Act ......................................................9, 10, 11

**Constitutional Provisions**

M.G.L.A. Const. pt. 1, art. 30 ......................................................................14, 15

U.S. Const. amend. I ....................................................................................*passim*

U.S. Const. amend. XIV ...........................................................................7, 17, 18

**Other Authorities**

12 C.F.R. Part 1006..............................................................................................4

16 C.F.R. Part 310..............................................................................................10

47 C.F.R. Ch. I, Subch. B, Pt. 64 .....................................................................10

209 CMR 18.00.....................................................................................................9

209 CMR 18.01, 18.03, 18.04, 18.08, 18.09, 18.10........................................10

209 CMR 18.02(g) ...............................................................................................9

209 CMR 18.14, 18.17.......................................................................................10

209 CMR 18.14, 18.17.......................................................................................12

209 CMR 18.16....................................................................................................10

209 CMR 18.16 ................................................................................................................10

209 CMR 18.18 ................................................................................................................10

209 CMR 18.22(1) ...........................................................................................................10

940 CMR 7.00 ...................................................................................................................9

940 CMR 7.04, 7.05 ........................................................................................................10

940 CMR 7.07 ..................................................................................................................10

940 CMR 7.08 ..................................................................................................................10

940 CMR 35.01(2) .............................................................................................................9

940 CMR 35.02 ................................................................................................................13

940 CMR 35.02 ..................................................................................................................8

940 CMR 35.03 ...................................................................................................14, 15, 17

940 CMR 35.04 .......................................................................................................... *passim*

Adam Newton, "Freedom of Petition Overview," Freedom Forum Institute (Oct. 10, 2002) (available online at https://is.gd/FOPOFFI) ..........................................16

CFPB Proposed Debt Collection Rule, available at https://files.consumerfinance .gov/f/documents/cfpb_debt-collection-NPRM.pdf (viewed Apr. 17, 2020) .......................4, 5

Plaintiff ACA International ("ACA") seeks a temporary restraining order and preliminary injunction on an emergency basis and expedited briefing schedule, to enjoin the enforcement of 940 CMR 35:00, *Unfair and Deceptive Debt Collection Practices During the State of Emergency Caused by COVID-19* (the "Regulation"), issued by the Massachusetts Attorney General ("AG") and made effective on March 26, 2020.   A copy of the Regulation is attached to ACA's Emergency Motion for Temporary Restraining Order and Preliminary Injunction (the "Motion") as Exhibit 1.  The AG lacked authority to issue the Regulation, which violates the constitutional and state-law rights of ACA members (and other professional debt collectors and creditors).

## STATEMENT OF FACTS[1]

ACA is a Minnesota nonprofit corporation with offices in Washington, D.C., and Minneapolis, Minnesota.   Founded in 1939, ACA represents more than 2,300 members, including third-party collection agencies, law firms, creditors, asset-buying or debt-buying companies, and vendor affiliates.   Among other things, ACA provides products, services, and publications, including educational and compliance-related information to promote and maintain the highest standards of professionalism in the credit-and-collection industry.  ACA Dec. (Ex. A) ¶¶ 2, 3.  ACA's membership includes first-party creditors, debt buyers, and collections agency members, some of whom are law firms and licensed attorneys.  *Id*. ¶ 4.  Each member pledges to ACA to treat all persons with dignity and respect, professionally and ethically.  ACA's mission is to help them fulfill their pledge by extoling the virtues of leadership, integrity, respect, responsibility, service, and education, and by assisting them in maintaining professionally responsible and legally compliant business practices.  *Id*. ¶¶ 5-6.

On March 26, 2020, the AG issued the Regulation on an emergency basis, and it became

---

[1] Due to space limitations, this briefing presents the facts in summary fashion.  For the full facts presented in support of this motion, please see the referenced supporting declarations.

effective that day.  *See* Exhibit 2 ("Guidance") at 1.  It contains two prohibitions:  one barring debt collectors from initiating certain telephone calls to consumers; and another barring creditors and debt collectors from initiating new collection lawsuits or acting upon remedies already obtained.  940 CMR 35.03, 35.04.  These prohibitions do not apply equally across the board, however.  Those seeking to collect mortgage debts, tenant debts, or debts for telephone, gas, or electric utility companies may still file lawsuits and act upon their existing remedies.  940 CMR 35.03(2)-(3).  Similarly, debt collectors may initiate telephone conversations if the sole purpose of the call is to discuss rescheduling court appearances, or to collect a mortgage or tenant debt. 940 CMR 35.04(2)-(3).  The Regulation also exempts six classes of collectors from its prohibitions by excluding them from its definition of "Debt collector."  Among others, these include certain nonprofits, federal employees, those collecting fiduciary- or escrow-related debts, and anyone else while serving legal process to judicially enforce a debt.  940 CMR 35.02.

The Regulation injures the public and the interests it purports to protect.  Telephone calls are sometimes the preferred method of communication that is convenient to a consumer, or the exclusive means of contact available. By prohibiting collectors from initiating calls, the Regulation can unduly hinder and even prevent their achieving the best possible and timely resolutions for all concerned—which can require the back-and-forth of a conversation to achieve. For example, temporary hardship repayment plans that can provide a variety of options for deferring payments or determining longer-term payment plans tailored to individual consumer situations where income has been interrupted for any reason can greatly benefit consumers.  This is especially true for those with COVID-19 or those on the front lines battling this epidemic.  *Id*. ¶ 17; PRAI Dec. ¶¶ 5-6 (Ex. B); ACAI Dec. (Ex. C) ¶¶ 5, 8. ACA members also preserve public health and safety by assisting the very healthcare industries that are servicing the public.  ACA

Dec. ¶¶ 18-21; *see also* ADSI Dec. (Ex. D) ¶¶ 2, 7-9; PRAI Dec. ¶¶ 3, 7.

ACA members routinely work with consumers and their creditor-clients to exhaust all options before resorting to litigation and to honor crisis-related requests to forbear on existing legal remedies during national or state-specific emergencies. ACA Dec. ¶ 19. Without question, the payment of just debts on voluntary terms reduces needless litigation. Collectors and creditors prefer voluntary resolutions because they are usually faster and more predictable. In addition, voluntary resolutions avoid attorney fees and typically maintain the goodwill of the consumer. Consumers benefit by presented with voluntary options to resolve their past-due accounts, including payment deferral, extended payment plans, or other financial assistance—any of which the consumer may prefer to litigation. The Regulation stifles these productive communications, thereby increasing the likelihood of a collection lawsuit eventually being filed.

The Regulation is also severely injuring ACA members, and is harming ACA. ACA members are seeing a decline in their revenues due to the Regulation, which are endangering their businesses. Meanwhile, the Regulation has required ACA to divert its resources, and it poses an imminent threat to ACA's membership levels and revenues from membership dues. ACA Dec. ¶ 11. It prohibits members' affirmative efforts to contact consumers via telephone yet effectively requires them to keep their doors open and staff employed to respond to consumer inquiries and disputes. In just the two weeks since the Regulation was promulgated, ACA has heard from members with Massachusetts operations that receipts were down between 20% and 50%, which has forced some members to lay off employees in order to reduce costs. If the Regulation is left in effect, those declined revenues could eventually force these members out of business. *Id*. ¶¶ 11-12; ADSI Dec. ¶¶ 4-6; ACAI Dec. ¶¶ 5-6; PRAI Dec. ¶¶ 5-6.

## ARGUMENT

The Court "may issue a preliminary injunction or TRO upon considering:   (1) the

3

likelihood of success on the merits; (2) the potential for irreparable harm if the injunction is denied; (3) the balance of harms; and (4) the effect (if any) on the public interest.'" *EF Cultural Travel BV v. Explorica, Inc.*, 274 F.3d 577, 581 (1st Cir. 2001);  *Latin Am. Music Co. v. Cardenas Fernandez & Assoc.*, 2 Fed. Appx. 40, 42 n.2 (1st Cir. 2001).  While likelihood of success is the touchstone of the preliminary-injunction inquiry, the Court "need not predict the eventual outcome on the merits with absolute assurance."  *Ross-Simons of Warwick, Inc. v. Baccarat, Inc.*, 102 F.3d 12, 15 (1st Cir. 1996).  Rather, it need only find that there is a strong likelihood that ACA will ultimately prevail.  *Sindicato Puertorriqueño de Trajabadores v. Fortuño*, 699 F.3d 1, 10 (1st Cir. 2012).  ACA carries that burden here.

ACA has standing because:  its members would have standing; the interests at stake are germane to ACA's purpose; and neither the claims asserted nor the relief requested requires ACA members to participate.  *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., Inc.*, 528 U.S. 167, 181 (2000).  Moreover, as detailed in Section E below, ACA can show that its members have suffered an injury-in-fact.  *See Kappa Alpha Theta Frat., Inc. v. Harvard Univ.*, 397 F. Supp. 3d 97, 104 (D. Mass. 2019) (quoting *Sierra Club v. Morton*, 405 U.S. 727, 739-40 (1972)). Indeed, "[a]ctions for declaratory or injunctive relief have generally been held to be well-suited to representation by an association" as long as individual members need not participate.  *Id*.

## A.     ACA is likely to succeed on its claims that 940 CMR 35.04 is invalid.

The Consumer Financial Protection Bureau ("CFPB") has recognized that, although some debt-collection communications can be unfair or deceptive, others are highly beneficial: "Communicating with a debt collector may benefit a consumer by helping the consumer to either resolve a debt the consumer owes, or identify and inform the debt collector if the debt is one that the consumer does not owe."  CFPB, 12 C.F.R. Part 1006, Debt Collection Practices (Reg. F), Proposed rule with request for public comment (May 6, 2019) ("CFPB Proposed Debt Collection

Rule"), at p.6, available at https://files.consumerfinance.gov/f/documents/cfpb_debt-collection-NPRM.pdf (viewed Apr. 17, 2020).   The CFPB also recognizes that telephone calls are a customary and appropriate way to contact consumers at the outset to accomplish these ends.  *Id.* at pp.13, 50, 109-10, 368-69 & n.632.  Indeed, the CFPB has found that "[m]ost debt collectors rely heavily on telephone calls as a means of establishing contact with consumers" and it "understands that response rates to letters can be quite low."  *Id.* at  p. 368.  The CFPB also recognizes delays in reaching consumers from their not responding to a debt collector's written communications often results in consumers being "less willing or able to repay the debt."  *Id.* at pp. 368-369.  Delay in contacting a consumer may therefore harm both the consumer, and the debt collector and its client—debts grow over time.  Section 35.04 ignores all of this, prohibiting collectors from initiating any communications by phone, even *helpful* communications.

COVID-19 has presented a serious public-health emergency, and the AG's power to issue regulations on an emergency basis is not in question.  *See* M.G.L. c. 30A.  But that power is not unlimited.  "[E]mergency' findings . . . must be carefully scrutinized because, if unwarrantably made, they may lead to improper denial of public hearings or comment on regulations, to evasion of the salutary purposes of c. 30A and possibly to other serious abuse."  *Pioneer Liquor Mart, Inc. v. Alc. Bev. Control Comm'n*, 350 Mass. 1, 9 (1965).

The AG exceeded her authority by issuing § 35.04.  As a member of the executive department, the AG lacks the inherent authority to issue regulations beyond what has been delegated.  *See Vapor Technology Ass'n v. Baker*, No. SUCV20193102D, 2019 WL 6050041, at *7, 36 Mass. L. Rptr. 93 (Mass. Super. Oct. 21, 2019), *injunction vacated as moot*, No. SJC-12834, 2019 WL 8106626 (Mass. Dec. 26, 2019).  The AG issued the Regulation under M.G.L. Chapter 93A, § 2, which prohibits unfair or deceptive acts in trade or commerce.  *Id.* § 2(a).

Section 2(c) of that chapter allows the AG to make regulations, but only to the extent that they are "not inconsistent with the rules, regulations and decisions of the Federal Trade Commission and the Federal Courts interpreting the provisions of 15 U.S.C. 45(a)(1) . . . as from time to time amended."   M.G.L. c. 93A, § 2(c).   Thus the AG may not "expand upon the statutory standards . . . to include acts which are not, and have no potential to become, unfair or deceptive."   *Purity Supreme, Inc. v. Attorney Gen.*, 380 Mass. 762, 775 (1980); *see id.* at 771 (AG must "identify particular business practices" as unfair or deceptive and cannot act in an arbitrary or capricious manner).   Under those standards, "[c]onduct is unfair or deceptive under Chapter 93A if it falls 'within any recognized or established common law or statutory concept of unfairness.'" *Massachusetts Ass'n of Private Career Sch. v. Healey*, 159 F. Supp. 3d 173, 188-89 (D. Mass. 2016) (citing *Cummings v. HPG Int'l Inc.*, 244 F.3d 16, 25 (1st Cir. 2001) ("Conduct is unfair or deceptive if it is 'within at least the penumbra of some common-law, statutory, or other established concept of unfairness' or 'immoral, unethical, oppressive, or unscrupulous.'")).

No matter the reason, except if the call is initiated to inform a consumer about rescheduling a court appearance, a debt collector is deemed under § 35.04 to commit an "unfair or deceptive act or practice"—thus labeling them a bad actor and subjecting them to potential substantial liability.   But there is *nothing* immoral, unethical, oppressive, or unscrupulous about initiating a single call to a consumer to talk about their validly owed debt.   The AG's categorical prohibition of such calls imposes an overbroad ban that is a prior restraint on commercial speech that is truthful and even helpful to consumers.   As detailed below, this is impermissible.

Recently, the U.S. Department of Justice ("DOJ") filed a Statement of Interest supporting a First Amendment free-exercise challenge brought by a church against a city and its mayor over their attempt to stop drive-in church services due to COVID-19.   The Statement was clearly

intended not just for that important case, but also for a much wider audience.  It cautions that "[t]here is no pandemic exception . . . to the fundamental liberties the Constitution safeguards" and that "[i]ndeed, 'individual rights secured by the Constitution do not disappear during a public health crisis."  Exhibit 3 ("DOJ Statement") at 4 (quoting *In re Abbott*, __ F.3d __, 2020 WL 1685929, at *6 (5th Cir. Apr. 7, 2020)).   "These individual rights, including the Bill of Rights made applicable to the states through the Fourteenth Amendment, are always in force to restrain government action."  *Id*.  "At the same time, the Constitution does not hobble government from taking necessary, temporary measures to meet a genuine emergency."  *Id*. (citing *Jacobson v. Commonwealth of Mass.*, 197 11, 29 (1905)).  DOJ's dividing line is that "the Supreme Court has instructed courts to intervene [and 'must grant relief' if] a statute purporting to have been enacted to protect the public morals, or the public safety, has no real or substantial relation to those objects, or is beyond all question, a plain, palpable invasion of rights secured by the fundamental law."  *Id*. at 5-6 (quoting *Jacobson*, *supra*, at 31) (emphasis omitted).  COVID-19 is a public health emergency, but not one that can justify bans on speech—or as will be discussed in Section B below, that can deny creditors and debt collectors their fundamental right to request and carry out the relief granted to them in courts of competent jurisdiction.

The First Amendment provides that "Congress shall make no law . . . abridging the freedom of speech . . . ."  It prohibits states from restricting speech because of its message, its ideas, its subject matter, or its content.  *Reed v. Town of Gilbert, Ariz.*, 135 S. Ct. 2218, 2224 (2015).  Content-based restrictions are presumptively unconstitutional and may be justified only if the government proves that they are narrowly tailored to serve a compelling state interest.  *Id*.

A restriction on speech is "content based" if it "applies to particular speech because of the topic discussed or the idea or message expressed."  *Id*. at 2227 (citing, *e.g., Sorrell v. IMS*

*Health, Inc.*, 131 S. Ct. 2653, 2663-64 (2011)).  Courts consider whether the law "on its face draws distinctions based on the message a speaker conveys."  *Id.* (internal quotes omitted).  Such facial distinctions may identify a particular subject matter to be restricted, while others may identify the speech's function or purpose.  *Id.*  Even if the challenged law does not make these kinds of facial distinctions, it will still be considered content-based if it "cannot be 'justified without reference to the content of the regulated speech,' or [was] adopted by the government 'because of disagreement with the message [the speech] conveys[.]'"  *Id.* (quoting *Ward v. Rock Against Racism*, 491 U.S. at 791 (1989)).

Here, § 35.04 is a content-based regulation that is subject to strict scrutiny.  It singles out a particular group of speakers—debt collectors (even lawyers)—and prohibits them from initiating telephonic conversations with consumers regarding debts.  This alone makes it content-based, but the carve-outs hammer the point home by exempting communications that involve certain debt collectors and topics.  Section 35.04 does *not* prohibit debt collectors from initiating phone calls that involve rescheduling a court appearance, a mortgage debt, or a debt owed by a tenant.  Initiating those kinds of communications is still allowed.  Section 35.02, meanwhile, exempts six classes of collectors from the Regulation altogether, including nonprofits and others who collect debts that arise from particular arrangements.  Thus, the only way to determine whether a communication runs afoul of § 35.04 is to evaluate its content and who is initiating it.  This subjects it to strict scrutiny.  *Rosenberg v. LoanDepot.com*, No. 19-10661-NMG, 2020 WL 409634, at *6 (D. Mass. Jan. 24, 2020); *see also Reed*, 135 S. Ct. at 2227 ("[R]egulation of speech is content based if a law applies to particular speech because of the topic discussed.").

Under this standard, the AG must overcome the presumption of unconstitutionality and establish that § 35.04 is "narrowly tailored to serve compelling state interests."  *Reed*, 135 S. Ct.

at 2224.  That is, the desired ends must "fit" the means chosen to accomplish them.  *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 572 (2011).  The AG cannot carry this burden.

First, § 35.04 does not serve a compelling state interest.  It is intended "to protect consumers from unfair and deceptive debt collection practices during the [COVID-19] State of Emergency."  940 CMR § 35.01(2).  As shown above, it does not.  And as detailed below, Massachusetts consumers are already protected by multiple state and federal laws.  The AG did not write § 35.04 on a blank slate.  Consumers are already heavily protected from unfair or deceptive phone calls through a tapestry of federal and state laws.  To begin with, M.G.L. c. 93, § 49 broadly prohibits consumer debt collection done in an "unfair, deceptive or unreasonable manner" and identifies objectionable practices.  The AG, meanwhile, has issued comprehensive debt-collection regulations (*see* 940 CMR 7.00, *et seq.*), as has the Massachusetts Division of Banks ("DOB") (*see* 209 CMR 18.00, *et seq.*).  The DOB's regulations provide another compendium of "unfair or deceptive acts or practices," and create a licensing system for debt collectors.  *See id.* § 18.01(1).  Under M.G.L. c. 93, § 24A, no unlicensed person may "directly engage in the commonwealth" as a debt collector.  Because Massachusetts's licensed attorneys may also serve as debt collectors (*see* 209 CMR 18.02(g)), § 35.04 even bans *attorneys* from initiating calls.

Massachusetts consumers also benefit from an additional layer of *federal* laws.  For example, the Fair Debt Collection Practices Act ("FDCPA"), codified at 15 U.S.C. §§ 1692-1692p, protects consumers against "abusive, deceptive, and unfair debt collection practices."  15 U.S.C. § 1692(a).  The Consumer Financial Protection Act (part of the Dodd-Frank Act) allows the CFPB to identify and prohibit unfair, deceptive, or abusive acts and practices by certain debt collectors.  12 U.S.C. §§ 5531, 5536.  The Telephone Consumer Protection Act ("TCPA"),

codified at 47 U.S.C. § 227, strictly regulates calls using automated dialing technologies. Both the FCC and the FTC have issued extensive regulations implementing the TCPA. *See* 47 C.F.R. Ch. I, Subch. B, Pt. 64 (FCC); 16 C.F.R. Part 310 (FTC).

This tightly-woven tapestry of regulations already protects consumers from all manner of unfair or deceptive telephone communications and thus render § 35.04 superfluous:

- The AG's existing regulations already deem abusive communications from creditors and debt collectors to be unfair or deceptive. 940 CMR 7.04, 7.05.

- Those same regulations provide a comprehensive list of representations and other communications that are deemed unfair or deceptive. 940 CMR 7.07.

- They also impose strict requirements on creditors' and debt collectors' initial contacts with consumers, and declare any deviation from those limitations to be unfair or deceptive. 940 CMR 7.08.

- The DOB's regulations impose their own layer of rules, any violation of which "shall be considered an unfair or deceptive act or practice under M.G.L. c. 93A, § 2." 209 CMR 18.22(1).

- The DOB's regulations list a comprehensive array of representations and other communications deemed unfair or deceptive. 209 CMR 18.16. They also limit the time, place, and frequency of phone calls to no more than two in each seven-day period to the consumer's residential number and two per 30-day period to other numbers. They also limit such calls to normal waking hours of 8 a.m. to 9 p.m., and forbid causing the debtors any call charge expenses. 209 CMR 18.14, 18.17.

- Like the AG's regulations, the DOB's regulations govern initial contacts with consumers. Among other things, they require that debt collectors disclose that they are debt collectors attempting to collect a debt, and that any information obtained will be used for that purpose. 209 CMR 18.16. Notably, the federal FDCPA requires this same disclosure in initial communications. 15 U.S.C. § 1692e(11). The DOB also requires debt collectors to send validation notices to consumers after initial contact, as does the FDCPA. 209 CMR 18.18; 15 U.S.C. § 1692g.

These voluminous regulations have teeth. Not only does the DOB impose exacting licensing and supervision requirements over debt collectors, *see* 209 CMR 18.01, 18.03, 18.04, 18.08, 18.09, 18.10, but those who violate these encyclopedic requirements are subject to

lawsuits by the AG and injured consumers, who may seek individual and class relief.  *See* M.G.L. c. 93A, §§ 4-9; *Lowell Gas Co. v. Attorney General*, 385 N.E.2d 240, 249 (Mass. 1979). Offending collectors and attorneys may face penalties, damages (up to treble damages), restitution, equitable relief, and attorneys' fees.  M.G.L. c. 93A, §§ 4, 9.

Federal law provides another row of teeth.  The FDPCA, which contains prohibitions similar to those in the AG and DOB's regulations, affords consumers a private federal right of action, individually or as a class, plus reasonable attorney's fees.  15 U.S.C. § 1692k.  The CFPB has substantial enforcement powers.  *See* 12 U.S.C. §§ 5561-5565.  And the TCPA provides an express private right of action for actual or statutory damages, which may be brought in the form of potentially ruinous class actions.  47 U.S.C. § 227(b)(3).

This existing web of statutes and regulations, the potent remedies that they provide, and the severe consequences that will visit any debt collector who violates them, all provide a secure protection scheme against debt collectors who initiate unfair or deceptive telephone calls.[2] Section 35.04 thus accomplishes nothing consequential.  To the contrary, as explained below, it actually prevents consumers from receiving beneficial calls from ACA members who may be able to extend them a lifeline.  The AG cannot show why avoiding conversations about resolving debts benefits consumers.  Nor can the AG show that society benefits by creditors bearing more charged-off debt, consumers avoiding debt resolution, or increases in collection litigation that will ensue as a result.  The AG issued the Regulation without comment, so there is no record of public commentary showing why these restrictions are necessary at all, let alone compelling.

---

[2] This is not mere supposition; the data shows that these protections are effective.  According to a study conducted by the ACA, only 0.15% of disputed accounts have a basis in fact, and these legitimate disputes comprise less than 4.5% of disputes submitted.  https://financialservices .house.gov/uploadedfiles/hhrg-116-ba00-wstate-auchterlonies-20190926.pdf, at 15 (testimony of Sara Auchterlonie).

Not only does § 35.04 fail to materially advance the state's interest in protecting consumers, it purports to contravene the DOB's primary licensing authority and regulatory promulgations. DOB's existing and *still-operative* regulations *allow* debt collectors to call consumers—which § 35.04 bans. *See* 209 CMR 18.14, 18.17. Moreover, both DOB's and the AG's preexisting regulations are *very* protective. Among other restrictions, they limit the frequency of calls (including voicemails and texts) to no more than two in each seven-day period to the consumer's residential number and two per 30-day period to other numbers, limit such calls to the hours of 8 a.m. to 9 p.m., and forbid causing the consumers to incur any charges.

Section 35.04 is also at war with the DOB's order designating all licensees of the DOB— including debt collectors—as "Essential Services" providers under Governor Baker's Order closing certain physical locations. *See* https://www.mass.gov/news/financial-services-are-essential-services-exempt-from-governor-baker-order-to-close-physical (viewed Apr. 15, 2020). The DOB's list "is based on federal guidance and amended to reflect the needs of Massachusetts' unique economy." Thus, not only is § 35.04 a tiny minnow in a giant regulatory ocean, it swims against its currents. It cannot be said to advance any compelling state interest.

Nor can it be said that § 35.04 is narrowly tailored to fit its declared purpose—the second requirement of strict scrutiny. The prohibition against debt collectors initiating any telephone calls is an attempt at fishing by explosive device; it nets collectors' truthful, fair, and even helpful communications and harms everything in the water. That is too broad to survive judicial review; it is certainly not what strict scrutiny requires, i.e., "the least restrictive means of achieving a compelling state interest." *McCullen v. Coakley*, 573 U.S. 464, 509-10 (2014).

An example will help illustrate this point. The current pandemic is an opportune time for debt collectors to initiate calls where they can engage directly with consumers in conversations

in which they can offer and discuss *helpful* information and options about their debts.  As noted above, ACA members are trained and highly encouraged to do this.  But § 35.04 prevents them from initiating even these helpful calls.  Restrictions violate the free-speech clause when, as here, they apply in a way counter to the interests the state seeks to safeguard.  *American Assoc. of Pol. Cons., Inc. v. FCC*, 923 F.3d 159, 168 (4th Cir. 2019), *cert. granted*, 140 S. Ct. 812 (2020).

Section 35.04 is both overly broad and under-inclusive.  It is not narrowly tailored to prohibit only speech that is unfair or deceptive—something that the existing body of law already accomplishes quite effectively.  And while it subjects to its severe restrictions and grave penalties certain debt collectors, it exempts six classes of them from its reach as well as any telephone calls initiated to collect mortgage and rent debts, thereby singling out and disfavoring both certain speakers and the content of *their* speech.  *See* 940 CMR 35.02 (definition of "[d]ebt collector"; 35.04(3)).  Further, as detailed above, this does not advance any compelling state interest.  Section 34.04 therefore fails strict scrutiny under the First Amendment.

Section 35.04 also fails under intermediate scrutiny, which would apply only if the provision were content-neutral—which the foregoing discussion makes clear, it is not.  Where, as here, "truthful and nonmisleading expression will be snared along with fraudulent or deceptive commercial speech," the AG must show that § 35.04 "serves a substantial state interest and is designed in a reasonable way to accomplish that end."  *Edenfield v. Fane*, 507 U.S. 761, 768-69 (1993); *see also McCullen*, 573 U.S. at 486.  Section 35.04 fails under intermediate scrutiny for essentially the same reasons that it fails under strict scrutiny.  Again, given the already-existing body of law and the abject lack of evidence that the Regulation is needed, § 35.04 adds no material benefit to consumers in terms of protecting them from unfair and deceptive collection activities.  Such an ineffectual measure cannot be said to further any substantial state interest.

By dragging such a wide net (with big holes in it for its exemptions), and imposing liability for initiating *any* telephone communications with consumers—save those carve-outs that make it content-based—one cannot legitimately describe § 35.04 as "reasonably designed" to accomplish its stated ends.  It does not even allow debt collectors to initiate calls to determine who may be experiencing hardships, or to call with an offer of assistance.  It is not well-aimed. It is a blunderbuss.  The First Amendment does not tolerate a blunderbuss.  Consequently, § 35.04 cannot survive intermediate scrutiny (but again, because it is facially content-based, the proper test is strict scrutiny).  ACA is likely to succeed on its First Amendment challenge that § 35.04 is invalid.

**B.     ACA is likely to succeed on its on its claims that 940 CMR 35.03 is invalid.**

Section 35.03 violates the separation-of-powers clause found in Article 30 of the Declaration of Rights of the Massachusetts Constitution.  Article 30 provides that each of the three governmental departments "shall never exercise" the powers of the others.   M.G.L.A. Const. pt. 1, art. 30 ("Article 30"); *see also Opinion of the Justices to the Senate*, 375 Mass. 795, 813 (1978) ("The legislative and executive departments are prohibited from exercising powers entrusted to the judicial department.  This prohibition is part of the principle of separation of powers, recorded and preserved in art. 30.").  Yet § 35.03 usurps the power of the courts to decide who may and may not file petitions and who may carry out valid judicial orders for relief. And its reach extends not only to Massachusetts state courts, but to federal courts and the courts of other states.  This is impermissible under both state and federal law.

By unilaterally restricting who may file collection lawsuits and proscribing the effect of duly-ordered judicial remedies, the AG has violated Article 30:

> The executive and legislative departments impermissibly interfere with judicial functions when they purport to restrict or abolish a court's inherent powers . . . or when they purport to reverse, modify, or contravene a court order . . . .  Inherent powers of the

14

> courts are those whose exercise is essential to the function of the judicial department, to the maintenance of its authority, or to its capacity to decide cases.

*Gray v. Comm'r of Revenue*, 422 Mass. 666, 671-72 (1996); *accord Hoffer v. Comm'r of Correction*, 397 Mass. 152, 156 (1986) ("When a government official denies rights in contravention of a court order, the executive department intrudes upon the judicial department's authority in violation of art. 30."). On its face, § 35.03 purports do to exactly that. As detailed in ¶¶ 64-67, § 35.03 effectively displaces the Orders of the SJC and other court departments which ensure the safety of the public, litigants, and court personnel by closing the Clerk's offices to the public, by barring in-person appearances, and by providing for telephonic and virtual access.

Section 35.03 also encroaches on the jurisdictional powers of *federal* courts. Federal district courts have jurisdiction over consumer debt-collection actions when the amount in controversy exceeds $75,000 and complete diversity of the parties exists. 28 U.S.C. § 1332(a). States may not alter this jurisdiction—only Congress can do that. *See Kline v. Burke Const. Co.*, 260 U.S. 226, 234 (1922); *accord Mason v. Hitchcock*, 108 F.2d 134, 135 (1st Cir. 1939) ("Every federal court, other than the Supreme Court, derives its jurisdiction wholly from the authority of Congress.") (citation omitted). Section 35.03 effectively redefines the jurisdiction of the federal courts by closing the federal courthouse doors to certain disfavored creditors and debt collectors whose consumers happen to reside in Massachusetts. It overrides valid orders of the federal courts by barring those creditors and debt collectors from pursuing judicially-prescribed remedies contained in valid federal-court orders. It further overrides the orders of the District Court of Massachusetts ensuring the safety of the public, litigants, and court personnel by rendering their in-person appearances unnecessary. *See* Compl. ¶ 68.

Section 35.03 interferes not only with the courts, but also obstructs creditors' and debt collectors' constitutional rights to petition the courts for redress of grievances. The First

Amendment provides that "Congress shall make no law . . . abridging . . . the right of the people . . . to petition the Government for a redress of grievances."  This right has its roots in Magna Carta and has long been viewed as a fundamental and inviolate right.  *See* Adam Newton, "Freedom of Petition Overview," Freedom Forum Institute (Oct. 10, 2002) (available online at https://is.gd/FOPOFFI) (viewed Apr. 15, 2020).  Since at least 1876, the Supreme Court has considered the right to petition "implicit in '[t]he very idea of government," observing that "[t]he historical roots of the Petition Clause long antedate the Constitution." *McDonald v. Smith*, 472 U.S. 479, 482 (1985) (quoting *United States v. Cruikshank*, 2 Otto 542 (1876)).  In *United Mine Workers of Am. v. Illinois State Bar Ass'n*, 389 U.S. 217, 222 (1967), the Court exalted the right to petition as "among the most precious of the liberties safeguarded by the Bill of Rights."  It is a fundamental liberty, protected against encroachment by federal, state, and local governments alike.  *See NAACP v. Button*, 371 U.S. 415 (1963).

Filing petitions in a court of competent jurisdiction and carrying out court-authorized relief cannot be deemed by the AG to be an unfair or deceptive act or trade practice.  "The Noerr-Pennington doctrine holds that entities who petition the government, 'whether by efforts to influence legislative or executive action or by seeking redress in court,' are immune from liability for such activity under the First Amendment." *Nader v. The Dem. Nat'l Comm.*, 555 F. Supp. 2d 137, 156-57 (D.D.C. 2008), *aff'd on other grounds*, 567 F.3d 692 (D.C. Cir. 2009) (emphasis added).  *See Brockton Power LLC v. City of Brockton*, 948 F. Supp. 2d 48, 66 (D. Mass. 2013) ("It is well established that private citizens who lobby or petition public officials are immune from suit for such activities."); *see also*, *e.g.*, *Calif. Motor Transp. Co. v. Trucking Unlimited*, 404 U.S. 508, 510 (1972) ("The right of access to the courts is indeed but one aspect of the right of petition."); *Picone v. Shire PLC*, No. 16-CV-12396-ADB, 2017 WL 4873506, at

*5 (D. Mass. Oct. 20, 2017) ("Noerr-Pennington immunity extends to 'petitioning' activities before the courts (i.e., litigation)."). The AG lacks the authority to deem petitioning activity by creditors and debt collectors to be an unfair and deceptive act or practice subject to liability under Chapter 93A. The constitution and Massachusetts law forbid it.

Section 35.03 also encroaches on the Massachusetts Legislature, which enacted the Massachusetts anti-SLAPP statute to protect parties from actions designed to chill petitioning activity—i.e., the presumed result of any violation of § 35.03. M.G.L. c. 231, § 59H. The anti-SLAPP law protects petitioning activities by creating a special motion to dismiss any claim that is primarily brought to chill such activities. *Steinmetz v. Coyle & Caron, Inc.*, 862 F.3d 128, 133 (1st Cir. 2017) (citing *Blanchard v. Steward Carney Hosp., Inc.*, 477 Mass. 141 (2017); *477 Harrison Ave., LLC v. Jace Bos., LLC*, 477 Mass. 162, 1237 (2017)). It defines "the exercise of the right to petition" broadly to include, among other things, a wide range of statements made to courts or that otherwise fall within constitutional protections of the right to petition government. M.G.L. c. 231, § 59H. In drafting the statute, "the Legislature intended to enact very broad protection for petitioning activities." *Duracraft Corp. v. Holmes Prods. Corp.*, 427 Mass. 156, 162 (1988). The AG's regulation improperly encroaches on this legislatively-determined policy.

Independently, Section 35.04 is also an invalid regulation under SJC jurisprudence, which affords absolute immunity for the petitioning activities in and related to litigation. "[S]tatements by a party, counsel or witness in the institution of, or during the course of, a judicial proceeding are absolutely privileged provided such statements relate to that proceeding." *Mack v. Wells Fargo Bank, N.A.*, 88 Mass. App. Ct. 664, 667 (2015). ACA is likely to succeed on its claims that § 35.04 is invalid.

**C.     ACA is likely to succeed on its claim that the Regulation violates due process.**

The due-process clause of the Fourteenth Amendment "require[s] that deprivation of life,

liberty or property by adjudication be preceded by notice and opportunity for hearing appropriate to the nature of the case." *Gerard v. Gerard*, 83 Mass. App. Ct. 1136 (2013).  Indeed, this is "elemental in the Constitution of the United States and of [Massachusetts]." *Realer v. Judges of Sup. Ct. of the Comm.*, 265 Mass. 135, 141-42 (1928).

The AG issued the Regulation as an emergency regulation on March 26, 2020.  It became effective that same day.  *See* Guidance, Exhibit 2 at 1.  The AG did not issue a public press release, however, until the day after the Regulation became effective.  *See* March 27 Press Release,  available  at  https://www.mass.gov/news/ags-office-issues-emergency-regulation-to-protect-consumers-from-harmful-debt-collection  (viewed  Apr.  17,  2020).   The Regulation exposes ACA members—particularly those who may be unaware of it due to a lack of notice and comment period—to the potential for liability and punitive sanctions.  ACA Dec. ¶ 10.  It undermines ACA's and its members' missions, threatens to label members as unfair and deceptive actors, infringes upon constitutional rights, and deprived them of sufficient notice before jeopardizing their good names, reputations, honor, standing, and associations in the community.  *Id.*  ACA is likely to succeed on its claim that this violates the due-process clause.

**D.  ACA is likely to succeed on its claim that the Regulation violates equal protection.**

The  equal-protection  clause  of  the  Fourteenth  Amendment  prohibits  selective enforcement "based upon an unjustifiable standard such as race, religion, or other arbitrary classification." *Commonwealth v. Ehiabhi*, 478 Mass. 154, 161 (2017) (emphasis added) (citing *Oyler v. Boles*, 368 U.S. 448, 456 (1962)).  Although the phrase "equal protection of the laws" does not appear in Article 10 of the Constitution of the Commonwealth, it "may be appropriately cited to raise the same constitutional principle." *Opinion of the Justices*, 357 Mass. 827, 830 (1970).  Article 10 provides that "[e]ach individual of the society has a right to be protected by it in the enjoyment of his life, liberty and property, according to standing laws." *Id.*  A proposed

law that contains "an absolute and arbitrary selection of a class, independently of good reasons for making a distinction, the provision would be unconstitutional and void." *Commonwealth v. Interstate Consol. St. Ry. Co.*, 187 Mass. 436, 438 (1905), *aff'd*, 207 U.S. 79 (1907).

Here, the AG has impermissibly singled out certain creditors and debt collectors (even Massachusetts attorneys) who are seeking to collect certain kinds debts, and barred them from filing new collection lawsuits, enforcing court-ordered remedies, or initiating certain types communications with consumers.  By arbitrarily discriminating against certain creditors and debt collectors, the Regulation deprives ACA's members who are subject to the Regulation of the equal protection of the laws.  ACA is likely to succeed on its equal-protection claim.

**E.    ACA and its members will suffer irreparable harm absent injunctive relief.**

Without the requested injunctive relief, ACA and its members will suffer irreparable harm.   The AG cannot dispute this, because "[i]t is well established that the loss of first amendment freedoms constitutes irreparable injury."  *Maceira v. Pagan*, 649 F.2d 8, 18 (1st Cir. 1981).  Thus, the harms alleged here by their very nature cannot be repaired.  And because the Regulation is currently in place, the harms are already being inflicted.

The Regulation is also inflicting permanent financial harm on ACA's members.  ACA Dec. ¶¶ 12-16.  For example, one member's largest client has suspended placing any collection accounts as a direct result of the Regulation.  PRAI Dec. ¶ 8.  This represents 13% of the member's revenue, and has no doubt played a large part in its year-over-year revenue decline of 36% for March and an estimated 50% for April.  *Id.* ¶¶ 6, 8.  As a consequence, the member is straining to keep its employees busy with adequate work.  *Id.* ¶ 8.  Another member estimates that the Regulation is causing losses of up to 70% of its revenues.  ADSI Dec. ¶¶ 4, 6.  Still another member has lost 30% of its revenues since March—a shortfall that is rapidly increasing—and has already been forced to lay off around 20% of its staff; these layoffs are

likely to continue.  ACAI Dec. ¶¶ 6-7.  The company anticipates—and indeed it seems self-evident—that the Regulation exacerbates an already bad economic situation.  *Id.*

**F.      The harm to ACA and its members outweighs any harm to the AG.**

The balance of the hardships tips strongly in ACA's favor.  As the previous section makes clear, the Regulation is not only depriving ACA members of their constitutional rights, but it is also causing concrete harm to their financial health and their ability to make payroll.  By contrast, enjoining the Regulation will not harm the AG.  The Regulation was not necessary in the first place, and when it is enjoined, the AG will still have a vast array of enforcement tools.

**G.      The requested relief will serve the public interest.**

Injunctive relief in this case will serve the public interest by upholding the fundamental rights the Regulation is infringing.  And it will provide concrete effects for Massachusetts businesses and citizens.  It will advance the free flow of truthful and helpful information among creditors, debt collectors, and consumers.  ACA Dec. ¶¶ 17-23, 28.  It will allow small-business debt collectors (including those collecting for indispensable health care providers, which the Regulation recognizes are straining under this pandemic) to access the courts that are accessible to them—the courts are accessible to *everyone*.  *See* PRAI Dec. ¶ 3; ADSI Dec. ¶¶ 4, 7-8; ACAI Dec. ¶¶ 2, 3, 9.  It will allow debt collectors, whom the Governor has designated essential personnel, to do business and to avoid layoffs.  PRAI Dec. ¶ 8; ADSI Dec. ¶¶ 5-6; ACAI Dec. ¶¶ 6, 9. And it will aid consumers who wish to pay their debts or who would benefit from hardship programs—and in the process, will eliminate needless litigation over unpaid bills.  *See* ACA Dec. ¶¶ 17-23, 27-28; PRAI Dec. ¶ 7; ADSI Dec. ¶ 8; *cf.* ACAI Dec. ¶ 8 (consumers have expressed appreciation during phone calls for debt collectors' understanding, compassion, and forbearance, which is possible only by phone).

**WHEREFORE,** ACA asks the Court to grant the Motion and issue its requested relief.

Dated:  April 20, 2020.

Respectfully submitted,

ACA INTERNATIONAL

By its attorneys,

*/s/ David M. Bizar*
David M. Bizar (BBO# 566795)
Seyfarth Shaw LLP
Seaport East, Suite 300
Two Seaport Lane
Boston, MA 02210-2028
Telephone:  (617) 946-4874
Fax:  (617) 790-5368
Email:  dbizar@seyfarth.com


Robert J. Carty, Jr. (*pro hac* application forthcoming)
Seyfarth Shaw LLP
700 Milam Street
Suite 1400
Houston, TX 77002
Telephone:  (713) 225-2300
Fax:  (713) 225-2340
Email:  rcarty@seyfarth.com