UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____

)
ACA INTERNATIONAL,                         )
   Plaintiff,                          )
              )
  v.                                      )   Civil Action No. 20-cv-10767-RGS
              )
MAURA HEALEY, in her official capacity     )
as the Attorney General of Massachusetts,  )
   Defendant                         )
_____)

**DEFENDANT MAURA HEALEY'S OPPOSITION TO PLAINTIFF'S
EMERGENCY MOTION FOR A TEMPORARY RESTRAINING
<u>ORDER AND FOR A PRELIMINARY INJUNCTION</u>**

   Attorney General Maura Healey, exercising her authority to define "unfair or deceptive acts or practices," has promulgated an emergency regulation that takes account of the ongoing coronavirus pandemic.  That regulation, among other things: (1) temporarily places a moratorium on initiating debt collection telephone calls; and (2) temporarily places a moratorium on filing new debt collection lawsuits.  The plaintiff, a trade association of debt collectors, seeks preliminary equitable relief, chiefly on the theories that those provisions violate its members' freedom of speech and right to petition the government, respectively.

   This Court should deny any equitable relief.  The temporary moratorium on initiating debt collection telephone calls is properly viewed as a restriction on commercial speech and, as such, is tailored to advance several important government interests.  The temporary moratorium on filing new debt collection lawsuits is in harmony with the petitioning right because it does not permanently deprive any debt collector of any substantive rights.  And the plaintiff's remaining claims are unlikely to succeed, no irreparable harm is threatened, and uninterrupted enforcement of the temporary regulation is emphatically in the public interest during this time of coronavirus.

## FACTS

### *The Debt Collection Industry Has Long Been Characterized by Aggressive Tactics, Especially the Use of the Telephone*

In 2014, approximately 23% of Massachusetts residents—more than 1.5 million people—had a debt in the collection process, including for money owing to credit card companies, educational institutions, retailers, and car dealers, among others.  Aff. of Max Weinstein (ECF #24-2) ¶¶7-8.  These debts are often collected by debt collectors—a company or law firm whose business is to collect a debt that was incurred to another company.  Id. ¶ 10-14.  Many "third-party" debt collectors act as agents of original "first-party" creditors, typically receiving as compensation a percentage of any amounts they collect from the consumer.  Id. ¶¶ 11, 14.  Sometimes, a law firm may act as a third-party debt collector, filing collections lawsuits in the small claims sessions of the Massachusetts District Courts and typically receiving a percentage of collected sums.  Id. ¶ 14.  Other debt collectors, known as "debt buyers," purchase defaulted debts from first-party creditors, typically for a small fraction of the outstanding balance, and then seek to collect the full balance from the consumer.  Id. ¶12.

All types of debt collectors pose special consumer protection concerns.  Id. ¶¶ 15-19.  As Congress found in enacting the Fair Debt Collection Practices Act, "[u]nlike creditors, who generally are restrained by the desire to protect their good will when collecting past due accounts, independent collectors are likely to have no future contact with the consumer and often are unconcerned with the consumer's opinion of them."  S. Rep. No. 95-382, 95th Cong., 1st Sess., reprinted in 1977 U.S.C.C.A.N. 1695, 1696.  In addition, because debt collectors' revenues often consist exclusively of a percentage of what they collect from consumers, the industry's predominant economic incentive is simply to maximize collections.  Id. ¶ 16.

Debt collectors typically pursue consumers through letters and telephone calls.  Id. ¶ 22.

By using automated dialing technologies, debt collectors are able to place large number of calls

to consumers at a very low cost.  Id. ¶ 26.  As such calls have become cheaper and easier for the

industry, they have also become more problematic and invasive for consumers:  Debt collectors

frequently inundate consumers with phone calls, even after having been asked to stop calling.  Id.

¶¶ 23-24.  The Massachusetts Attorney General's Office (AGO) frequently receives complaints

from consumers who report receiving an excessive number of debt collection calls, calls at

inconvenient or unreasonable times, and calls from debt collectors who have ignored requests

that calls cease.  Id. ¶¶ 23, 25, 27.  Some consumers receive as many as 15 telephone calls from

debt collectors per day.  Id. ¶ 28.  Consumers report that debt collection calls substantially

interfere with and complicate the routine tasks of their daily lives, and are enormously stressful

and highly intrusive.  Weinstein Aff. ¶¶ 29-30; cf. Telephone Consumer Protection Act (TCPA),

P.L. 102-243, 105 Stat. 2394 (Dec. 20, 1991) (Unrestricted telemarketing "can be an intrusive

invasion of privacy and, when an emergency or medical assistance telephone line is seized, a risk

to public safety.").  Consumers frequently agree to pay debt collectors simply to stop telephone

calls.  Weinstein Aff. ¶ 31.

### *The Debt Collection Industry Has Long Been Subject to Stringent Regulations, Especially Around Telephonic Communication*

In recognition of the special consumer protection concerns posed by debt collectors, both

Massachusetts and federal law extensively regulate the debt collection industry.  Many of those

regulations focus on telephonic communication.

At the federal level, the Fair Debt Collection Practices Act (FDCPA)—enacted in 1977 in

response to "abundant evidence of the use of abusive, deceptive, and unfair debt collection

practices" that contribute to "personal bankruptcies, to marital instability, to the loss of jobs, and

to invasions of individual privacy," 15 U.S.C. § 1692(a)—forbids debt collectors from:

- Calling a consumer before 8:00 A.M. or after 9:00 P.M., or at any other time known to be inconvenient to the consumer; id. § 1692c(a)(1);

- Calling the consumer's place of employment if the debt collector "has reason to know" that the employer forbids such calls; id. § 1692c(a)(3);

- Calling a consumer who has requested that they stop doing so;[1] id. § 1692c(c);

- Calling or engaging a consumer in conversation repeatedly or continuously with intent to annoy, abuse, or harass; id. § 1692d(5);

- Calling a consumer without meaningful disclosure of the caller's identity; id. § 1692d(6);

- Filing a collection lawsuit in a judicial district other than where the consumer resides or signed the underlying contract, or where any subject property is located; id. § 1692i;

- Using a false, deceptive, or misleading representation or means to attempt to collect a debt; id. § 1692e; and

- Engaging in other conduct "the natural consequence of which is to harass, oppress, or abuse" a consumer in connection with the collection of a debt.  Id. § 1692d.

These provisions and others seek to achieve Congress' aim "to eliminate abusive debt collection

practices by debt collectors . . . ."  15 U.S.C. § 1692(e).

At the state level, the Massachusetts Consumer Protection Act prohibits "unfair or

deceptive acts or practices in the conduct of any trade or commerce . . . ."  Mass. G.L. c. 93A,

§ 2; see also Mass. G.L. c. 93, § 49 (deeming it unfair, deceptive, or unreasonable for any

creditor to "communicate[] with the alleged debtor in such a manner as to harass or embarrass

the alleged debtor").  The Massachusetts Consumer Protection Act pronouncement incorporates

the Federal Trade Commission Act, of which the FDCPA is a part, meaning that conduct that

---

[1] A debt collector must also cease collection calls and letters if a consumer files for bankruptcy.  See, e.g., Randolph v. IMBS, Inc., 368 F.3d 726, 728 (7th Cir. 2009).

violates the FDCPA also violates G.L. c. 93A.  See McDermott v. Marcus, Errico, Emmer & Brooks, P.C., 775 F.3d 109, 122 (1st Cir. 2014).

"The purpose of [G.L. c. 93A, § 2's] open-ended legislative use of the words 'unfair' and 'deceptive' was to allow for the regulation of future, as-yet-undevised, business practices." Purity Supreme, Inc. v. Att'y Gen'l, 380 Mass. 762, 771 (1980).  Accordingly, the Attorney General of Massachusetts is authorized to "make rules and regulations interpreting" the ban on unfair and deceptive acts and practices.  Mass. G.L. c. 93A, § 2(c).

Pursuant to that authority, and to effectuate the general provisions of Mass. G.L. c. 93, § 49, the Attorney General has promulgated regulations "defining unfair or deceptive acts or practices, for the collection of debts from persons within [Massachusetts]."  940 C.M.R. § 7.01. Pursuant to those regulations, a creditor may not:

- Communicate by telephone with a consumer without disclosing the creditor's name and identifying the individual making the call; id. § 7.04(1)(d);

- Initiate a communication to a consumer at her residence more than twice weekly, or at places other than her residence more than twice monthly, for each debt; id. § 7.04(1)(f);

- Call a consumer at times other than between 8:00 A.M. and 9:00 P.M., unless the creditor knows her waking hours to be otherwise; id. § 7.04(1)(g);

- Call a consumer's place of employment if she has requested that such calls not be made; id. § 7.04(1)(g); or

- Contact other persons who reside with the consumer in various ways; 940 C.M.R. § 7.05(3).

In contrast to the FDCPA, which applies only to debt collectors, these regulations apply to both debt collectors and first-party creditors.  See 940 C.M.R. § 7.03.

***The Coronavirus Temporarily Alters the Ordinary Patterns of Everyday Life in Massachusetts***

In response to the emerging coronavirus pandemic, Governor Charles Baker declared a state of emergency in Massachusetts on March 10.  The Governor subsequently ordered the

temporary closures of all primary and secondary schools and non-emergency childcare programs. The Governor also, on March 23, prohibited gatherings of more than 10 people and ordered all physical places of business except those deemed "essential" to temporarily close, an order that remains in effect through at least May 18.

These dramatic restrictions on economic activity were accompanied by an equally dramatic spike in unemployment claims.  In the five weeks preceding April 23, Massachusetts received more than 650,000 new claims for unemployment assistance, representing nearly 18 percent of the Commonwealth's labor force.  See Larry Edelman, "4.4 million more Americans seek unemployment benefits" (Boston Globe, Apr. 23, 2020).[2]  Others in need have not yet completed a claim.  See Ted Daniel, "As unemployment claims grow, so does frustration with Mass. unemployment agency: Backlog has left many unable to file for benefits and struggling to pay necessities like rent and utilities" (Boston 25 News, Apr. 23, 2020).[3]

During the week of March 16, each department of the Commonwealth's trial judiciary issued a standing order aimed at minimizing the need for people to be physically present at state courthouses while simultaneously ensuring that the courts remained open to receive and adjudicate "emergency" matters.  Anticipating a slowdown or halt in non-emergency court business, the Commonwealth's Supreme Judicial Court ordered all statutes of limitation tolled from March 17 through May 3,[4] and later extended that tolling through May 31.[5]

---

[2] https://www.bostonglobe.com/2020/04/23/business/44-million-more-americans-file-jobless-claims-amid-coronavirus-pandemic/
[3] https://www.boston25news.com/news/health/unemployment-claims-grow-so-does-frustration-with-mas-unemployment-assistance-agency/XV3KI2LAQRE5LP6XKIXDPE4RL4/
[4] See https://www.mass.gov/supreme-judicial-court-rules/supreme-judicial-court-order-regarding-court-operations-under-the.
[5] See https://www.mass.gov/doc/supreme-judicial-court-updated-order-regarding-court-operations-under-the-exigent-circumstances/download.

As the SJC succinctly observed in a recent opinion, "[e]veryday life is heavily disrupted; most businesses, schools, and houses of worship are closed, while grocers, pharmacies, and delivery services stretch to provide essential services to meet basic needs, and families without paychecks worry about how to meet those needs." Committee for Public Counsel Svcs. v. Chief Justice of the Trial Court, 484 Mass. 431, 2020 WL 1659939 at *1 (Apr. 3, 2020).

***Debt Collectors Continue Business-as-Usual Notwithstanding the Coronavirus***

Even as the coronavirus pandemic descended on everyday life in Massachusetts, debt collectors continued to utilize intrusive and high-pressure collection tactics. Between March 13 and March 26, debt collectors filed at least 2,069 collection lawsuits in small claims sessions of the Massachusetts District Courts. Weinstein Aff. ¶ 33. Debt collectors also continued to use aggressive calling tactics to demand payment from consumers, many of whom were already under significant financial distress. Id. ¶¶ 34-37. For instance:

- On March 19, a consumer complained to the AGO: "They call multiple times a day, every day, even on holidays and weekends, from spoofed numbers that appear as local calls." Id. ¶ 37.

- On March 20, another reported: "I am being harassed by [company], I am late a week due to this pandemic we all are experiencing they are calling 6 or 7 times a day . . . I have been paying on time for the last few months but like most people were not allowed to work[.]" Id. ¶ 35.

- And, on March 25, another reported: "It's the middle of a national global pandemic and [company] keeps calling and harassing us to pay them. . . . We obviously can't make a payment right now. They're using threatening language saying they'll send people to my house in the middle of a pandemic." Id. ¶ 36.

***Attorney General Healey Promulgates a Regulation that Adapts Debt Collection Practices to the Changed Times***

As noted, the Attorney General of Massachusetts is empowered to "make rules and regulations interpreting" the statutory ban on unfair or deceptive acts or practices in commerce. Mass. G.L. c. 93A, § 2(c). On March 26, Attorney General Healey exercised that power to

promulgate, pursuant to Mass. G.L. c. 30A, § 2, a new emergency regulation on "Unfair and

Deceptive Debt Collection Practices During the State of Emergency Caused by COVID-19" (the

"Regulation"). <u>See</u> Weinstein Aff. ¶ A (a copy of the Regulation). The Regulation supplements

the preexisting regulations applicable to the debt collection industry.

Two substantive provisions of the Regulation are particularly pertinent to this case. First,

the Regulation temporarily deems certain acts by a creditor (i.e., including a debt collector) to

collect a debt to be unfair or deceptive. 940 C.M.R. § 35.03(1). One such act is to "initiate, file,

or threaten to file any new collection lawsuit" except one arising out of a debt owing on a

mortgage loan, or by a tenant to a landlord. <u>Id</u>. §§ 35.03(1)(a) & (2). Second, the Regulation

temporarily deems it unfair or deceptive for a debt collector (i.e., not all creditors) to "initiate a

communication with any debtor via telephone . . . to the debtor's residence, cellular telephone, or

other telephone number provided by the debtor as his or her personal telephone number" except

as relates to a debt owing on a mortgage loan, or by a tenant to a landlord. <u>Id</u>. §§ 35.04(1) & (3).

This latter provision exempts communications made solely to discuss a rescheduled court

appearance, as well as those initiated or requested by the debtor. <u>Id</u>. §§ 35.04(1) & (2).

As noted, both § 35.03 and § 35.04 are temporary. By their own terms, each is effective

only until the earlier of: (1) ninety days following the Regulation's effective date; or (2) thirty

days following the lifting of the gubernatorially declared state of emergency. <u>Id</u>. §§ 35.03(1) &

35.04(1). In addition, by virtue of being an emergency measure, the Regulation cannot "remain

in effect for longer than three months" without notice and a public hearing. Mass. G.L. c. 30A,

§ 2. Although the Regulation was issued on March 26, its substantive portions did not take

effect until March 27. <u>See</u> 940 C.M.R. § 35.02 (defining "State of Emergency Period" to mean

"one business day following March 26, 2020").

## ARGUMENT

The plaintiff seeks both temporary and preliminary relief to enjoin the enforcement of the Regulation.  A preliminary injunction is an "extraordinary and drastic" remedy, "never awarded as of right."  <u>Munaf v. Geren</u>, 553 U.S. 674, 689-90 (2008) (internal citation omitted).  To obtain such relief, the movant must show: "(1) a substantial likelihood of success on the merits, (2) a significant risk of irreparable harm if the injunction is withheld, (3) a favorable balance of hardships, and (4) a fit (or lack of friction) between the injunction and the public interest." <u>Nieves-Marquez v. Puerto Rico</u>, 353 F.3d 108, 120 (1st Cir. 2003).  This same four-factor test also governs issuance of a temporary restraining order.  <u>Coates v. JP Morgan Chase Bank, NA</u>, No. 12-cv-11831-RGS, 2012 WL 5398536 at *5 (D. Mass. Nov. 1, 2012) (citation omitted).

The first factor is the "<u>sine qua non</u> of a preliminary injunction.  If the moving party cannot demonstrate that he is likely to succeed in his quest, the remaining factors become matters of idle curiosity."  <u>Arborjet, Inc. v. Rainbow Treecare Sci. Advancements, Inc.</u>, 794 F.3d 168, 173 (1st Cir. 2015) (citations omitted).  And the last two factors—balance of hardships and promotion of the public interest—"merge when the Government is the opposing party."  <u>Nken v. Holder</u>, 556 U.S. 418, 435 (2009).

This Court should deny any equitable relief.  First, the plaintiff is not likely to succeed on any of its claims that the Regulation contravenes Massachusetts law.  <u>See</u> pp. 10-11 below.  Second, the plaintiff is not likely to succeed on its claim that § 35.04's temporary moratorium on debt collection calls violates its members' freedom of speech.  <u>See</u> pp. 11-20 below.  Third, the plaintiff is not likely to succeed on its claim that § 35.03's temporary moratorium on filing new debt collection lawsuits violates its members' right to petition the government.  <u>See</u> pp. 20-22 below.  Fourth, the plaintiff is not likely to succeed on its claim that the Regulation violates the

federal due process clause.  See p. 23 below.  Fifth, the plaintiff is not likely to succeed on its

claim that the Regulation violates the federal equal protection clause.  See pp. 23-24 below.

Finally, the remaining factors support denial of injunctive relief.  See pp. 24-25 below.

**I.  The Plaintiff Is Not Likely to Succeed on Any of Its Claims that the Regulation Contravenes Massachusetts Law.**

As a preliminary matter, the plaintiff asserts numerous claims that the Regulation

contravenes Massachusetts state law.  Specifically, the plaintiff argues that: (1) § 35.03 violates

article 30 of the Massachusetts Declaration of Rights (ECF #7 at 21-22;[6] see also ECF #2 at ¶¶

94-100); (2) § 35.03 violates Mass. G.L. c. 231, § 59H, the "anti-SLAPP" statute (ECF #7 at 24;

see also ECF #2 at ¶¶ 79-80); (3) § 35.03 violates a Massachusetts common law litigation

privilege (ECF #7 at 24; see also ECF#2 at ¶¶ 81-82); (4) § 35.03 exceeds the scope of the

Attorney General's rulemaking authority under Mass. G.L. c. 93A, § 2(c) (ECF #7 at 11-12; see

also ECF #2 at ¶¶ 101-04); and (5) both § 35.03 and § 35.04 contravene the equal protection

principles embodied in article 10 of the Massachusetts Declaration of Rights (ECF #7 at 25-26;

see also ECF #2 at ¶¶ 88-93).

None of these claims are likely to succeed because the Eleventh Amendment deprives

this Court of jurisdiction to hear them.  Specifically, Ex parte Young, 209 U.S. 123 (1908),

which gives federal courts jurisdiction over claims for prospective injunctive relief against state

officials accused of violating federal law, does not similarly give federal courts jurisdiction over

claims of violation of state law.  Pennhurst State Sch. & Hosp. v. Halderman, 465 U.S. 89, 106

(1984).  "A federal court's grant of relief against state officials on the basis of state law, whether

prospective or retroactive, does not vindicate the supreme authority of federal law."  Id.  Instead,

---

[6] Citations to the plaintiff's memorandum of law (ECF #7) refer to the page numbers appearing in the memorandum's header, not those appearing in its footer.

"it is difficult to think of a greater intrusion on state sovereignty than a federal court instructing state officials on how to conform their conduct to state law." Id.

As such, all of the plaintiff's claims that the Regulation contravenes Massachusetts state law are beyond this Court's jurisdiction, and hence enjoy no likelihood of success.

## II.     The Plaintiff Is Not Likely to Succeed on Its Claim that § 35.04's Temporary Moratorium on Debt Collection Calls Violates Its Members' Freedom of Speech.

The plaintiff first argues (ECF #7 at 11-21) that § 35.03 is invalid because its temporary moratorium on initiating debt collection calls violates its members' freedom of speech under the First Amendment.  Specifically, the plaintiff argues (ECF #7 at 14-20) that § 35.04 is subject to strict scrutiny because it forms a content-based restriction on speech under Reed v. Town of Gilbert, 576 U.S. 155, 135 S. Ct. 2218 (2015).

The plaintiff is unlikely to succeed on this claim.  First, because § 35.04 regulates commercial speech, § 35.04 must be analyzed using the test set forth in Central Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of N.Y., 447 U.S. 557, 564 (1980), rather than strict scrutiny. See pp. 12-13 below.  Second, applying the Central Hudson test, § 35.04 is tailored to directly advance at least three substantial government interests: (1) shielding consumers from aggressive debt collection practices that wield undue influence in view of the coronavirus pandemic; (2) protecting residential tranquility while citizens have largely had to remain at home during the coronavirus pandemic; and (3) temporarily vouchsafing citizens' financial wellbeing during the coronavirus pandemic.  See pp. 14-20 below.

**A.      Because It Regulates Commercial Speech, § 35.04 Must Be Analyzed Using the <u>Central Hudson</u> Test Rather than Strict Scrutiny.**

The plaintiff argues (ECF #7 at 14-15) that § 35.04 is a content-based restriction on speech that is subject to strict scrutiny.  This argument fails because a regulation of commercial speech such as § 35.04 is not subject to strict scrutiny.

Commercial speech connotes "expression related solely to the economic interests of the speaker and its audience," and includes speech that proposes a commercial transaction.  <u>Central Hudson Gas & Elec. Corp. v. Public Service Comm'n of N.Y.</u>, 447 U.S. 557, 561-62 (1980). Here, because § 35.04 applies only to telephonic communications initiated by a debt collector to a debtor, it regulates only commercial speech.  <u>See</u>, <u>e.g.</u>, <u>Mass. Ass'n of Private Career Sch. v. Healey</u>, 159 F. Supp. 3d 173, 194 (D. Mass. 2016) (deeming regulation limiting private career schools' ability to initiate communications with prospective students to restrict only commercial speech); <u>Stover v. Fingerhut Direct Mktg., Inc.</u>, 709 F. Supp. 2d 473 (S.D. W. Va. 2009) (analyzing telephone calls by debt collector as commercial speech).

Rather than contend that § 35.04 restricts non-commercial speech, the plaintiff relies exclusively on <u>Reed</u> to argue that § 35.04 is subject to strict scrutiny, simply because it is content based.  In <u>Reed</u>, the Supreme Court deemed a municipal sign ordinance—which prescribed special rules for categories of signs including "ideological signs," "political signs," and "temporary directional signs relating to a qualifying event"—to be content-based because the rules that applied to a given sign "depend[ed] entirely on the communicative content of the sign." 135 S. Ct. at 2227.  Applying strict scrutiny, the Court held that the sign ordinance was "hopelessly underinclusive" with respect to the municipality's asserted interests in aesthetics and traffic safety.  <u>Id.</u> at 2231-32.

12

Conspicuously missing from Reed is any indication that it applies to restrictions on commercial speech, which the Supreme Court has "always been careful to distinguish . . . from speech at the First Amendment's core." Fla. Bar v. Went For It, Inc., 515 U.S. 618, 623 (1995). Even content-based restrictions on commercial speech have long been analyzed using the brand of intermediate scrutiny set forth in Central Hudson. See, e.g., Sorrell v. IMS Health Inc., 564 U.S. 552, 571-72 (2011). Indeed, the notion that a restriction on commercial speech might depend on the content of that speech is part of the architecture of commercial speech doctrine: Because such speech "is linked inextricably with the commercial arrangement it proposes . . . the State's interest in regulating the underlying transaction may give it a concomitant interest in [regulating] the expression itself." Edenfield v. Fane, 507 U.S. 761, 767 (1993).

Reed did not suggest that it intended to disrupt these settled doctrines. See generally Note, Free Speech Doctrine After Reed v. Town of Gilbert, 129 Harv. L. Rev. 1981, 1990-91 (2016). Accordingly, two Courts of Appeals and numerous District Courts—including another session of this Court—have concluded that the Central Hudson test continues to govern content-based restrictions on commercial speech even after Reed. See, e.g., Contest Promotions, LLC v. City & Cty. of San Francisco, 874 F.3d 597, 601 (9th Cir. 2017); Lone Star Sec. & Video, Inc. v. City of Los Angeles, 827 F.3d 1192, 1198 n.3 (9th Cir. 2016) ("[A]lthough laws that restrict only commercial speech are content based, such restrictions need only withstand intermediate scrutiny [under Central Hudson]."); Dana's R.R. Supply v. Att'y Gen'l, 807 F.3d 1235, 1246 (11th Cir. 2015) ("[T]he general rule that content-based restrictions trigger strict scrutiny is not absolute. Content-based restrictions on certain categories of speech such as commercial and professional speech, though still protected under the First Amendment, are given more leeway . . . ."); Mass. Ass'n of Private Career Schs., 159 F. Supp. 3d at 192-93.

**B.      Section 35.04 Is Amply Justified Under the <u>Central Hudson</u> Test.**

Commercial speech enjoys only a "limited measure of protection, commensurate with its subordinate position in the scale of First Amendment values, and is subject to modes of regulation that might be impermissible in the realm of noncommercial expression." <u>Fla. Bar</u>, 515 U.S. at 623.  Specifically, where commercial speech is neither misleading nor related to unlawful activity, a regulation of that speech is justified where:

1. The government can assert a substantial interest to be achieved by the restriction;

2. The restriction directly advances that interest; and

3. The restriction is not more extensive than necessary to serve that interest

<u>Central Hudson</u>, 447 U.S. at 564.

Section 35.04's temporary moratorium on debt collection calls is amply justified under that test.  First, § 35.04 is justified by any one or more of three substantial government interests, specifically: (1) shielding consumers from aggressive debt collection practices that wield undue influence in view of the coronavirus pandemic; (2) protecting residential tranquility while citizens have largely had to remain at home during the coronavirus pandemic; and (3) temporarily vouchsafing citizens' financial wellbeing during the coronavirus pandemic.  <u>See</u> pp. 14-17 below.  Second, § 35.04 directly advances each of those interests.  <u>See</u> pp. 18-19 below. Third, § 35.04 is not more extensive than needed to serve those interests.  <u>See</u> pp. 19-20 below.

**1.      Section 35.04 is justified by one or more of three substantial government interests.**

Section 35.04 is justified by any one or more of three substantial government interests: (1) shielding consumers from aggressive debt collection practices that wield undue influence in view of the coronavirus pandemic; (2) protecting residential tranquility while citizens have largely had to remain at home during the coronavirus pandemic; and (3) temporarily vouchsafing

14

citizens' financial wellbeing during the coronavirus pandemic.  Cf. Rubin v. Coors Brewing Co., 514 U.S. 476, 483-86 (1995) (sequentially considering alternative interests proffered by government defendant).

First, the Commonwealth has a substantial interest in restricting aggressive collection tactics that "may be pressed with such frequency or vehemence as to intimidate, vex, or harass the recipient."  Edenfield, 507 U.S. at 769; accord Mass. Ass'n of Private Career Sch. v. Healey, 159 F. Supp. 3d at 192-93 (upholding AG regulation that deemed it an unfair practice for for-profit career schools to initiate communication with a prospective student more than twice per week by any method, based on substantial government interest in protecting prospective students from high-pressure recruiting tactics).  The First Amendment has long been understood to condone a ban on commercial speech that, while not literally misleading, occurs "under circumstances conducive to uninformed acquiescence" by its recipient.  Ohralik v. Ohio State Bar Ass'n, 436 U.S. 447, 464-65, (1978) (attorney has no First Amendment right to conduct in-person solicitation of injured person); accord Fla. Bar, 515 U.S. at 624-25 (attorney has no First Amendment right to send mail solicitation to person who has recently been injured).  Here, the Commonwealth's interest in shielding citizens from undue influence in connection with debt collection must be understood in the context of the coronavirus pandemic.  Specifically, work is scarce, money is dear, and even the mere suggestion of physical contact with other persons— including in connection with repayment of a debt—is fraught with real and perceived danger. Under these circumstances, the government assumes an even stronger interest in protecting consumers from debt collectors' already aggressive telephone communication tactics.

Second, the Commonwealth has a substantial interest in protecting residential tranquility during the coronavirus pandemic.  "The State's interest in protecting the well-being, tranquility,

and privacy of the home is certainly of the highest order in a free and civilized society" and is something "which the State may legislate to protect . . . ." Frisby v. Schultz, 487 U.S. 474, 484-85 (1988).  This rationale has frequently been invoked to reject free speech challenges to the Telephone Consumer Protection Act, 47 U.S.C. § 227, and other statutes that similarly ban or restrict whole categories of telephonic communications by solicitors and marketers.  See, e.g., Moser v. Fed. Communications Comm'n, 46 F.3d 970, 974 (9th Cir. 1995) (upholding TCPA's ban on nonconsensual prerecorded calls on strength of interest in "residential privacy"); Gomez v. Campbell-Ewald Co., 768 F.3d 871, 876-77 (9th Cir. 2014) (applying same rationale to cover text messages sent to cellular telephones), aff'd on other grounds 136 S. Ct. 663 (2016); Van Bergen v. Minnesota, 59 F.3d 1541, 1554-55 (8th Cir. 1995) (upholding similar Minn. statutory ban on same rationale); Patriotic Veterans, Inc. v. Zoeller, 845 F.3d 303, 305-06 (7th Cir. 2017) (upholding similar Ind. statutory ban on same rationale).  Here again, the Commonwealth's interest is especially strong in the circumstances of the coronavirus pandemic, when citizens have effectively been required to spend a good deal more time in the home.

Third, the Commonwealth has a substantial interest in temporarily vouchsafing citizens' financial wellbeing during the coronavirus pandemic.  The pandemic presents an intertwined public health crisis and economic crisis.  As economic activity has slowed to a crawl, the government has assumed a substantial interest in ensuring that citizens have the wherewithal to procure basic necessities such as food and shelter.  In this way, the Commonwealth's interest here is not unlike the interest undergirding the federal Bankruptcy Code: to give certain insolvent debtors breathing space to reorder their affairs and to make peace with their creditors.  Grogan v. Garner, 498 U.S. 279, 286 (1991).

As noted, each of these three government interests is molded by the exigent circumstances of the coronavirus pandemic.  As the law has often recognized in distressed times, exigent circumstances "may . . . clothe with [a public] interest what at other times or in other places would be a matter of purely private concern."  Block v. Hirsh, 256 U.S. 135, 155 (1921) (Holmes J.) (upholding Washington D.C. rent control restrictions made necessary by influx of people into city during World War I); accord Yakus v. United States, 321 U.S. 414, 441-43 (1944) (upholding World War II-era price control legislation, which sought, among other things, "to protect persons with relatively fixed and limited incomes" during wartime economy).  "[I]f state power exists to give temporary relief from the enforcement of contracts in the presence of disasters due to physical causes such as fire, flood, or earthquake, that power cannot be said to be nonexistent when the urgent public need demanding such relief is produced by other and economic causes."  Home Building & Loan Ass'n v. Blaisdell, 290 U.S. 398, 439-40 (1934) (upholding Great Depression-era Minn. statute extending time for mortgagee to redeem mortgage prior to foreclosure sale).  In this connection, the law of Massachusetts and many other states reflects that the meaning of "unfair or deceptive" conduct is properly affected by the presence of a temporary public emergency.  See, e.g., 940 C.M.R. § 3.18 (price gouging during declared statewide or national emergency); Cal. Penal Code § 396(b) & (i) (price gouging for 30 days following presidential, gubernatorial, or local declaration of emergency); Iowa Admin. Code R. 61-31.1(714) (price gouging during, and for up to six months following, declared emergency); Mo. Code Regs. tit. 15, § 60-8.030 (price gouging in federally or state-declared "disaster area").

### 2. Section 35.04 directly advances each of the Commonwealth's substantial government interests.

A restriction of commercial speech "directly advances" a government interest if the government can demonstrate that "the harms it recites are real and that [the] restriction will in fact alleviate them to a material degree." Fla. Bar, 515 U.S. at 625-26.

First, § 35.04 directly advances the government's interest in shielding consumers from aggressive debt collection practices. As the record demonstrates, the debt collection industry has a long history of utilizing telephonic communications as a source of pressure on consumers. Weinstein Aff. ¶¶ 22-31. Attendant consequences to consumers may include emotional distress, interference with the routine tasks of daily life, and the payment of debts that are not actually due in order to get the calls to cease. Id. ¶¶ 29-31. In some extreme cases, a consumer may also experience physical distress as a result. See GreenPoint Credit Corp. v. Perez, 75 S.W.3d 40 (Tex. App. 2002) (affirming award of compensatory damages to elderly consumer who suffered shingles, related sores, anxiety, nausea, and elevated blood pressure due to repeated telephone and in-person harassment by debt collector). Section 35.04 alleviates those harms by temporarily curtailing such communications during the coronavirus pandemic.

Second, and for essentially the same reasons, § 35.04 directly advances the government's interest in preserving the tranquility of the home. See TCPA, P.L. 102-243, 105 Stat. 2394 (Dec. 20, 1991) (unsolicited telephone calls "can be an intrusive invasion of privacy").

Third, § 35.04 directly advances the government's interest in temporarily vouchsafing citizens' financial wellbeing during the coronavirus pandemic. Insofar as § 35.04 has the effect of channeling debt collection to means other than telephonic communication, the Regulation will materially alleviate the pressure on consumers to maintain sufficient funds to provide for their basic needs. See Weinstein Aff. ¶ 36 (consumer: "It's the middle of a national global pandemic

and [company] keeps calling and harassing us to pay them. . . .  We obviously can't make a payment right now.").

### 3.     Section 35.04 is not more extensive than needed to serve the Commonwealth's substantial government interests.

The third prong of <u>Central Hudson</u> is satisfied by a "fit" between the government's interest and the means chosen to achieve that interest, "a fit that is not necessarily perfect, but reasonable; that represents not necessarily the single best disposition but one whose scope is in proportion to the interest served, that employs not necessarily the least restrictive means but . . . a means narrowly tailored to achieve the desired objective."  <u>Fla. Bar</u>, 515 U.S. at 632 (citation omitted).  Three features of § 35.04's temporary moratorium on debt collection calls demonstrate that it is narrowly tailored to the Commonwealth's interests.

First, § 35.04's moratorium is limited to telephonic communications.  It does not restrict a debt collector's use of postal mail, e-mail, or other non-contact, non-telephonic means to communicate with a debtor.  <u>See</u> Weinstein Aff. Exh. B.  Indeed, the record in this case reveals that such "[w]ritten collection notices . . . can be effective," albeit more costly than telephonic communications.  Aff. of Robert Terrasi (ECF #7-2) ¶ 5; <u>see also</u> Aff. of Jay Gonsalves (ECF #7-3) ¶ 5 (describing how firm has transitioned to "special COVID-19 letter[s]" since Regulation was enacted).  The preservation of such "ample alternative channels" has frequently served to demonstrate that a restriction on commercial speech is appropriately tailored.  <u>See</u>, <u>e.g.</u>, <u>Fla. Bar</u>, 515 U.S. at 633-34; <u>Mass. Ass'n of Private Career Sch. v. Healey</u>, 159 F. Supp. 3d at 192-93.

Second, § 35.04's moratorium is limited to communications initiated by the debt collector.  Consumers are free to call debt collectors, and debt collectors are free to receive those calls, a circumstance that has also frequently served to demonstrate that a restriction on commercial speech is appropriately tailored.  <u>See</u>, <u>e.g.</u>, <u>Fla. Bar</u>, 515 U.S. at 633-34; <u>Mass. Ass'n</u>

of Private Career Sch. v. Healey, 159 F. Supp. 3d at 192-93.  Indeed, during the brief time that this suit has been pending, the plaintiff's CEO has observed in a blog post that "the collections industry is experiencing an unprecedented number of inbound calls from consumers seeking their help in resolving debts,"[7] a trend that § 35.04 does not prohibit.

Third, § 35.04's moratorium is temporary, persisting only for ninety days at most.  Such a "limit in time, to tide over a passing trouble, may well justify a law that could not be upheld as a permanent change."  Block, 256 U.S. at 157.  The time-limited nature of a restriction on commercial speech is also a hallmark of narrow tailoring.  See, e.g., Fla. Bar, 515 U.S. at 633-34 (upholding prohibition on direct-mail solicitation of injury victims by attorneys for thirty days following accident, in part based on prohibition's being "limited to a brief period").

### III.   The Plaintiff Is Not Likely to Succeed on Its Claim that § 35.03's Temporary Moratorium on Filing New Debt Collection Lawsuits Violates Its Members' Right to Petition the Government.

The plaintiff next argues (ECF #7 at 21-24) that § 35.03 is invalid because its temporary moratorium on filing new debt collection actions in court violates its members' right to petition the government.[8]  The First Amendment provides that "Congress shall make no law abridging . . . the right of the people . . . to petition the Government for a redress of grievances."  The right of access to courts is an aspect of this First Amendment right to petition.  Borough of Duryea v. Guarnieri, 564 U.S. 379, 387 (2011).

---

[7] See https://www.insidesources.com/dangerous-narrative-around-stimulus-checks-could-harm-consumers/.  A copy of the post is filed with this memorandum as Exhibit 1 (ECF #24-1).

[8] In an apparent reference to the other debt collection activities that are temporarily proscribed by § 35.03, the plaintiff purports that its argument extends to "carrying out court-authorized relief . . . ."  ECF #7 at 23.  But the plaintiff makes no attempt to explain how activities such as enforcing a capias warrant are within the scope of the right to petition.

The right of access to courts, however, permits measures that impose mere procedural obstacles to the vindication of substantive rights.  See, e.g., Rivera v. Allin, 144 F.3d 719, 725-26 (11th Cir. 1998) (provision of Prison Litigation Reform Act that makes certain plaintiffs ineligible to proceed in forma pauperis does not offend right of access because it is "purely procedural" and "in no way prescribe[s] rules of decision"); Sires v. Gabriel, 748 F.2d 49 (1st Cir. 1984) (injunction barring demonstrably vexatious litigant from filing new complaint without leave would not offend right of access); In re City of San Bernardino, 558 B.R. 321, 330-31 (C.D. Cal. 2016) (application of automatic bankruptcy stay does not offend creditor's right of access).  A mandated delay to the vindication of substantive rights is such a permissible procedural obstacle.  See, e.g., Block, 256 U.S. at 157-58 (upholding D.C. statute that forbids most evictions for two years, while "secur[ing] to the landlord a reasonable rent" in meantime); Blaisdell, 290 U.S. at 445 (upholding Minn. statute that permits mortgagor to retain possession of residence pending redemption for up to two years, where indebtedness is not impaired, interest continues to run, conditions of redemption are not modified, and mortgagee's right to obtain deficiency judgment is not diminished).

Here, § 35.03 does not permanently or irrevocably prevent creditors from vindicating any substantive rights.[9]  Section 35.03, like § 35.04, is temporary, lasting only for ninety days at most.  Cf. Blaisdell, 290 U.S. at 447 (upholding Minn. statute in part because it is "temporary in operation . . . limited to the exigency which called it forth").  All state statutes of limitation have been tolled, with the consequence that no creditor will find itself without legal recourse for

---

[9] Although the plaintiff briefly argues (ECF #7 at 22) that § 35.03 "redefines the [diversity] jurisdiction of the federal courts," § 35.03 purports to do no such thing—certainly no more than any other state law enactment that incidentally affects the ability to bring suit in federal court under § 1332.  Cf. Guaranty Trust Co. v. York, 326 U.S. 99, 109-10 (1945) (federal court sitting in diversity bound to apply state law statute of limitations).

recovery of alleged debts.  Cf. Stewart v. Kahn, 78 U.S. 493, 507 (1870) (federal legislation that

tolled some statutes of limitation in view of Civil War "promotes justice").  And § 35.03 does

not halt the accrual of interest or any other liabilities that a consumer may incur by virtue of her

agreement with a creditor.  Thus, the effect of § 35.03 is merely to delay a creditor's day in

court, while temporarily protecting consumers from a method of debt collection that is uniquely

threatening under the circumstances of the pandemic.

Section 35.03 is not the only enactment of its type to emerge in response to the

coronavirus pandemic.  Recent federal legislation imposes a 60-day moratorium on the initiation

of judicial (and non-judicial) foreclosure proceedings against a federally backed mortgage loan.

Coronavirus Aid, Relief, and Economic Security Act ("CARES") Act, P.L. 116-136, 134 Stat.

281, § 4022(c)(2) (Mar. 27, 2020).  The same legislation imposes a 120-day moratorium on the

filing of eviction actions where the leased property participates in a specified federal program or

has a federally backed mortgage loan.  Id. at § 4024(b)(1).  And Massachusetts and several other

states have either enacted comparable legislation, or have decreed a moratorium on eviction

and/or foreclosure proceedings by gubernatorial order.  See, e.g., Mass. St. 2020, c. 65, § 3(b)

(Apr. 20, 2020) (prohibiting courts from accepting writs, summons, or complaints for certain

summary process evictions for next 120 days or until 45 days after end of declared emergency);

Alaska Stat. 2020, c. 10, § 21 (Apr. 9, 2020) ("suspend[ing]" statutory causes of action for

eviction for nonpayment of rent through June 30 or until end of declared emergency); see

generally National Consumer Law Center, "Major Consumer Protections Announced in

Response to COVID-19" (Apr. 28, 2020).[10]

---

[10] https://library.nclc.org/major-consumer-protections-announced-response-covid-19

IV.    **The Plaintiff Is Not Likely to Succeed on Its Claim that the Regulation Violates the Federal Due Process Clause.**

The plaintiff argues (ECF #7 at 24-25) that the Regulation violates federal due process because it allegedly went into effect on March 26, one day before it was publicly announced by a news release.  Blaming the "lack of [a] notice and comment period," the plaintiff argues that the Regulation exposed its members to liability even though they may not have been aware of it.

The plaintiff's argument fails because, although the Regulation was issued on March 26, its substantive portions did not take effect until March 27.  See 940 C.M.R. § 35.02 (defining "State of Emergency Period" to mean "one business day following March 26, 2020").  To the extent the plaintiff is arguing that it was entitled to a notice and comment period, it is long-established that due process imposes no such requirement on legislative-type rules of prospective application.  E.g., Bi-Metallic Investment Co. v. State Bd. of Equalization, 239 U.S. 441, 445-46 (1915); see also Mass. G.L. c. 30A, § 2 (notice and comment not required unless emergency regulation extends beyond 90 days from effective date).  And the plaintiff does not identify any creditor or debt collector that experienced any confusion about the Regulation's effectiveness, nor does it identify any actual or threatened enforcement of the Regulation based on actions taken on March 26.

V.    **The Plaintiff Is Not Likely to Succeed on Its Claim that the Regulation Violates the Federal Equal Protection Clause.**

Although the plaintiff purports to argue (ECF #7 at 25-26) that the Regulation violates federal equal protection, it never identifies a class that the Regulation singles out, let alone one based on a suspect classification.  As such, any distinctions drawn by the Regulation are subject to rational basis review, which seeks only "some reasonably conceivable set of facts that could establish a rational relationship between challenged law[] and the government's legitimate ends."

Kittery Motorcycle, Inc. v. Rowe, 320 F.3d 42, 47 (1st Cir. 2003).  To the extent the plaintiff is criticizing the Regulation's singling-out of creditors and debt collectors from other commercial actors, that distinction is likely to satisfy rational basis review based on the governmental purposes described at pages 15-17 above.  To the extent the plaintiff is criticizing the Regulation's distinction between first-party creditors and debt collectors, that distinction is likely to satisfy rational basis review based on the documented differences between those two types of creditors.  See Weinstein Aff. ¶ 16; S. Rep. No. 95-382.

## VI.    The Plaintiff Has Not Demonstrated an Entitlement to a Preliminary Injunction Under the Remaining Factors.

Because an inability to demonstrate a likelihood of success on the merits is "fatal" to a request for preliminary injunctive relief, this Court need not necessarily consider the remaining factors.  Arborjet, 794 F.3d at 173.  But, even if this Court finds that the plaintiff has demonstrated a likelihood of success on any of its claims, the plaintiff can show neither irreparable harm nor any public interest sufficient to warrant injunctive relief.

The plaintiff first argues (ECF #7 at 26) that the loss of its free speech rights constitutes irreparable harm.  To the extent the plaintiff has demonstrated a likelihood of success on the merits of its free speech challenge to § 35.04, this is an accurate statement of the law.  See Asociacion de Educacion Privada de P.R., Inc. v. Garcia-Padilla, 490 F.3d 1, 21 (1st Cir. 2007).  But that does not compel this Court to accord great weight to that factor.  See Tracy Rifle & Pistol LLC v. Harris, 118 F. Supp. 3d 1182, 1193 (E.D. Cal. 2015) (although plaintiff was likely to succeed in challenge to statute prohibiting certain methods of advertising gun sales, harm occasioned by loss of such free speech rights was entitled to only "minimal weight" based on plaintiff's ability to utilize alternative methods of advertising; denying injunction based on balance of equities and public interest), aff'd, 637 F. App'x 401 (9th Cir. 2016).

24

The plaintiff also argues (ECF #7 at 26-27) that the Regulation is "inflicting permanent financial harm on [its] members."  But monetary damages alone do not constitute irreparable harm, at least so long as the very existence of the movant's business is not threatened.  Vaqueria Tres Monjitas, Inc. v. Irizarry, 587 F.3d 464, 485 (1st Cir. 2009).  Here, the affidavits of some of the plaintiff's members show that revenues are down.  Terrasi Aff. ¶ 6; Gonsalves Aff. ¶ 6; Aff. of Glenn Misiph (ECF #14-2) ¶¶ 11-12.  But they do not show that those lost revenues are attributable to the Regulation, nor do they detail the affiants' expenses, or how those expenses cannot be temporarily decreased, so as to show that an affiant's failure is imminent.  To the contrary, the plaintiff's evidence reveals that debt collectors are continuing to do business, and continuing to receive revenues, albeit through other permissible means such as postal mail. Gonsalves Aff. ¶ 6; Misiph Aff. ¶¶ 11-12.  In all events, the temporary duration of the Regulation suggests that no debt collector is likely to have to close its doors before the Regulation lapses.

Finally, the governmental purposes described at pages 15-17 above demonstrate that uninterrupted enforcement of the Regulation is emphatically in the public interest.

## **CONCLUSION**

For all of the foregoing reasons, this Court should deny any equitable relief.

Respectfully submitted,
MAURA HEALEY
ATTORNEY GENERAL

By her attorneys:

April 30, 2020

     */s/ Eric A. Haskell*
Jennifer E. Greaney, BBO No. 643337
Eric A. Haskell, BBO No. 665533
Assistant Attorneys General
One Ashburton Place
Boston, Mass.  02108
(617) 963-2855
eric.haskell@mass.gov

25

## CERTIFICATE OF SERVICE

I certify that a true copy of this document will be sent electronically by the ECF system to attorneys of record identified on the Notice of Electronic Filing.

*/s/ Eric A. Haskell*

April 30, 2020

Eric A. Haskell
Assistant Attorney General