UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| ACA INTERNATIONAL,<br><br>   Plaintiff,<br><br>v.<br><br>MAURA HEALEY, IN HER OFFICIAL CAPACITY AS MASSACHUSETTS ATTORNEY GENERAL<br><br>   Defendant. | Civil Action No. 1:20-cv-10767-RGS |

**PLAINTIFF'S SUPPLEMENTAL BRIEFING IN SUPPORT OF MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION**

Plaintiff ACA International ("ACA") respectfully submits the following supplemental briefing, as invited by the Court during the hearing on May 1, 2020.

**I.    The Regulation is unconstitutional under *MAPCS* and *Central Hudson*.**

The Court mentioned during the hearing that it found instructive the opinion of the Honorable Frank Dennis Saylor IV in *Massachusetts Assoc. of Private Career Schools v. Healey* ("*MAPCS*"), 159 F. Supp. 3d 173 (D. Mass. 2016), in which the Court applied the Supreme Court's decision in *Central Hudson Gas & Elec. Corp. v. Public Service Comm'n of New York*, 447 U.S. 557 (1980).  ACA notes that it cited to Judge Saylor's *MAPCS* opinion in its principal brief, *see* ACA brief at 6.  ACA prevails here under its analysis.

**A.    Using Judge Saylor's Analysis, the Regulation Fails Under *Central Hudson*.**

Judge Saylor's thorough analysis of the *Central Hudson* "intermediate scrutiny" doctrine fully supports ACA's position.  One of the regulations at issue in *MAPCS* (940 Mass. Code Regs. § 31.04(9)) was designed to eliminate any misrepresentations about the amount of time it took to complete any program.  Yet it also prohibited truthful statements, such as the statement

that a student could complete a program faster than the median time. This, Judge Saylor found, went too far and "fail[ed] the final step of the *Central Hudson* test." *Id.* at 204. The same is true of the AG's Regulation here. The Regulation fails to just target deceptive or unfair speech, it prohibits *all* speech made by debt collector-initiated phone calls (unless the call is to collect a mortgage or tenant debt, or is to inform a consumer of a new court date). *See* ACA's Br. at 6, 12-14 and declarations.

Another regulation at issue in *MAPCS* (940 Mass. Code Regs. § 31.05(7)) also illustrates that even *Central Hudson*'s intermediate scrutiny analysis requires speech restrictions be narrowly tailored. It made a disclosure requirement for any school's statement that credits earned there could be transferred to other institutions. The school either had to disclose the institutions that accepted such credit transfers or state that it was aware of none. *Id.* at 206. Judge Saylor invalidated the latter option because it required a controversial and potentially false disclosure that was likely to chill or restrict more speech than necessary. *Id.* If this chilling effect does not survive *Central Hudson*, then *a fortiori* neither can the AG's ban here.

And one regulation in *MAPCS* deserves particular attention. Under it, recruiters could initiate two communications—by phone, text, recorded audio message, or in person—in a seven-day period. *Id.* at 208. That regulation is very similar to the AG's preexisting regulation governing contact frequency by debt collectors. *C.f.* 940 CMR 31.06(9) *with* 209 CMR 18.14(1)(a), (d). ACA is not challenging that regulation here, but is compelled to note that, in *MAPCS*, the AG took the position that this functionally-identical limitation on communications was an effective means of furthering "the Commonwealth's asserted interest in protecting consumers from high-pressure, 'pain-based' recruiting methods." *Id.* The AG does not argue here that its existing debt-collection regulations were any less effective, nor could she plausibly.

This refutes the AG's position here that consumers must be protected by the Regulation from receiving *all* collector-initiated phone calls (except those regarding mortgage or tenant debts, or to inform of new court dates).

It is undisputed that the Regulation "entirely prohibits the dissemination of truthful, nonmisleading commercial messages"—it does so expressly. Nor is it disputed that the AG's Regulation fails to target only speech that is "deceptive" or "unfair." The AG admitted at the hearing it effects a total ban on collector-initiated calls that were perfectly acceptable a few weeks ago, and that she proffers will be again soon.[1] Instead, the AG cites three purported interests that the Regulation allegedly serves: (1) shielding consumers from aggressive debt collection practices that wield undue influence in view of the coronavirus pandemic; (2) protecting residential tranquility while citizens have largely had to remain at home during the coronavirus pandemic; and (3) temporarily vouchsafing citizens' financial wellbeing during the coronavirus pandemic. These putative interests cannot support the Regulation. None of them are mentioned in it. And they are already covered adequately by the existing tapestry of regulations cited in both parties' briefs. Every allegation[2] of misconduct noted in the AG's supporting affidavit would, if true, *already* be unlawful under existing law. Thus the Regulation is redundant and accomplishes nothing material. *See Edenfield v.Fane*, 507 U.S. 761, 770-71 (1993) ("[A] governmental body seeking to sustain a restriction on commercial speech must demonstrate that the harms it recites are real and that its restriction will in fact alleviate them to a material degree.").

Courts do not countenance the government's clamping down on truthful commercial

---

[1] During oral argument the AG undercut her position on this point, which is discussed below.

[2] It bears mentioning that every allegation included in the AG's supporting affidavit was, as proffered, an unsubstantiated complaint and not actual evidence of unlawful conduct.

3

speech on lawful subjects for the sake of protecting people from the consequences of that speech, by avoiding or limiting the speech's impact on those who are receiving it. The Supreme Court has soundly "rejected the 'highly paternalistic' view that government has complete power to suppress or regulate commercial speech." *Central Hudson*, 447 U.S. at 562. Instead, it has cautioned courts that "people will perceive their own best interests if only they are well enough informed, and . . . the best means to that end is to open the channels of communication rather than to close them . . . ." *Id.*

The Court's rejection of overprotective speech regulations has deep roots. In *Martin v. Struthers*, it held that the government's interest in residential privacy did not outweigh the right of door-to-door pamphleteers to knock on residential doors and distribute information, finding that the resident, not the government, should make the choice of whether to listen to the pamphleteer's message. 319 U.S. 141, 147-48 (1943); *accord Watchtower Bible & Tract Soc. of N. Y., Inc. v. Village of Stratton*, 536 U.S. 150, 168 (2002). And in striking down Vermont's restrictions on pharmaceutical companies' rights to purchase certain prescriber information, the Court in *Sorrell v. IMS Health Inc.*, 564 U.S. 552 (2011) noted that "it is doubtful that concern for 'a few' physicians who may have 'felt coerced and harassed' by pharmaceutical marketers can sustain a broad content-based rule . . . . Many are those who must endure speech they do not like, but that is a necessary cost of freedom." *Id.* at 575. It went on to say that physicians "can, and often do, simply decline to meet with detailers . . . ." *Id.*

Thus, not only are the AG's claimed interests post-hoc rationalizations which are insufficient to warrant the ban on telephone calls that they impose, but the Regulation does *nothing* material to advance those interests, which are already amply protected.

***The examples of other restrictions the AG cited at the hearing are inapposite.*** During

the hearing, the AG cited a number of cases for the proposition that states may curtail citizens' rights during various economic or other exigencies. But none of the examples provided involved a total ban on initiating conversations. Instead, the AG cited cases involving economic restrictions such as price controls and other restrictions on conduct. But speech restrictions are subject to much closer scrutiny than are conduct restrictions, including in a commercial context.

In her brief, the AG also cited the Supreme Court's decisions in *Ohralik v. Ohio State Bar Association*, 436 U.S. 447, 464-65 and *Florida Bar v. Went For It, Inc.*, 515 U.S. 618, 624-25 (1995). AG Br. at 15. *Ohralik* rested on that "solicitation of business by a lawyer through direct, in-person communication with the prospective client has long been viewed as inconsistent with the profession's ideal of the attorney-client relationship and as posing a significant potential for harm to the prospective client." 436 U.S. at 454. ". . . *Ohralik*'s holding was narrow and depended upon certain 'unique features of in-person solicitation by lawyers' [soliciting for new potential clients] that were present in the circumstances of that case." *Id*. at 774. For example, "*Ohralik* in no way relieves a State of the obligation to demonstrate that its restrictions on speech address a serious problem and contribute in a material way to solving that problem." *Edenfield,* 507 U.S. at 762. Thus, *Ohralik* was limited to its peculiar facts. Unlike *Ohralik*, this case does not involve an attorney personally visiting a prospective client without invitation while he or she was lying injured in a hospital bed to solicit business. It cannot be cited to justify the blanket ban that the Regulation imposes.

*Florida Bar* is similarly distinguishable and inapposite. For among other reasons, that "[t]he Bar submitted a 106-page summary of its 2-year study of lawyer advertising and solicitation to the District Court" which "support[ed] the Bar's contentions that the Florida public views direct-mail solicitations in the immediate wake of accidents as an intrusion on

privacy that reflects poorly upon the profession [of law]." 515 U.S. at 626. "In light of this showing—which respondents at no time refuted, save by the conclusory assertion that the Rule lacked 'any factual basis,' [the Court] conclude[d] that the Bar ha[d] satisfied the second prong of the *Central Hudson* test." *Id*. at 628. That is not the case here.

Moreover, in both *Florida Bar* and in *Ohralik*, the proponent of the regulation was the regulator of the attorney profession—the state Bars—which had reached, and then robustly supported, their conclusions for their regulations to govern the conduct of their professions *using their direct authority over their licensees*. Here, however, the proponent of the Regulation, the AG, does not directly regulate and does not license professional debt collectors or attorneys. The Massachusetts Division of Banks ("DOB") and Massachusetts Bar do, and as discussed in ACA's brief, DOB's existing and still-operative regulations *allow* debt collectors (and attorneys) to initiate calls to consumers (limited in frequency and hours of the day)—which the Regulation § 35.04 bans, by labelling such regulator-authorized communications to be "an unfair or deceptive act or practice." *See* ACA Br. at 10-12; *c.f.* 209 CMR 18.14, 18.17 *with* 940 CMR 35.04. The AG does not possess the authority to regulate or license the professions of debt collection and law; her authority is solely to declare acts or practices which are unfair or deceptive to be unfair or deceptive. It cannot be said, for First Amendment purposes, that the Massachusetts Attorney General can support an argument as if she was the regulator and licensor of the professions, particularly when the regulators and licensors have not adopted her positions.

***The AG failed to establish that ample alternative channels of communication overcome Debt Collectors' First Amendment Right to Initiate Calls to Consumers.*** The AG argued at the hearing that the Regulation is permissible because it leaves debt collectors with ample alternative means of initiating communications with consumers. Alternative means are irrelevant here. The

availability of alternative means of communication is relevant only when the restriction is content-neutral. *See Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989) ("Our cases make clear, however, that even in a public forum the government may impose reasonable restrictions on the time, place, or manner of protected speech, *provided the restrictions 'are justified without reference to the content of the regulated speech*, that they are narrowly tailored to serve a significant governmental interest, and that they leave open ample alternative channels for communication of the information.") (emphasis added). As ACA showed in its brief (has further argument on below) and as the AG has not disputed, the Regulation is both content- and speaker-based. Moreover, the AG failed to carry her evidentiary burden of showing that such alternative channels exist. The AG provides no evidence that mail or email is adequate. To the contrary, she admits in her brief that telephonic communications are cheaper and more effective. *See* AG Br. at 3. And she fails to rebut in any way the declarations ACA provided demonstrating that collectors are imminently about to go out of business due to the call initiation ban, and that their initiated calls are *indispensable* means of providing accurate, even *helpful*, information and for working out agreements that are everyone's best interest, including consumers.

***Despite what the AG says, the Regulation is not a temporary imposition.*** The AG repeatedly stated at the hearing that the Regulation is limited to 90 days—the implication being that a deprivation of basic First Amendment rights is fine as long as it is limited in duration. But as the Court noted, that is not legally accurate because the Constitution does not take holidays. The loss of a fundamental constitutional right, even temporarily, is an irreparable injury—not a temporary imposition. *Vaqueria Tres Monijatas, Inc. v. Izarry*, 587 F.3d 464, 484 (1st Cir. 2009); *Elrod v. Burns*, 427 U.S. 347, 373 (1976). And the balance of equities and the public's interest always favors upholding the Constitution. *Hobby Lobby Stores, Inc. v. Sebelius*, 723

F.3d 1114, 1145 (10th Cir. 2013); *Wrenn v. D.C.*, 864 F.3d 650, 667 (D.C. Cir. 2017).

Nor is the AG's position factually accurate. The AG undermined her own position when her counsel volunteered at the hearing that she can extend the Regulation beyond 90 days by starting a notice and comment period, or simply issue another emergency regulation—options that her counsel did not rule out. Moreover, the deprivations are not "temporary" for any debt-collection agency that goes out of business because of the Regulation. And as ACA's unrebutted declarations establish, some collectors will likely be forced to close their doors before the Regulation expires. The AG's contention that the present constitutional deprivations are allowed because they are temporary overlooks this harm—and indeed is illusory.

**B.    Using Judge Saylor's Analysis, the Regulation is Subject to and Fails *Sorrell's* Heightened Scrutiny Analysis.**

Judge Saylor chose to apply *Central Hudson*'s "intermediate scrutiny" test rather than the *Sorrell*'s "heightened scrutiny" test for two reasons. First, he found that "[i]n [the *MAPCS*] case, the regulations, unlike those in *Sorrell*, are motivated by a '*neutral* justification': preventing for-profit schools from misleading or deceiving consumers." *MAPCS*, 159 F. Supp. 3d at 193.[3] And second, he found that those regulations' prohibitions were expressly targeted *solely* at *specific* "speech that tends to mislead or deceive." *Id.* at 203.

But neither of these conditions is true in this case. Here, the Regulation was not neutrally purposed to prevent "false or misleading" speech. As shown in both parties' principal briefs, the existing tapestry of laws and regulations already prohibited *everything* the AG's brief cites to justify the Regulation—with one notable exception—unsolicited calling by debt collectors. The AG's brief openly acknowledges what is *obvious*—that **the regulation's real purpose is to have**

---

[3] The AG justified the regulations in MAPCS "on the ground that they are necessary to address 'widespread acts and practices in the for-profit and occupational school industry [that] continue to unfairly harm consumers.'" *Id.* at 191 (quoting 940 Mass. Code Regs. § 31.01).

8

**"the effect of channeling debt collection to means other than telephonic communication"** in order to **"materially alleviate the pressure on consumers to maintain sufficient funds to provide for their basic needs."** AG brief at 18-19.  **Whether or not that purpose is laudable, it is not *neutral***.  *See Renton v. Playtime Theatres, Inc.*, 475 U.S. 41, 48 (1986) ("content-neutral speech regulations are those that are *justified* without reference to the content of the regulated speech") (internal quotation marks omitted) (emphasis added by the Court).

In *Sorrell*, "Vermont argue[d] that its prohibitions safeguard[ed] medical privacy and diminish[ed] the likelihood that marketing will lead to prescription decisions not in the best interests of patients of the State" and that "[i]t can be assumed that these interests are significant." 564 U.S. at 557.  But the Court recognized that "[o]n its face, Vermont's law enacts content-and-speaker-based restrictions . . . based in large part on the content of a purchaser's speech." *Id*. at 564-64.  That is also indisputably true, and is undisputed, about the AG's Regulation here.  *See* ACA brief at 7-8.  Just as the AG's brief dispelled any notion that her Regulation here was neutrally purposed, in *Sorrell*, "[a]ny doubt that [the statute] impose[d] an aimed, content-based burden on detailers [was] dispelled by the record and by formal legislative findings." 564 U.S. at 564.  Further, "Vermont's law . . . ha[d] the *effect* of preventing detailers—and only detailers—from communicating with physicians in an effective and informative manner" and "[t]he legislature [had] designed [the statute] to target those speakers and their messages for disfavored treatment." *Id*. at 565 (emphasis added).  And "'[i]n its *practical operation*,' Vermont's law had 'go[ne] even beyond mere content discrimination, to actual viewpoint discrimination.'" *Id*. (quoting *R.A.V. v. St. Paul*, 505 U.S. 377, 391 (1992)) (emphasis).  Accordingly, the Court found it "apparent that [the statute] imposes burdens that are based on the content of speech and that are aimed at a particular viewpoint." *Id*.  All

9

indisputably true here as well, where the AG has singled out only professional licensed third-party debt collectors to prevent (disfavor) just *their* initiated telephone communications to consumers regarding the payment of just debts, while at the same timing leaving first-party creditors free to initiate telephone communications to consumers **with the exact same messages**.

Viewpoint discrimination by the government is always presumptively unconstitutional under the First Amendment, even in commercial speech cases. *Id*. at 571. As ACA argued in its brief, this requires the kind of "heightened scrutiny" used in *Sorrell*. "The First Amendment requires heightened scrutiny whenever the government creates 'a regulation of speech because of disagreement with the message it conveys.'" *Id*. at 566 (quoting *Ward*, 491 U.S. at 791); *see also Edenfield*, 507 U.S. at 777.

"The First Amendment guards against laws 'targeted at specific subject matter,' a form of speech suppression known as content based discrimination." *Matal v. Tam*, 137 S. Ct. 1744, 1765-66 (2017) (a recent commercial speech decision) (citing *Reed v. Town of Gilbert*, 576 U.S. ___, ___, 135 S. Ct. 2218, 2230 (2015)). In *Matal*, the Supreme Court observed that "[t]his category includes a subtype of laws that go further, aimed at the suppression of particular views . . . on a subject." *Id*. (internal quotation marks omitted). "A law found to discriminate based on viewpoint is an 'egregious form of content discrimination,' which is 'presumptively unconstitutional.'" *Id*. (quoting *Rosenberger, supra*). "At its most basic, the test for viewpoint discrimination is whether—within the relevant subject category—the government has singled out a subset of messages for disfavor based on the views expressed." *Id*. "[T]he government violates the First Amendment when it denies access to a speaker solely to suppress the point of view he espouses on an otherwise includible subject." *Id*.

The Regulation restricts speech based not only on *content*, but also on the *speaker*. That

is, it "single[s] out a subset of messages for disfavor based on the views expressed"—namely, speech designed to collect a valid debt that does not fall into various exceptions. *Matal*, 137 S. Ct. at 1766 (2017). When, as here, such a restriction is also overly broad and ensnares commercial speech that is neither unfair nor deceptive, but true, informative, and helpful, the law *must* be struck down. *Sorrell*, 564 U.S. at 578; *see also Iancu v. Brunetti*, 139 S. Ct. 2294 (2019). "That the State finds expression too persuasive does not permit it to quiet the speech or to burden its messengers." *Sorrell*, 564 U.S. at 578. Rather, when the State disagrees with the content of a speaker's message, "[t]he State can express that view through its own speech." *Id*.

## II.     Plaintiff's State Law Claims are not Barred by the Eleventh Amendment.

Finally, ACA wishes to reply to the AG's Eleventh Amendment defense. In *Larson v. Domestic & For. Comm. Corp.*, 337 U.S. 682 (1949), the Supreme Court allowed injunctive relief against a federal official despite an asserted defense of sovereign immunity, ruling that

> where the officer's powers are *limited by* statute, his actions beyond those limitations are considered individual and not sovereign actions. The officer is not doing the business which the sovereign has empowered him to do or he is doing it in a way which the sovereign has forbidden. His actions are ultra vires his authority and therefore may be made the object of specific relief.

*Id.* at 689 (emphasis added). The Court noted that "[t]he principle has been applied with respect to state officers seeking to enforce unconstitutional enactments . . . [a]nd is equally applicable to a Federal officer acting in excess of his authority or under an authority not validly conferred." *Id.* at 690-91. It reaffirmed the validity of the *Larson* exceptions in *Malone v. Bowdoin*, 369 U.S. 643, 647 (1962) and *Dugan v. Rank*, 372 U.S. 609, 621-22 (1963).

> . . . *Dugan* continues to provide the Court's most recent formulation of the *Larson* exceptions: a suit against a federal official for specific relief is not considered to be against the government, and thus is not barred by sovereign immunity, where the plaintiff alleges: (1) action by officers beyond their statutory powers [or] (2) even though within the scope of their authority, the powers themselves or the manner in which they are exercised are constitutionally void.

11

*E. V. v. Robinson*, 906 F.3d 1082, 1091 (9th Cir. 2018) (internal quotation marks omitted).

The necessary corollary is that "State officials are not entitled to eleventh amendment immunity if they are acting ultra vires, that is without proper authority." *Rymer v. Lemaster*, No. 18-5655, 2019 WL 2583007, at *4 (6th Cir. Jan. 14, 2019) (citing *Miami Univ. Assoc. Stud. Gov't v. Shriver*, 735 F2d 201, 204 (6th Cir. 1984)). In *Miami Univ.*, the court noted:

> In *Pennhurst*, the Court ruled that the eleventh amendment and principles of sovereign immunity precluded the federal courts from instructing "state officials on how to conform their conduct to state law." *Id*. 104 S.Ct. at 911. Our own analysis of *Pennhurst* suggests that it may not provide the Board of Trustees with immunity. State officials are not entitled to eleventh amendment immunity if they are acting ultra vires, that is without proper authority. While *Pennhurst* narrowed somewhat the scope of the ultra vires doctrine, it also made clear that the doctrine still applies when an official acts "without any authority whatever." *Id*. 104 S.Ct. at 908 n. 11, quoting from *Florida Dept. of State v. Treasure Salvors, Inc.*, 458 U.S. 670, 697, 102 S.Ct. 3304, 3321, 73 L.Ed.2d 1057 (1982).

The *Rymer* court concluded that to state a claim against a state official which avoids the Eleventh Amendment, a plaintiff must therefore make "non-conclusory allegations that demonstrate[] that [what was undertaken by the state official] *exceeded the scope of [the] . . . official's authority*" such that the official's act was ultra vires. *Id*. at *4 (emphasis added). In *Salvors*, the Supreme Court concluded "that the Eleventh Amendment does not bar an action against a state official that is based on a theory that the officer acted beyond the scope of his statutory authority *or*, if within that authority, that such authority is unconstitutional. In such an action, however, the Amendment places a limit on the relief that may be obtained by the plaintiff. 458 U.S. at 689. And that, "[i]n determining the relief that may be granted if a state officer is found *to have acted without valid statutory authority*, the question is whether the relief 'constitute[s] permissible prospective relief or a retroactive award which requires the payment of funds from the state treasury.'" *Id*. at 690 (internal quotation marks omitted) (emphasis added) (quoting *Quern v. Jordan*, 440 U.S. 332, 346-47 (1979)).

12

ACA is not seeking an order from this Court enjoining the AG to act in accordance with state law. Exactly the opposite. ACA seeks an order from this Court to enjoin the AG from acting ultra vires. As ACA argued in its opening brief, ACA seeks an order that the AG's Regulation was issued without valid authority, i.e. that she had no authority under Massachusetts law to ban creditors and debt collectors from filing new suits or taking action on existing remedies by declaring such acts or practices unfair or deceptive. *See* ACA's Brief at 14 (the Massachusetts Constitution expressly prohibits executive-department officials like the AG from interfering with judicial functions, and thus prohibited her from "restrict[ing] or abolish[ing] a court's inherent powers" or "revers[ing], modify[ing] or contraven[ing] a court order", thereby providing the AG with no authority whatever to ban petitioning to courts and modifying and contravening court orders); *id.* at 17 (the Legislature's anti-SLAPP statute, M.G.L. c. 231, § 59H, expressly prohibits *anyone* from chilling petitioning activity in Massachusetts state and federal court proceedings thereby barring the AG from interfering with persons' petitioning rights).

And, as ACA also argued, the AG likewise had no authority under state law to impose a complete ban on debt collector-initiated calls. The Massachusetts Legislature expressly limited the AG's authority to issue regulations under from M.G.L. c. 93A, § 22(c) such that her regulations shall "not [be] inconsistent with the rules, regulations and decisions of the Federal Trade Commission and the Federal Courts interpreting the provisions of 15 U.S.C. 45(a)(1) . . . as from time to time amended." M.G.L. c. 93A, § 2(c). The SJC recognized that, under this express limitation on the AG's authority, the AG is not permitted to "expand upon the statutory standards . . . to include acts which are not, and have no potential to become, unfair or deceptive." *Purity Supreme, Inc. v. Attorney Gen.*, 380 Mass. 762, 775 (1980). The SJC held that the AG "could not promulgate regulations which expand upon the statutory standards (as

13

incorporating FTC and Federal court decisions) to include acts which are not, and have no potential to become, unfair or deceptive. [Her] regulations will be subject to court challenge on the grounds that [she] has exceeded [her] statutory powers in defining 'unfair' or 'deceptive,' or that a regulation is constitutionally invalid facially or as applied." *Id.* Again, that is exactly what ACA is alleging here—that the AG's Regulation is inconsistent with 15 U.S.C. § 45(a)(1) (Section 5 of the FTC Act) because it takes truthful and even helpful commercial speech and deems it to be an unfair or deceptive act or practice. That is not a power that the AG possesses under state law; it inconsistent with the FTC Act. *See McDermott v. Marcus, Errico, Emmer & Brooks, P.C.*, 775 F.3d 109, 116 (1st Cir. 2014); FTC Policy Statement on Unfairness (Dec. 17, 1980), available at https://www.ftc.gov/public-statements/1980/12/ftc-policy-statement-unfairness. Moreover, numerous cases have found under the Fair Debt Collection Practices Act that even multiple telephone calls per day are not unfair or deceptive.[4] This is important because the FDCPA expressly provides at 15 U.S.C. § 1692*l*(a) that an FDCPA violation constitutes an unfair or deceptive practice under 15 U.S.C. § 45(a)(1), which is the very statute that places a hard limit on the kinds of regulations the AG may impose under Massachusetts law. By

---

[4] *See, e.g., Hinderstein v. Advanced Call Ctr. Technologies*, No. CV 15-10017-DTB, 2017 WL751420, at *5 (C.D. Cal. Feb. 27, 2017) (debt collector's "conduct did not constitute harassment, oppression, or abuse in violation of the FDCPA" where collector placed 49 calls in an 18-day period); *Valle v. Nat'l Recovery Agency*, No. 8:10-cv-2775-T-23MAP, 2012 WL 1831156, at *2 (M.D. Fla. May 18, 2012) (22 calls in one month does not alone constitute harassing conduct); *Tucker v. CBI Grp., Inc.*, 710 F. Supp. 2d 1301, 1305-06 (M.D. Fla. 2010) (granting summary judgment to collector who made 57 collection calls in a month, and sometimes up to seven in a day, because "Plaintiff has not demonstrated that CBE engaged in oppressive conduct such as repeatedly making calls after it was asked to cease"); *Waite v. Fin. Recover Serv's, Inc.*, No. 8:09-cv-02336-T-33AEP, 2010 WL 5209350, at *5 (M.D. Fla. Dec. 16, 2010) (despite call log reflecting up to 29 calls in a month and up to four calls in one day, nothing in record showed that the calls were intended to be abusive or harassing); *Arteaga v. Asset Acceptance, LLC*, No. CV-F-09-1860 LJO GSA, 2010 WL 3310259, at *5 (C.D. Cal. Aug. 23, 2010) (daily or nearly daily phone calls alone fail to raise an issue of fact for a jury to determine whether an FDCPA violation occurred).

declaring even a single phone to be call unfair or deceptive, the AG has taken action that conflicts with these cases, and which is therefore "inconsistent with the rules, regulations and decisions of the Federal Trade Commission and the Federal Courts interpreting the provisions of 15 U.S.C. 45(a)(1)." M.G.L. c. 93A, § 2(c). That the AG is afforded authority to issue *certain* regulations under § 22(c) is irrelevant, because that Section expressly provides that any regulations that she issues shall "not [be] inconsistent with the rules, regulations and decisions of the Federal Trade Commission and the Federal Courts interpreting the provisions of 15 U.S.C. 45(a)(1) . . . as from time to time amended." M.G.L. c. 93A, § 2(c). When, as here, her regulations are inconsistent, they are necessarily ultra vires.

The AG argued at the hearing that the ultra vires exception to Eleventh Amendment immunity does not apply here because the complaint is expressly brought against the AG in her official capacity, not her individual capacity. But the AG has not cited any case authorities which require that the suit must expressly be against the state official in their personal capacity, in order to avoid the defense of Eleventh Amendment immunity raised by the official defendant. Even if the Court accepts this premise, at this nascent stage of the case, the equitable outcome would be for the Court to simply permit ACA to amend its complaint accordingly.

Finally, the AG has failed to rebut ACA's challenge that 940 CMR 35.03 is unconstitutional because it violates the First Amendment's petitioning clause. ACA stands on its briefing. *See* ACA Br. at 15-17.

Wherefore, the Court should grant ACA International's emergency motion for a temporary restraining order and preliminary injunction.

Dated: May 4, 2020.

        Respectfully submitted,

        ACA INTERNATIONAL

        By its attorneys,

        */s/ David M. Bizar*
        David M. Bizar (BBO# 566795)
        Seyfarth Shaw LLP
        Two Seaport Lane, Suite 300
        Boston, MA 02210-2028
        Telephone: (617) 946-4874
        Fax: (617) 790-5368
        Email: dbizar@seyfarth.com

        Robert J. Carty, Jr. (admitted *pro hac vice*)
        Seyfarth Shaw LLP
        700 Milam Street
        Suite 1400
        Houston, TX 77002
        Telephone: (713) 225-2300
        Fax: (713) 225-2340
        Email: rcarty@seyfarth.com

## **CERTIFICATE OF SERVICE**

     I certify this document has been filed electronically and is available for viewing and downloading from the ECF system. I further certify this document will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on May 4, 2020.

        */s/ David M. Bizar*
        David M. Bizar