UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 20-10767-RGS

ACA INTERNATIONAL

v.

MAURA HEALEY, in her official capacity as
Massachusetts Attorney General

MEMORANDUM AND ORDER ON PLAINTIFF'S MOTION FOR A
TEMPORARY RESTRAINING ORDER
AND PRELIMINARY INJUNCTION

May 6, 2020

STEARNS, D.J.

Plaintiff ACA International (ACA) seeks a temporary restraining order and preliminary injunction enjoining Maura Healey, the Attorney General of Massachusetts (Attorney General) from enforcing 940 CMR 35.00, "Unfair and Deceptive Debt Collection Practices During the State of Emergency Caused by COVID-19" (the Regulation), issued in her official capacity on March 26, 2020, and made effective the same day. *See* Pl.'s Ex. 2 (Dkt #2-2) at 1. ACA asserts a likelihood of success on the merits of its claims, arguing that the Regulation "violates the constitutional and state-law rights of ACA members." Pl.'s Mem. (Dkt #7) at 2. ACA contends that some of its Massachusetts members will be irreparably harmed by the Regulation as it

effectively prohibits them from conducting their businesses in the Commonwealth with the likely result of bankruptcy.

BACKGROUND

ACA is a registered Minnesota non-profit trade association with more than 2,300 members who work in the credit-and-collection industry (some within and others outside of Massachusetts), including in their ranks first-party creditors, debt buyers, and collections agencies.[1]  ACA provides its members products, services, and publications, including educational and compliance-related information.  That ACA has standing to litigate this case is not a matter in dispute.  *See Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., Inc.*, 528 U.S. 167, 181 (2000).

The Attorney General issued the Regulation pursuant to Mass. Gen. Laws ch. 93A, § 2 (Chapter 93A), which prohibits unfair or deceptive acts in

---

[1] As examples, ACA cites Action Collection Agencies, Inc. (ACAI) d/b/a Action Collection Agency of Boston.  ACAI was founded in 1967 in Boston, and provides collection services to Massachusetts hospitals, healthcare providers, and utility companies.  ACAI specializes in medical collections which make up a significant percent of its income.  It reports that 74% of its bad-debt revenue in 2019 represented collections from Massachusetts consumers.  Similarly, Peter Roberts & Associates, Inc. (PRA), another Massachusetts ACA member with 21 employees, also principally serves healthcare providers.  In its calls to consumers, PRA states that it establishes "payment arrangements, identif[ies] and untangle[s] third party payer issues and discuss[es] credit related matters."  Terrasi Aff. (Dkt #7-2) ¶ 3.

trade or commerce.[2]  *Id.* § 2(a).  The Regulation states that "[t]he purpose of 940 CMR 35.00 is to provide emergency regulations[3] to protect consumers from unfair and deceptive debt collection practices during the State of Emergency declared by the Governor of Massachusetts on March 10, 2020 pursuant to Executive Order No. 591: Declaration of State of Emergency to Respond to COVID-19."  The Regulation prohibits debt collectors from initiating telephone calls to debtors and from initiating a lawsuit to collect a debt.

Section 35.03 of the Regulation, entitled "Prohibitions on Debt Collection Activity with Regard to All Creditors, Including Debt Collectors," provides that:

> [f]or the ninety (90) days following the effective date of this regulation or until the State of Emergency Period expires, whichever occurs first, it is an unfair or deceptive act or practice for any creditor, including a debt collector, to: (a) initiate, file, or threaten to file any new collection lawsuit; (b) initiate, threaten to initiate, or act upon any legal or equitable remedy for the

---

[2] As a member of the executive department, the Attorney General may issue regulations within her delegated authority.  *See Vapor Tech. Ass'n v. Baker,* 2019 WL 6050041, at *7 (Mass. Super. Oct. 21, 2019), injunction vacated as moot, 2019 WL 8106626 (Mass. Dec. 26, 2019).  For its "Authority," the Regulation states that "940 CMR 35.00 is issued pursuant to M.G.L. c. 30A, §§ 2 and 3, and M.G.L. c. 93A, sec. 2."

[3] In an addendum to the Regulation, the Attorney General justifies the emergency adoption of the rule "[b]ecause the economic and medical crisis faced by Massachusetts residents is acute and continues to escalate."  Compl. at Ex A.

garnishment, seizure, attachment, or withholding of wages, earnings, property or funds for the payment of a debt to a creditor; (c) initiate, threaten to initiate, or act upon any legal or equitable remedy for the repossession of any vehicle; (d) apply for, cause to be served, enforce, or threaten to apply for, cause to be served or enforce any capias warrant; (e) visit or threaten to visit the household of a debtor at any time; (f) visit or threaten to visit the place of employment of a debtor at any time; and (g) confront or communicate in person with a debtor regarding the collection of a debt in any public place at any time.

Section 35.04 of the Regulation, entitled "Prohibition on Debt Collection Telephone Calls with Regard to Debt Collectors Only," provides that:

> [f]or the ninety (90) days following the effective date of this regulation or until the State of Emergency Period expires, whichever occurs first, **it shall be an unfair or deceptive act or practice for any debt collector to initiate a communication with any debtor via telephone**, either in person or by recorded audio message to the debtor's residence, cellular telephone, or other telephone number provided by the debtor as his or her personal telephone number, provided that a debt collector shall not be deemed to have initiated a communication with a debtor if the communication by the debt collector is in response to a request made by the debtor for said communication.
>
> (Emphasis added).

The term "debt collector" is defined in § 35.02 to mean:

> any person or business whose principal purpose is the collection of a debt, or who regularly collects or attempts to collect, directly or indirectly, a debt owed or due or asserted to be owed or due another.  The term debt collector shall also include any person who buys or acquires debt that is in default at the time of purchase or acquisition and who seeks to collect such debt.  The

term debt collector shall include a creditor who, in the process of collecting his own debt, uses any name other than his own which would indicate that a third person is collecting or attempting to collect the debt. The term debt collector shall also include a person in a business the principal purpose of which is the enforcement of security interests.

While the Regulation bars debt collectors from initiating telephone calls to consumers and creditors or seeking legal recourse on any matter involving a debt, 940 CMR 35.03, 35.04, there are exceptions.  Persons seeking to collect mortgage debts, tenant debts, or debts for telephone, gas, or electric utility companies may file lawsuits and resort to their existing remedies.  *See* 940 CMR 35.03(2)-(3).  Debt collectors may initiate telephone conversations if the sole purpose of the call is to discuss rescheduling court appearances, or to collect a mortgage or tenant debt.  *See* 940 CMR 35.04(2)-(3).  The Regulation also exempts six classes of collectors from its prohibitions by excluding them from its definition of "Debt Collector." These include certain nonprofit entities, federal employees, persons collecting fiduciary- or escrow-related debts, and anyone serving legal process to judicially enforce a debt.  *See* 940 CMR 35.02.

ACA members complain that their only alternative to telephone calls for the foreseeable future is letters, which "rarely yield collection results for a large proportion of the accounts in inventory and are largely used to convey the consumers' rights under federal and state law."  Compl. ¶ 44.  Also, ACAI

represents that in the case of its medical provider clients, it provides information over the telephone about charity care and other health care programs for which distressed consumers may be eligible, some of which are time sensitive.

ACA's Complaint asserts the following claims against the Regulation - Count I and II - violations of the First Amendment; Count III  - violation of the Massachusetts Anti-Slapp statute; Count IV - infringement of the Massachusetts common-law litigation privilege; Count V - violation of the Due Process Clause of the Fourteenth Amendment; Count VI - denial of Equal Protection; Count VII - violation of the separation of powers under the federal and state constitutions; and Count VIII - unlawful expansion of the Attorney General's regulatory authority under Chapter 93A.  ACA filed for an emergency temporary restraining order on April 20, 2020, followed by a motion for an expedited hearing on April 24, 2020.  The court allowed the motion for an expedited hearing and held a video conference on May 1, 2020.

## STANDARD FOR INJUNCTIVE RELIEF

The standard for issuing a temporary restraining order is "the same as for a preliminary injunction." *Bourgoin v. Sebelius*, 928 F. Supp. 2d 258, 267 (D. Me. 2013).  In order for a court to grant this species of relief, a plaintiff "must establish that [it] is likely to succeed on the merits, that [it] is

likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in [its] favor, and that an injunction is in the public interest." *Voice of the Arab World, Inc. v. MDTV Med. News Now, Inc.,* 645 F.3d 26, 32 (1st Cir. 2011), quoting *Winter v. Natural Res. Def. Council, Inc.,* 555 U.S. 7, 20 (2008).[4]  In the conventional case, "[t]he party seeking the preliminary injunction bears the burden of establishing that these four factors weigh in its favor." *Esso Standard Oil Co. v. Monroig-Zayas,* 445 F.3d 13, 18 (1st Cir. 2006).  However, "[i]n the First Amendment context, the likelihood of success on the merits is the linchpin of the preliminary injunction analysis. . . . [I]rreparable injury is presumed upon a determination that the movants are likely to prevail on their First Amendment claim." *Sindicato Puertorriqueño de Trabajadores v. Fortuño,* 699 F.3d 1, 10-11 (1st Cir. 2012).

## DISCUSSION

---

[4] Massachusetts law is no different.  To obtain preliminary relief, plaintiffs must prove a likelihood of success on the merits of the case and a balance of harm in their favor when considered in light of its likelihood of success.  *Packaging Indus. Group, Inc. v. Cheney*, 380 Mass. 609, 616-617 (1980).  "One . . . is not entitled to seek [injunctive] relief unless the apprehended danger is so near as at least to be reasonably imminent." *Shaw v. Harding*, 306 Mass. 441, 449 (1940).  A party seeking to enjoin governmental action must also ordinarily show that "the relief sought will [not] adversely affect the public." *Tri-Nel Mgt. v. Bd. of Health of Barnstable*, 433 Mass. 217, 219 (2001).

Before turning to the ACA's likelihood of success on the merits, let me note that much of plaintiff's briefing is addressed to issues of state law. Among these are whether the Attorney General in issuing the Regulation exceeded the authority granted her by the Legislature under the Massachusetts Consumer Protection Statute, Chapter 93A, § 2; whether her actions violated Mass. Gen. Laws, ch. 231, § 59H, the anti-SLAPP statute; whether in decreeing that any violation of 940 CMR 35.00 would be deemed a strict liability offense, she usurped the exclusive right of the Legislature to enact laws in violation of art. 30 of the Massachusetts Declaration of Rights;[5] and whether in singling out a discrete subclass of debt collectors for sanction, she violated the equal protection guarantees of art. 10.

These are matters of genuine importance, but I agree with the Attorney General that it is not for a federal court to police the boundaries of a state constitution for violations by its officials. This is for important reasons of Eleventh Amendment sovereign immunity as well as respect for comity among sovereign judicial systems. As established in a long line of cases

---

[5] Article 30 states: "In the government of this commonwealth, the legislative department shall never exercise the executive and judicial powers, or either of them: the executive shall never exercise the legislative and judicial powers, or either of them: the judicial shall never exercise the legislative and executive powers, or either of them: to the end it may be a government of laws and not of men."

8

flowing from *Ex parte Young*, 209 U.S. 123 (1908), the injunctive power of a federal court over state officials is defined and confined by the extent that such relief is necessary to vindicate a violation of *federal* law.  *See Edelman v. Jordan*, 415 U.S. 651, 664 (1974) ("Petitioner concedes that *Ex parte Young*, *supra*, is no bar to that part of the District Court's judgment that prospectively enjoined petitioner's predecessors from failing to process applications within the time limits established by the federal regulations."); *Idaho v. Coeur d'Alene Tribe of Idaho*, 521 U.S. 261, 277 (1997), quoting *Papasan v. Allain,* 478 U.S. 265, 277 (1986) (citation and internal quotation marks omitted) ("The [*Ex parte Young*] exception has been 'tailored to conform as precisely as possible to those specific situations in which it is necessary to permit the federal courts to vindicate federal rights.'").

As cautioned by the Supreme Court in *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 106 (1984): "[I]t is difficult to think of a greater intrusion on state sovereignty than when a federal court instructs state officials on how to conform their conduct to state law." It is true that in a footnote in *Pennhurst*, the Court admitted of a possible exception when a state official is acting ultra vires, *see id.* at 101 n.11, an argument that counsel for ACA raised at oral argument.  However, as the Court further explained,

"a state officer may be said to act ultra vires only when [s]he acts 'without any authority whatever,'" *id.*, quoting *Fla. Dep't of State v. Treasure Salvors, Inc.*, 458 U.S. 670, 697 (1982), while a claim as is made here that she erred in the exercise of the authority that had been delegated to her, is not sufficient, *id.*

## Likelihood of Success on the Merits

ACA took the position in its motion for a temporary restraining order that the disputed speech of its members is "pure" speech for First Amendment purposes, and that any restriction based on its content faces strict scrutiny in a reviewing court. *See* Pl.'s Mem. at 8-14.[6] Content-based restrictions on expressive speech in traditional public fora are "presumptively invalid" under the First Amendment, *R.A.V. v. City of St. Paul, Minn.,* 505 U.S. 377, 382, 394 (1992), while "time, place, [and/]or manner" restrictions which are content-neutral are, on the other hand, subject to intermediate scrutiny, *Nat'l Amusements, Inc. v. Town of Dedham*, 43 F.3d 731, 736, 741 (1st Cir. 1995). The test of content-neutrality "is whether government has adopted a regulation of speech because of disagreement with the message it conveys." *Globe Newspaper Co. v. Beacon*

---

[6] As the hearing on the motion progressed, ACA's counsel appeared to move to the more defensible position that the speech at question was entitled to the protections given to commercial speech, as will be discussed.

*Hill Architectural Comm'n*, 100 F.3d 175 (1st Cir. 1996), quoting *Nat'l Amusements*, 43 F.3d at 737.

In applying strict judicial scrutiny, the operative test is whether a regulation "is necessary to serve a compelling state interest and is narrowly drawn to achieve that end." *Arkansas Writers' Project, Inc. v. Ragland*, 481 U.S. 221, 231 (1987). Where intermediate scrutiny pertains, restrictions on the time, place, or manner of protected expression "are valid provided that they are justified without reference to the content of the regulated speech, that they are narrowly tailored to serve a significant governmental interest, and that they leave open ample alternative channels for communication of the information." *Clark v. Cmty. for Creative Non-Violence*, 468 U.S. 288, 293 (1984).

As *Clark* implies, not all speech is created equal. As First Amendment jurisprudence has evolved, the Supreme Court has recognized a distinction between expressive, or as it is sometimes labeled, "political" speech,[7] and what has come to be known as "commercial" speech, that is, "expression related solely to the economic interests of the speaker and its audiences." *El*

---

[7] S*ee R.A.V.*, 505 U.S. at 422 (Scalia, J., concurring) ("Our First Amendment decisions have created a rough hierarchy in the constitutional protection of speech. Core political speech occupies the highest, most protected position . . . .").

*Dia, Inc. v. P.R. Dep't of Consumer Affairs*, 413 F.3d 110, 115 (1st Cir. 2005),

quoting *Central Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n*, 447 U.S.

557, 561 (1980).

Commercial speech, because it is untethered to the general public

interest, is accorded less First Amendment protection than its more exalted

cousin.  At its fringes, commercial speech that is misleading may be banned

altogether.  *Rocket Learning, Inc. v. Rivera-Sánchez*, 715 F.3d 1, 13-14 (1st

Cir. 2013).  But the mere fact that speech proposes a commercial transaction

does not mean that the First Amendment drops altogether from the

picture.   A State has no constitutional power to suppress "truthful,

nonmisleading commercial messages." *44 Liquormart, Inc. v. Rhode*

*Island*, 517 U.S. 484, 501 (1996) (plurality opinion).

In part, commercial speech is defined by its primary economic

motivation.  *Bolger v. Youngs Drug Prods. Corp.*, 463 U.S. 60, 67 (1983).

The speech at issue here cannot be categorized as anything but

commercial.  This is true even when, as ACA argues, its members are in their

"good cop" mode, "work[ing] with consumers and their creditor-clients to

exhaust all options before resorting to litigation and to honor crisis-related

requests to forbear on existing legal remedies during national or state-

specific emergencies."  Pl.'s Mem. at 3.  After all, "good cop or "bad cop," the

aim is to persuade, or in the worst case, intimidate, a debtor into making payment. Nonetheless, as the Supreme Court has made clear, commercial speech, properly defined, "is entitled to the protection of the First Amendment, albeit to protection somewhat less extensive than that afforded 'noncommercial speech.'" *Zauderer v. Office of Disciplinary Counsel of Supreme Court of Ohio*, 471 U.S. 626, 637 (1985). That level of protection falls, if not always neatly, into the category of "intermediate scrutiny," as guided by the factors set out in *Central Hudson*, 447 U.S. at 566.[8]

Under the *Hudson* test, "[a]t the outset, [a court] must determine whether the expression is protected by the First Amendment." *Id.* If the answer is "yes," there are three more questions to be answered: (1) is the asserted governmental interest substantial; (2) does the disputed regulation advance that governmental interest; and (3) is the regulation no more extensive than necessary to serve that interest. *Id.*

In turning to the first of the *Hudson* tests, it is apparent that 940 CMR 35.00 is not a "time, place, and manner" regulation; rather, it imposes a flat

---

[8] I agree with Chief Judge Saylor's conclusion in *Mass. Ass'n of Private Career Sch. v. Healey*, 159 F. Supp. 3d 173, 192 (D. Mass. 2016), that neither *Sorrell v. IMS Health Inc.*, 564 U.S. 552 (2011), nor *Reed v. Town of Gilbert, Ariz.*, 576 U.S. 155 (2015), "disturb the Court's longstanding framework for commercial speech under *Central Hudson*." To the extent that any argument to the contrary might apply to this decision, I adopt Judge Saylor's reasoning and that of the other courts on which he relies.

ban on a particular medium of speech (telephone communications) involving a particular subject matter (the solicitation of payment of a debt) by a particular subset of those persons (debt collectors) who engage in that type of speech.  Thus, the question is whether the commercial speech at issue falls under the umbrella of that which is actually false, deceptive, or misleading, or proposes an unlawful activity, or instead is of the kind that has only a "potential" to mislead.  *In re R.M.J.*, 455 U.S. 191, 203 (1982).  As debt collection in its normal practice falls within the latter category, the court must turn to the remaining three prongs of the *Hudson* test.

The Attorney General invokes three separate governmental interests as substantial:  "(1) shielding consumers from aggressive debt collection practices that wield undue influence in view of the coronavirus pandemic; (2) protecting residential tranquility while citizens have largely had to remain at home during the coronavirus pandemic; and (3) temporarily vouchsafing citizens' financial wellbeing during the coronavirus pandemic." Def.'s Opp'n (Dkt #24) at 14-15.  As for the first asserted interest, the Attorney General offers no empirical support for the proposition that consumers are more susceptible to undue influence exerted by debt collectors during a pandemic than would ordinarily be the case.  The gist of the counterargument is that "the mere suggestion of physical contact with

other persons – including in connection with repayment of a debt – is fraught with real and perceived danger." *Id.* at 15.  There is nothing offered, however, that suggests that debt collectors are more prone than other commercial entities to defy the social distancing rules decreed by the Governor by chasing down debtors in person.  Nor is it clear why consumers would not think it more likely to be confronted in person by their landlords or mortgage holders (who are expressly exempted from the Attorney General's ban).

The third of the asserted state interests, vouchsafing the financial wellbeing of Massachusetts residents, seems to have little to do with the prohibition of only one form of communication facilitating collection of payment on a debt, that is, a telephone call.  While the Regulation promises some relief from unwanted telephone calls, it does not pretend to offer any relief from the debt itself or the obligation to repay it in full.  The supporting cases cited by the Attorney General, *Yakus v. United States*, 321 U.S. 414 (1944), and *Block v. Hirsh*, 256 U.S. 135 (1921), are not concerned with debt relief or debt collection but with the legality of wartime rent control and price control regimes that weigh directly on landlords and purveyors, not debtors.  More importantly, these cases have nothing to do with the suppression of speech.  The case that appears most on point, *Home Building & Loan Ass'n v. Blaisdell*, 290 U.S. 398 (1934), which upheld a Minnesota state law

permitting mortgagees to delay foreclosure on their homes, also does not involve any issue of speech.  Moreover, it has even less pertinence as the Attorney General's Regulation explicitly exempts the collection of mortgage and tenant debts from the telephone ban.

The second asserted governmental interest – preserving domestic tranquility – stands on somewhat firmer ground, as a "residential privacy" interest has been recognized by several lower courts in rejecting analogous First Amendment challenges to the restrictions on consumer contacts set out in the Telephone Consumer Protection Act.  *See, e.g., Moser v. Fed. Communications Comm'n*, 46 F.3d 970, 974 (9th Cir. 1995).  I will assume for present purposes that preserving domestic tranquility is a sufficiently significant state interest for the Regulation to pass muster under the second prong of *Hudson*.

At the third step in *Hudson*, the Attorney General must show that the Regulation advances the interest in preserving domestic tranquility to a "material degree."  *44 Liquormart*, 517 U.S. at 505.  At the fourth step, she must show that the restriction on speech imposed by the Regulation in safeguarding that interest is not more extensive than necessary, *Central Hudson*, 447 U.S. at 564, or phrased differently, that the government could not have achieved its interest in preserving domestic tranquility "in a manner

that does not restrict speech, or that restricts less speech." *Thompson v. Western States Med. Ctr.*, 535 U.S. 357, 371 (2002).  As Chief Judge Saylor aptly observed in *Mass. Ass'n of Private Career Sch.*, 159 F. Supp. 3d at 202, these final two steps of *Central Hudson* are complementary.  Here the Attorney General's rationale fails.

The best that can be said for the Regulation is that it decreases incrementally the number of times that a phone might ring in a debtor's home with a wanted or unwanted call from one species of debt collector – although in this day and age of cell phones and caller ID the option of simply not answering the phone or placing it in silent mode is a viable alternative for consumers.  I say incrementally because the prior supplanted regulation had already imposed a limit of two calls per week by debt collectors.  The Regulation does not insulate a home dweller from debt collection efforts – mortgagors, landlords, and nonprofit entities, among others are excepted from the ban – rather it singles out one group debt collectors and imposes a blanket suppression order on their ability to use what they believe is their most effective means of communication, the telephone.[9]   If what the

---

[9] The most uncomfortable of the Attorney General's arguments is that a total ban is tolerable because she, at least for the present, intends it to last 90 days.  As the Court noted at oral argument, constitutional rights do not take a holiday simply because governing authorities declare an emergency.

Attorney General meant to accomplish by way of the Regulation was a strict-liability ban on all deceptive and misleading debt collection calls, the Regulation is redundant as that is already the law, both state and federally.

Like Chapter 93A, the Federal Trade Commission Act (FTCA), 15 U.S.C. § 45, provides that "unfair or deceptive acts or practices in or affecting commerce[ ] are . . . unlawful."  15 U.S.C. § 45(a)(1).  In fact, Chapter 93A "defines unfair acts or practices by reference to interpretations of those terms in the Federal Trade Commission Act, 15 U.S.C. § 45(a)(1) (2006), in which [Chapter] 93A has its roots."  *Kraft Power Corp. v. Merrill*, 464 Mass. 145, 156 (2013).

> The Massachusetts statute at issue here, Chapter 93A, straightforwardly declares that "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce are . . . unlawful."  Mass. Gen. Laws ch. 93A, § 2(a).  "[T]he intent of the legislature" is that a court hearing a Chapter 93A claim will be "guided by the interpretations given by the Federal Trade Commission and the Federal Courts to section 5(a)(1) of the Federal Trade Commission Act (15 U.S.C. [§ ] 45(a)(1)), as from time to time amended."  Mass. Gen. Laws ch. 93A, § 2(b).  The statute permits the Massachusetts Attorney General to implement "rules and regulations interpreting the provisions" of Chapter 93A, but these "shall not be inconsistent with the rules, regulations and decisions of the Federal Trade Commission and the Federal Courts interpreting the provisions of the" Federal Trade Commission Act, "as from time to time amended." Mass. Gen. Laws ch. 93A, § 2(c).

*McDermott v. Marcus, Errico, Emmer & Brooks, P.C.*, 775 F.3d 109, 116 (1st Cir. 2014) (alterations in original).  The First Circuit has found that "[i]t

follows that, because Massachusetts has folded the FTC Act into Chapter 93A, unfair or deceptive conduct that violates the FTC Act also violates Chapter 93A." *Id.* at 122.

More specific to the Attorney General's purpose, the Federal Debt Collection Practices Act (FDCPA), 15 U.S.C. § 1692, protects consumers against "abusive, deceptive, and unfair debt collection practices." 15 U.S.C. § 1692(a).[10] Similarly, "the FDCPA establishes that an unfair debt collection act in violation of the FDCPA is a *per se* violation of the FTC Act." *McDermott*, 775 F.3d at 123. "[B]ecause Massachusetts has 'wholly incorporated' the FTC Act and its interpretation into state consumer protection law, a violation of the FDCPA not only per se violates the FTC Act, it also constitutes a per se Chapter 93A violation." *Id.*[11]

---

[10] "To establish a valid claim under the FDCPA, a plaintiff must show: '(1) that [he] was the object of collection activity arising from consumer debt, (2) defendants are debt collectors as defined by the FDCPA, and (3) defendants engaged in an act or omission prohibited by the FDCPA.'" *Weiner v. Rushmore Loan Mgmt. Servs., LLC*, 327 F. Supp. 3d 268, 271 (D. Mass. 2018) (alteration in original), quoting *O'Connor v. Nantucket Bank*, 992 F. Supp. 2d 24, 30 (D. Mass. 2014).

[11] The court does note that Section 5 of the FTCA does not authorize a private right of action. *See Lee v. BAC Home Loans Servicing, LP*, 2013 WL 212615, at *4 (D. Mass. Jan. 18, 2013), citing *Holloway v. Bristol-Myers Corp.*, 485 F.2d 986, 987 (D.C. Cir. 1973) (stating that no private right of action exists under the FTCA).

The Consumer Financial Protection Act (part of the Dodd-Frank Act) also allows the Consumer Financial Protection Bureau to identify and prohibit unfair, deceptive, or abusive acts and practices by certain debt collectors.  *See* 12 U.S.C. §§ 5531, 5536.  The Telephone Consumer Protection Act (TCPA), codified at 47 U.S.C. § 227, strictly regulates calls using automated dialing technologies.   Both the Federal Communications Commission (FCC) and the Federal Trade Commission (FTC) have issued extensive regulations implementing the TCPA.  *See* 47 C.F.R. Ch. I, Subch. B, Pt. 64 (FCC); 16 C.F.R. Part 310 (FTC).

Moreover, Massachusetts has its own unfair debt collection statute, Mass. Gen. Laws ch. 93, § 49 (debt collection in an unfair, deceptive or unreasonable manner) which provides that "[n]o one who is a creditor or an attorney for a creditor, or an assignee of a creditor, of a natural person present or residing in Massachusetts who has incurred a debt primarily for personal, family or household purposes shall collect or attempt to collect such debt in an unfair, deceptive or unreasonable manner."  Under Mass. Gen. Laws ch. 93, § 24A(a), no unlicensed person may "directly or indirectly engage in the commonwealth" as a debt collector.[12]

---

[12] The Massachusetts Division of Banks (DOB)'s regulations create a licensing system for debt collectors. *See* 209 CMR 18.01(1).  Because

As is pointed out in ACA's brief, the Attorney General has issued comprehensive debt-collection regulations (*see* 940 CMR 7.00, *et seq.*), as has the DOB (*see* 209 CMR 18.00, *et seq.*).  In 940 CMR 7.04 and 7.05, the Attorney General deems abusive communications from creditors and debt collectors to be unfair or deceptive, listing representations and other communications that are deemed "unfair or deceptive."  *See also* 940 CMR 7.07.  The same regulation imposes strict requirements on creditors' and debt collectors' initial contacts with consumers and declares any deviation from those limitations to be "unfair or deceptive."  *See* 940 CMR 7.08.  The DOB's regulation 209 CMR 18.22(1) declares any violation "shall be considered an unfair or deceptive act or practice under M.G.L. ch. 93A, § 2."

DOB Regulation 209 CMR 18.16 further lists representations and communications considered "unfair or deceptive," and 209 CMR 18.14 limits the time, place, and frequency of phone calls to consumers no more than two in each seven-day period to a residential number and two per 30-day period to other numbers.  All calls must be made between 8 a.m. and 9 p.m. and debt collectors are forbidden to charge call expenses to a debtor.  *See* 209 CMR 18.14 and 18.17.  Like the FDCPA under 15 U.S.C. §

---

Massachusetts's licensed attorneys may also serve as debt collectors *see,* 209 CMR 18.02(g), § 35.04 also bans them from initiating calls.

1692e(11), and existing Attorney General regulations, the DOB requires debt collectors to disclose their identity and purpose, and inform the consumer that any information that they provide may be used to collect their debt. *See* 209 CMR 18.16(11). Like the FDCPA under 15 U.S.C. § 1692g, the DOB also requires debt collectors to send validation notices to consumers after initial contact. *See* 209 CMR 18.18.

While I laud the Attorney General's desire to protect citizens of Massachusetts during a time of financial and emotional stress created by the Covid-19 pandemic, I do not believe that the Regulation adds anything to their protections that the existing comprehensive scheme of law and regulation already affords to debtors, other than an unconstitutional ban on one form of communication.

In addition to the § 35.04 ban on all telephonic communications by certain debt collectors, the Regulation also makes the initiation of a lawsuit by these same debt collectors during the "state of Emergency Period" a *per se* violation of Chapter 93A. *See* 940 CMR 35.03. ACA argues that the moratorium on initiating debt collection lawsuits violates its members' right to petition the government by "usurp[ing] the power of the courts to decide who may and may not file petitions and who may carry out valid judicial orders for relief. And its reach extends not only to Massachusetts state

courts, but to federal courts and the courts of other states.   This is impermissible under . . . federal law."  Pl.'s Mem. at 14.  I agree.

The First Amendment provides that "Congress shall make no law . . . abridging . . . the right of the people . . . to petition the Government for a redress of grievances."   The constitutional guarantee of the right of citizen access to the courts, state and federal, has been identified by the United States Supreme Court as "among the most precious of the liberties safeguarded by the Bill of Rights."  *United Mine Workers of Am., Dist. 12 v. Illinois State Bar Ass'n,* 389 U.S. 217, 222 (1967); *see also California Motor Transp. Co. v. Trucking Unlimited,* 404 U.S. 508, 510 (1972)  ("The right of access to the courts is indeed . . . one aspect of the right of petition."); *NAACP v. Button,* 371 U.S. 415, 433 (1963) (noting that First Amendment freedoms, including the right to petition, are "delicate and vulnerable, as well as supremely precious in our society" and therefore demand exacting protection).

As reiterated by the Court most recently in *Borough of Duryea, Pa. v. Guarnieri*, 564 U.S. 379 (2011):

> This Court's precedents confirm that the Petition Clause protects the right of individuals to appeal to courts and other forums established by the government for resolution of legal disputes. "[T]he right of access to courts for redress of wrongs is an aspect of the First Amendment right to petition the government." *Sure-Tan, Inc. v. NLRB*, 467 U.S. 883, 896-897; *see also BE & K*

> *Constr. Co. v. NLRB*, 536 U.S. 516, 525 (2002); *Bill Johnson's Restaurants, Inc. v. NLRB*, 461 U.S. 731, 741 (1983); *California Motor Transport Co. v. Trucking Unlimited*, 404 U.S. 508, 513 (1972). . . . The right to petition applied to petitions from nobles to the King, from Parliament to the King, and from the people to the Parliament, and it concerned both discrete, personal injuries and great matters of state.

*Id.* at 387, 395 (alteration in original);[13] *see generally,* Benjamin Plener Cover, *The First Amendment Right to a Remedy,* 50 U. C. Davis L. Rev. 1741 (2017).

While not disputing that right of ACA members to access to the courts, the Attorney General argues that that the law nonetheless "permits measures that impose mere procedural obstacles to the vindication of substantive rights." Def.'s Opp'n at 21. She cites as examples the Prison Litigation Reform Act's (PLRA) requirements that inmates exhaust available administrative remedies before filing a lawsuit in federal court (i.e., prisoner must complete an application to qualify for *in forma pauperis* status or to request court permission prior to filing a new lawsuit if previously deemed a vexatious filer. *See Rivera v. Allin*, 144 F.3d 719, 725 (11th Cir. 1998) (the

---

[13] The final sentence of this paragraph reflects the majority's rejection of Justice Scalia's view that the right to petition the courts is not, as a matter of historical precedent, "a constitutionally protected" right. *Id.* at 403 (Scalia, J., concurring in part). However, Justice Scalia acknowledges that there are scholars of the common law who disagree with his view. *See id.* at 404.

PLRA disqualification of some inmates from *in forma pauperis* status does not infringe the right of petition because it is "purely procedural" and "in no way prescribe[s] rules of decision"). Putting aside the fact that prisoners enjoy fewer constitutional protections than ordinary citizens, *see, e.g., Overton v. Bazzetta*, 539 U.S. 126, 133-135 (2003), the PLRA does not divest an inmate of any remedies at all, it simply requires a resort to administrative remedies before invoking judicial relief. The analogy, in other words, does not fit.

The Attorney General argues, as with the ban on telephonic communication, that the Regulation is temporary and as "[a]ll state statutes of limitation have been tolled, . . . no creditor will find itself without legal recourse for recovery of alleged debts. . . . Thus, the effect of § 35.03 is merely to delay a creditor's day in court, while temporarily protecting consumers from a method of debt collection that is uniquely threatening under the circumstances of the pandemic." Def.'s Opp'n at 22.[14] However, as the Court recognized in the *Blaisdell* mortgage case on which the Attorney General relies, the mere fact of an emergency does not increase constitutional power,

---

[14] At oral argument, the Attorney General essentially conceded that the 90-day period is a matter of grace, not right, and that the Regulation may well be extended should she deem the present emergency to be ongoing.

nor diminish constitutional restrictions.[15]  Unlike § 35.03, the Minnesota law specified that "relief may be had through authorized judicial proceedings with respect to foreclosures of mortgages, and execution sales, of real estate; that sales may be postponed and periods of redemption may be extended." *Blaisdell*, 290 U.S. at 416.[16]  In the *Blaisdell case*, the Minnesota trial court

---

[15]  Specifically, the Court stated that

> [e]mergency does not create power.  Emergency does not increase granted power or remove or diminish the restrictions imposed upon power granted or reserved.

Blaisdell, 290 U.S. 425.  Moreover,

> Constitutions can not be changed by events alone.  They remain binding as the acts of the people in their sovereign capacity, as the framers of Government, until they are amended or abrogated by the action prescribed by the authority which created them. It is not completent [*sic*] for any department of the Government to change a constitution, or declare it changed, simply because it appears ill adapted to a new state of things.

*Id.* at 451, (Sutherland, J., dissenting), quoting *People ex rel. Twitchell v. Blodgett*, 13 Mich. 127, 139 (1865).

[16]  Invoking the relevant provision of the statute, John Blaisdell and his wife asked the district court of Hennepin County to extend the period of redemption from a foreclosure sale to provide them additional time to get a loan (made nearly impossible by the Great Depression).  The Association objected to the introduction of evidence asserting that the statute was unconstitutional.  The motion was granted, and a motion for a new trial was denied.  On appeal, the Minnesota Supreme Court reversed the district court's decision and remanded.  *See Blaisdell v. Home Bldg. & Loan Ass'n*, 189 Minn. 422 (1933).  Evidence was then taken in the trial court, and the court made detailed findings of fact.  The court then entered judgment

took evidence and issued a judgment after the Minnesota Supreme Court

remanded the case requiring it to do so.[17]

## Irreparable Harm

As the court has previously noted, a finding of a First Amendment

violation obviates the need for an additional showing of irreparable harm.

*See Sindicato Puertorriqueño de Trabajadores,* 699 F.3d at 10-11.[18]

---

extending the period of redemption to May 1, 1935, subject to the condition that the Blaisdells should pay the Association $40 a month through August, September, and October of 1933, that the payments should be $80, in two installments, and thereafter $40 a month, with all these amounts to go to the payment of taxes, insurance, interest, and mortgage indebtedness. This judgment was sustained by the Minnesota Supreme Court. *See Blaisdell v. Home Bldg. & Loan Ass'n,* 189 Minn. 448 (1933).

[17] The Attorney General also cites to federal legislation imposing a 60-day moratorium on filing judicial foreclosure proceedings against a federally-backed mortgage loan (FBML) and a 120-day moratorium on the filing of eviction actions where the leased property participates in a specified federal program or has a federally-backed mortgage loan. *See* Coronavirus Aid, Relief, and Economic Security Act (CARES) Act, P.L. 116-136, 134 Stat. 281, § 4022(c)(2) and § 4024(b)(1) (Mar. 27, 2020). First, unlike the debts subject to 940 CMR 35.03, the federal government is the sponsor or underwriter of the loans, and this section of CARES applies only to servicers of 1-4 family FMBLs (with no application to 5-family or more). *See id.* §§ 4022(a)(2), 4024(a)(4)(A). Second, the federal government permits multifamily landlords whose properties are financed with a Freddie Mac Multifamily to defer federal loan payments for 180 days (and up to one year) by showing hardship because of COVID-19. *See* §§ 4022(b), 4022(c)(1).

[18] ACA contends that its members, including some in Massachusetts, have been directly harmed by the Regulation, which prohibits them from any telephonic contact with consumers concerning their core business of debt collection. To cite two exemplars, PRA states that its March revenues were down 36% from the prior March, projects that April will be down 50%

**Balance of the Equities; Public Interest**

Given the plethora of protection provided to debtors by the laws and regulations the court has previously cited, the interest a debtor may have in the Regulation may not weigh as heavily as the threat of extinction faced by smaller collection agencies who have been effectively put out of business.  Of perhaps greater concern is the impact the Regulation may have on hospitals and utilities who depend on collection agencies to remain solvent.  Finally, the court recognizes the argument advanced by ACA that a capitalist society has a vested interest in the efficient functioning of the credit market which depends in no small degree on the ability to collect debts.[19]

ORDER

For the foregoing reasons, the court hereby enters a temporary restraining order enjoining the Attorney General from enforcing the provisions of the Regulation that ban telephonic communications initiated by the defined debt collectors with consumers in connection with the

---

compared last year, and reports that it has lost its major client because of the Regulation.  Terrasi Aff. ¶ 6; Compl. ¶¶ 52-54.  All Debts Solution (ADS), another ACA member from Massachusetts, "estimates that it will lose 60 to 70% of its revenue as a result of the Regulation."  Compl. ¶ 59.

[19] The Massachusetts Division of Banks has declared collection agencies "essential businesses," presumably with the expectation that they will keep their doors open and staff employed.

payment of a debt that is due and owing (the entirety of 940 CMR 35.04).
The court also enjoins the Attorney General from enforcing 940 CMR 35.03
in so far as it bars the defined debt collectors from bringing enforcement
actions in the state and federal courts of Massachusetts.  This Order is
intended to have no impact on any other law or regulation regarding debt
collection that is now in force.

SO ORDERED.

/s/ Richard G. Stearns
UNITED STATES DISTRICT JUDGE